ORIGINAL

FILED
NOV 5 2003
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ENTERGY NUCLEAR GENERATION COMPANY, Plaintiff, v. THE UNITED STATES, Defendant. | No.: 03-2626C<br>Judge: Lettow |

## COMPLAINT

Entergy Nuclear Generation Company ("ENGC") for its complaint in this action, alleges as follows:

## NATURE OF THE CASE

1. ENGC brings this lawsuit to recover significant damages caused by the Department of Energy's ("DOE") material partial breach of its unconditional obligation to begin disposing of spent nuclear fuel and high level nuclear waste (collectively, "SNF") generated by the commercial nuclear power plant owned by ENGC. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 et seq. ("NWPA"), DOE and ENGC's predecessor – Boston Edison Company ("BECO") – entered into a contract in 1983 under which ENGC and BECO have paid and ENGC continues to pay substantial fees in return for DOE's obligation to remove and dispose of SNF beginning no later than January 31, 1998. ENGC and BECO fully complied with the fee payment obligations under the contract. DOE, however, has failed to perform its reciprocal obligation to dispose of SNF, and has stated that it will not do so until 2010 at the earliest. ENGC has incurred and will continue to incur significant costs associated

with procuring additional SNF storage capacity and other damages as a result of DOE's total disregard of its contractual obligations.

## PARTIES

2. ENGC is the owner of the Pilgrim Nuclear Power Station ("Pilgrim") located in Plymouth, Massachusetts, for which the Atomic Energy Commission ("AEC") issued a license in 1972. The Pilgrim plant has generated and continues to generate SNF, which is stored at the plant site. BECO, ENGC's predecessor, entered into a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract") with DOE pursuant to which DOE is to accept and dispose of the SNF generated by the Pilgrim plant in return for payment of specified fees by the owner. ENGC completed the purchase of the Pilgrim plant from BECO on July 13, 1999. By letter dated July 13, 1999 and in accordance with Article XIV of the Standard Contract, BECO notified DOE that it had assigned the Standard Contract covering the Pilgrim plant to ENGC.[1]

3. Defendant is the United States of America, acting through DOE.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(a)(1).

5. DOE's complete failure to comply with its essential contractual obligation to begin disposing of SNF by January 31, 1998 constitutes a material partial breach of its Standard Contract with ENGC, for which ENGC may seek recovery of its damages without exhausting any administrative remedies. In companion decisions handed down on August 31, 2000, the Federal Circuit has conclusively rejected the Government's exhaustion of remedies jurisdictional

---

[1] BECO also has brought in this court a case "directly-related" to the instant case. See RCFC 40.2(a). BECO's complaint includes claims based on the same Standard Contract currently held by ENGC. See Boston Edison Co. v. United States, No. 99-447C (Complaint Filed July 12, 1999) (Lettow, J.).

defense. See Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000) ("Northern States"); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000) ("Maine Yankee").

6. Furthermore, Article XI of the Standard Contract states, "Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Pursuant to this provision, ENGC is entitled to pursue its legal claims without exhausting any administrative remedies.

## FACTUAL BACKGROUND

### The Standard Contract

7. In 1982, Congress enacted the NWPA, codifying the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of commercial SNF. Pursuant to Section 302(a)(5)(B) of the NWPA, 42 U.S.C. § 10222(a)(5)(B), DOE was required to commence disposing of commercially-generated SNF no later than January 31, 1998, in return for the payment of fees by utilities and others that generated or held title to the SNF. The fees are paid into the Nuclear Waste Fund, which is the source of funds to cover DOE's costs for disposing of SNF.

8. Pursuant to Section 302 of the NWPA, in 1983 DOE developed the Standard Contract. The Standard Contract embodies the reciprocal obligations mandated by the NWPA, pursuant to which contract holders agree to pay fees into the Nuclear Waste Fund in return for the provision of SNF disposal services by DOE, beginning no later than January 31, 1998. See 10 C.F.R. Part 961.11. Specifically, the Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." 10 C.F.R. § 961.11, Art. II.

9. BECO – predecessor owner of the Pilgrim plant – executed its Standard Contract with DOE on June 17, 1983. As noted above, on July 13, 1999, ENGC purchased the Pilgrim plant from BECO. To date, BECO and ENGC together have paid more than $109 million into the Nuclear Waste Fund pursuant to this contract and ENGC continues to pay fees of approximately $5 million per year.

**DOE's Anticipatory Breach of the Contractual Deadline**

10. Notwithstanding the obligation imposed upon DOE by the Standard Contract, DOE failed to meet most of the early milestones established by the NWPA. These early failures eventually led to problems further along the program schedule, particularly in establishing the geologic repository called for by the NWPA. At the same time, however, DOE continued to make commitments and representations that it would begin to dispose of SNF by the 1998 deadline.

11. For example, in a September 7, 1984 letter by Donald P. Hodel, then Secretary of Energy, to United States Senator J. Bennett Johnston, Secretary Hodel stated, "Pursuant to my authority, it is my intention that this commitment together with the overall thrust of the [NWPA], will create an obligation for [DOE] to accept spent fuel in 1998 whether or not a repository is in operation."

12. Similarly, in its 1987 Mission Plan Amendment, DOE announced that the geologic repository called for by the NWPA would not be available until 2003. DOE indicated, however, that it would be able to begin accepting SNF by 1998 at a Monitored Retrievable Storage ("MRS") facility designed to store SNF until commencement of repository operations.

13. Congress substantially amended the NWPA in 1987. As amended, the NWPA required DOE to focus its entire repository development effort on characterizing Yucca Mountain, Nevada, one of the earlier-identified candidate sites, to determine its suitability as the

nation's first geologic repository. 42 U.S.C. § 10133. Congress also authorized DOE to construct a MRS but did not name a specific site. Rather, the NWPA provided two different options for siting a MRS. Under the first option, a MRS could be sited through the efforts of the Nuclear Waste Negotiator, an Executive Branch position created by the 1987 Amendments. 42 U.S.C. §§ 10242-10249. Under the second option for MRS siting, DOE was authorized to site and develop a MRS on its own, but on a schedule that was linked by the NWPA to the development of the repository. 42 U.S.C. §§ 10165(b), 10168(d).

14. By 1987, the repository program was more than ten years behind schedule. Despite the fact that, in less than five years, the repository program had fallen ten years behind schedule, DOE relied solely on the efforts of the Nuclear Waste Negotiator for development of the MRS. DOE did not develop any contingency plans for meeting the January 31, 1998 deadline in the event that the Negotiator was unsuccessful, a state of events that continued even after the Negotiator's authority expired with the unsuccessful completion of his mission. Not surprisingly, DOE's waste disposal program fell further behind schedule.

15. In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation") wherein DOE retreated from its earlier acknowledgments that it had an unconditional obligation to begin disposing of SNF by January 31, 1998. 60 Fed. Reg. 21973, 21974 (May 3, 1995). In its Final Interpretation, DOE stated that, since passage of the NWPA, it "has become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998," and that it would commence disposing of SNF at a repository by 2010 at the earliest. 60 Fed. Reg. at 21794. The Final Interpretation also stated DOE's conclusion that the NWPA does not impose an obligation on DOE to commence disposing of contract holders' SNF in 1998 in the absence of a disposal or interim storage facility. Id. at 21794-95.

**DOE's Breach of its Contractual Obligation**

16. Various utilities filed petitions for review of the Final Interpretation in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit ruled in favor of the petitioners and held that the NWPA imposed on DOE an unconditional obligation to begin disposing of SNF by January 31, 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996). The Court further held that this obligation was reciprocal to the utilities' obligation to pay fees into the Nuclear Waste Fund. The Court remanded the matter to DOE for proceedings consistent with the opinion.

17. Notwithstanding the D.C. Circuit's unequivocal ruling, DOE advised Standard Contract holders that it would not begin to dispose of SNF by the January 31, 1998 deadline. Specifically, DOE announced in a December 17, 1996 letter to contract holders "that DOE anticipates it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." DOE further took the position that its failure to meet the deadline was excused because its delay was unavoidable.

18. In response to DOE's recalcitrance, various utilities filed another petition with the D.C. Circuit for a writ of mandamus to compel DOE to comply with the mandate in Indiana Michigan. In Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997) ("Northern States I"), the D.C. Circuit reiterated that DOE had an unconditional obligation under both the NWPA and the Standard Contract to begin disposing of utilities' SNF by January 31, 1998. The Court also held that DOE had a clear duty to act in accordance with this unconditional obligation and issued a writ of mandamus precluding DOE from arguing that its failure to meet the January 31, 1998 deadline was unavoidable. On November 30, 1998, the United States Supreme Court denied DOE's petition for a writ of certiorari in the Northern States I case, 525 U.S. 1016 (1998).

19. Despite the ruling in Northern States I, DOE made no effort to meet the contractual deadline. DOE did not begin to dispose of SNF by January 31, 1998, as required by the NWPA and Standard Contract, and has maintained the position announced prior to the D.C. Circuit's rulings that it will not begin to dispose of SNF until 2010 at the earliest. DOE has failed and refused to provide any firm commencement date for the disposal of ENGC's SNF.

20. In Maine Yankee, decided by the Federal Circuit on August 31, 2000, the Federal Circuit concluded that DOE's admitted failure to begin accepting spent nuclear fuel by the January 31, 1998 contractual deadline constituted a breach of the Standard Contract. In the companion Northern States case, the Federal Circuit held that the unavoidable delays provision of the contract "does not bar a suit seeking damages for the Government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." Northern States, 224 F.3d at 1367. In summary, the Federal Circuit has determined as a matter of law that DOE breached the contract and that ENGC and other similarly situated utilities that are parties to a Standard Contract can bring an action for breach of contract damages in this Court.

**Nature of Damages Sustained by ENGC as a Result of DOE's Breach**

21. As a direct consequence of DOE's disregard of its contractual obligations and defiance of the D.C. Circuit's rulings, ENGC has been and will be forced to incur substantial additional costs to provide for extended on-site storage of its SNF. Moreover, ENGC has incurred and will continue to incur other substantial damages, including but not limited to regulatory costs associated with efforts to ensure sufficient on-site storage capacity or alternative off-site storage capacity to permit continued operation of its nuclear plant.

## CLAIMS FOR RELIEF

## COUNT I

**(Partial Breach of Contract)**

22. Paragraphs 1 through 21 are incorporated herein by reference as if set forth in full.

23. ENGC and its predecessor – BECO – have complied and ENGC continues to comply with all of its obligations under the Standard Contract, including the payment of all required fees into the Nuclear Waste Fund.

24. DOE has failed to perform its obligation under the Standard Contract to dispose of SNF beginning no later than January 31, 1998, and thereby has partially and materially breached the Standard Contract.

25. As a direct and proximate result of DOE's partial breach of the Standard Contract, ENGC has incurred and will incur damages in an amount to be determined at trial. The rate at which ENGC's damages will continue to accrue is dependent upon various factors including but not limited to when DOE commences performance of its contractual obligations, and ENGC reserves all rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches of the Standard Contract.

## COUNT II

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

26. Paragraphs 1 through 25 are incorporated herein by reference as if fully set forth in full.

27. The Standard Contract between ENGC and DOE contains an implied covenant of good faith and fair dealing, pursuant to which DOE has a duty to perform its obligations under the contract in good faith and not to take actions detrimental to ENGC's contractual rights. DOE

has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF; by steadfastly attempting to avoid its obligations under the contract as defined by the D.C. Circuit; by failing to make any effort to dispose of ENGC's SNF or even to provide ENGC with a firm date on which DOE will begin to do so; and by insisting on ENGC's continued performance of its reciprocal obligation to pay fees into the Nuclear Waste Fund despite DOE's refusal to perform.

28. DOE's failure to act has not been the result of inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been well below the level of annual receipts into the Nuclear Waste Fund. There are ample funds available to DOE to comply with its contractual obligations.

29. In contrast to DOE's failure to take any action to meet its contractual commitments, DOE has taken action to receive, transport, and store SNF from other entities. For example, DOE has accepted and continues to store SNF from foreign research reactors.

30. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, ENGC has suffered and will continue to suffer damages as alleged above.

## COUNT III

### (Taking Without Just Compensation)

31. Paragraphs 1 through 30 are incorporated herein by reference as if set forth in full.

32. Based on its long standing commitment to dispose of SNF, which was codified with a date certain in the NWPA, the Government was and is unequivocally obligated under the Standard Contract and NWPA to commence acceptance and disposal of ENGC's SNF no later than January 31, 1998.

33. The Government's failure and refusal to comply with the requirements of the Standard Contract for acceptance and disposal of ENGC's SNF constitutes a taking of ENGC's vested real property rights. For example, the Government's failure to honor its commitments under the Standard Contract will prevent ENGC from being able to decommission its nuclear plant site and devote this site to commercial uses as soon as it otherwise would have been able to do so. The Government's conduct has deprived, and will continue to deprive, ENGC of the full valuable economic use of its site, as well as the real property on which the SNF is stored and from which it cannot lawfully be removed.

34. ENGC is entitled to just compensation for this taking of ENGC's real property in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ENGC respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(a) On Count I, for damages in an amount to be established at trial;

(b) On Count II, for damages in an amount to be established at trial;

(c) On Count III, for damages in an amount to be established at trial;

(d) Pre-judgment and post-judgment interest as permitted by law;

(e) Costs of suit, including reasonable attorneys' fees as permitted by law; and

(f) Such other and further relief as this Court may deem proper.

Dated: November 5, 2003

Respectfully submitted,

Alex D. Tomaszczuk
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7940 – telephone
(703) 770-7901 – facsimile

Counsel of Record for Plaintiff
Entergy Nuclear Generation Company

*Of Counsel*:
Jay E. Silberg
Devon E. Hewitt
Daniel S. Herzfeld
Jack Y. Chu
SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000

John M. Fulton
Assistant General Counsel
Entergy Nuclear Generation Company
440 Hamilton Avenue
Mail Stop 12A
White Plains, NY 10601

Document #: 1257195 v.1