IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENTERGY NUCLEAR GENERATION COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2626C |
| v. | ) | (Judge Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant, the United States, respectfully requests that the Court deny the motion for summary judgment on liability filed by plaintiff, Entergy Nuclear Generation Company ("ENG") in this case. Additionally, defendant respectfully requests that the Court grant the Government's cross-motion for summary judgment on liability. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by ENG in this case.

STATEMENT OF THE ISSUES

1. Whether ENG has standing to assert liability against the Government based upon alleged breaches that occurred prior to its assignment of the Standard Contract on July 13, 1999.

2. Whether the Department of Energy's liability to ENG should be established the date of DOE's first post-assignment approved scheduled acceptance of spent nuclear fuel ("SNF") and/or high-level waste ("HLW"), as identified in an approved delivery commitment schedule ("DCS").

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

## SUMMARY OF ARGUMENT

ENG claims that the Government "breached ENG's Standard Contract when it failed to begin disposal of ENGC's and other utilities' spent nuclear fuel on January 31, 1998." Motion, at 1-2 (May 28, 2004). Consequently, ENG seeks the entry of an order establishing DOE's liability as of January 31, 1998. Id. However, ENG's request is improper for two independent reasons.

First, ENG was not a party to the Standard Contract on January 31, 1998. Indeed, on July 13, 1999, the original contract holder, Boston Edison Company ("BECO"), assigned the Standard Contract to ENG. The Department of Energy had no obligation to accept any of ENG's SNF and/or HLW until some time after the date of the assignment. Consequently, ENG lacks standing to contend that the Court should enter an order on liability as of January 31, 1998.

Second, under the terms of the Standard Contract, DOE was not obligated to accept SNF from every Standard Contract holder on January 31, 1998. Instead, as discussed below, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract holders, including the specific amounts of SNF and/or HLW that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. BECO, the original contract holder with DOE, acted in accordance with the Standard Contract's contractual mechanism for creating these specific acceptance obligations, submitting delivery commitment schedules ("DCSs") to DOE that DOE subsequently approved.

Under this contractual mechanism, the 1999 or, alternatively, the 2000 delivery commitment schedule ("DCS") is the first approved schedule upon which ENG could potentially be entitled to rely as an assignee to the Standard Contract. See A. 254, 257. Because the DCS allows DOE to accept the SNF identified in that DCS at a point between January 31 of one year and January 30 of the following year, the earliest partial breach that could run to ENG would be January 30, 2000 (under the 1999 DCS, if that DCS applies to ENG) or January 30, 2001 (under the 2000 DCS). As the Court is aware, the Government has filed a motion for summary judgment in Boston Edison Co. v. United States, No. 99-447C (Fed. Cl.), seeking resolution of whether it is BECO or, rather, ENG that has standing to maintain a claim regarding DOE's inability to accept SNF under BECO's 1999 DCS. The resolution of that motion should govern the determination of the Government's obligations to ENG here. In any event, however, ENG cannot claim a breach of the Standard Contract on January 31, 1998, given that it was not a contract holder at that time and given that its assignment does not purport to assign pre-assignment claims to ENG.[1]

## ARGUMENT

### I. THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is an acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v.

[1] We do not contend that BECO would be entitled to assign claims that arose prior to its contract assignment to ENG. However, because the language of BECO's contract assignment expressly excludes claims that arose prior to the BECO-ENG contract assignment, see A. 378 ("sale includes the transfer and assignment of Boston Edison's rights and obligations under the captioned contract, with the exception of any claims against the Department of Energy accrued prior to the date of transfer"), we need not address whether assignment of claims under the Standard Contract would be permissible.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c). In this case, there is no dispute over any facts that could preclude the Government's entitlement to summary judgment upon the issue presented here.

## II. ENG HAS NO BASIS UPON WHICH TO CLAIM LIABILITY AGAINST THE GOVERNMENT FOR BREACH OF CONTRACT PRIOR TO JULY 13, 1999, BECAUSE ENG WAS NOT A PARTY TO THE STANDARD CONTRACT UNTIL THAT TIME

### A. ENG Has The Burden Of Establishing Its Standing

ENG's motion for summary judgment on liability is premised upon the assumption that DOE's partial breach of the Standard Contract resulting from DOE's failure to begin SNF acceptance by January 31, 1998, automatically created an injury-in-fact to each and every member of the commercial nuclear utility industry. However, ENG overlooks the fact that it had absolutely no rights under or interest in the Standard Contract prior to the assignment by BECO of its contractual rights to ENG. Consequently, prior to July 13, 1999, DOE's contract was with

BECO, and DOE's only obligations were to BECO. ENG consequently lacks standing to assert DOE's liability for alleged breaches that occurred prior to that date.

The "irreducible constitutional minimum" of standing places the burden upon the plaintiff to establish each of three elements: (1) a "concrete and particularized" injury in fact that is "not conjectural or hypothetical;" (2) a causal connection between the alleged violation and the injury; and (3) the ability of the court to redress the injury by a favorable decision:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends Of The Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000) (citations omitted); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (complainant bears the burden of establishing all three elements of standing). "The plaintiff has the burden to 'clearly and specifically set forth facts sufficient to satisfy [] Art. III standing requirements.'" Miccosukee Tribe of Indians v. Florida State Athletic Comm'n, 226 F.3d 1226, 1230 (11th Cir. 2000) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)); see White's Place, Inc. v. Glover, 222 F.3d 1327, 1329 (11th Cir. 2000) (plaintiff has the burden "to allege and then to prove facts sufficient to support jurisdiction"). "If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." Miccosukee Tribe, 226 F.3d at 1230.

To satisfy the injury-in-fact requirement, the plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotations and citations omitted). Injury-in-fact, like the other elements of standing, "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of litigation." Id. at 561.

B. ENG Cannot Satisfy Its Burden Of Establishing That It, Rather Than The Company That Assigned Its Contract To ENG, Has Suffered An Injury-In-Fact Prior To July 13, 1999

On July 13, 1999, BECO assigned its contract for the Pilgrim nuclear reactor to ENG. In its letter notifying DOE of its assignment of the Standard Contract to ENG, BECO stated that BECO "has, effective July 13, 1999, consummated the sale of Pilgrim Nulcear Power Station to Entergy Nuclear Generation Company, and that such sale includes the transfer and assignment of [BECO's] rights and obligations under the captioned contract, with the exception of any claims against the Department of Energy accrued prior to the date of transfer." A. 378 (emphasis added).[2]

Under these circumstances, ENG has no standing to assert that the Government is liable for any alleged breaches that occurred prior to July 13, 1999. The existence of a breach of contract is but one element of the issue of liability. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) ("Plaintiff requested a judgment finding in Plaintiff's favor on the issue of liability and not merely a component element of that issue (whether there was a breach)"); Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are

[2] BECO also has sued the Government seeking damages for breach of the Standard Contract, No. 99-447C (Fed. Cl.) (Lettow, J.).

necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd on reh'g en banc, 64 F.3d 1531 (Fed. Cir. 1995), aff'd, 518 U.S. 839 (1996) (emphasis added).

The Court of Claims has recognized that, before a Government contractor is entitled to judgment on entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions: "Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so . . . ." Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977);[3] see Cosmo Constr. Co. v. United States, 451 F.2d 602, 605 n.3 (Ct. Cl. 1971) ("A wrong done, but from which no loss or damage results . . . will not sustain an action.") (citation omitted). In an action involving issues of both entitlement and quantum, "evidence on damages or quantum is not totally excluded [from consideration of entitlement], because there must be some evidence of damage to support a finding on liability. . . . sufficient to demonstrate that the issue of liability is not purely academic." Id. at 605-06.

Here, ENG could not have suffered an injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998, as ENG was not assigned BECO's rights under the Standard Contract until July 13, 1999. Instead, any injury that ENG incurred necessarily would result from DOE's failure to accept ENG's SNF at some point after the date of assignment, and as provided for by approved delivery commitment schedules.

---

[3] Although Westlaw states that this is an unpublished disposition, the opinion is actually published in the United States Court of Claims Reports. See 215 Ct. Cl. at 976.

Consequently, ENG has no basis for arguing that DOE had an obligation to accept SNF and/or HLW by January 31, 1998, or that such an alleged breach of this obligation caused it to incur damages.

## III. DOE's OBLIGATION TO BEGIN ACCEPTANCE OF ENG'S SNF AND/OR HLW BEGAN NO EARLIER THAN THE 1999 DCS, NOT IN 1998, AND, THEREFORE, A FINDING OF LIABILITY PRIOR TO JANUARY 30, 2000, AT THE EARLIEST, IS INAPPROPRIATE

### A. The Delivery Commitment Schedules That BECO Submitted To DOE And That DOE Approved Constitute Binding Commitments That Provide A Contractual Basis For Determining Liability In This Case

In addition to the fact that ENG lacks standing to assert liability against the Government prior to July 13, 1999, the delivery commitment schedules submitted by BECO, and subsequently approved by DOE, establish that DOE's first post-assignment obligation to accept SNF and/or HLW would have occurred between January 31, 1999 and January 30, 2000. Although ENG claims that DOE's delay in beginning SNF acceptance by January 31, 1998, constitutes a partial breach of the Standard Contract, that breach, in and of itself, does not render DOE liable to ENG. Nor does it establish that ENG has incurred any damages as a result of DOE's alleged breach of the Standard Contract. Instead, DOE's contractual liability arises from its inability to accept SNF identified in an approved DCS and final delivery schedule.

The Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, timely to submit a delivery commitment schedule ("DCS") to DOE at least 63

months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance

that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in

writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. The Standard Contract requires that, beginning January 1, 1992, the contract holder "shall submit to DOE the [delivery commitment schedules] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Further, the Standard Contract

defines the scope of the Standard Contract as relating to the acceptance by DOE of SNF "specified in a delivery commitment schedule as provided in Article V below." Id. § 961.11, Art. II. Until a contract holder submits a DCS for a particular year, DOE cannot approve a specific delivery commitment to that contract holder for that year. See id. § 961.11, Art. V.B.1. Accordingly, absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree

upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[4] Id.

In this case, BECO followed the procedures described above in submitting DCSs. Indeed, DOE approved DCSs that BECO submitted for acceptance of SNF from BECO in 1999, 2000, and 2001. As discussed above, BECO sold its Pilgrim plant and assigned its DOE contract to ENG on July 13, 1999. Therefore, prior to this date, DOE was not obligated to accept any SNF from ENG. Rather, at most, any obligations that DOE had to accept SNF under the terms of the Standard Contract that ENG now holds ran to BECO, not to ENG. Although we have argued in the Boston Edison case that the first "partial breach" of the Standard Contract that runs to the contract holder under the contract at issue in this case should be viewed as January 30, 2000, that motion is awaiting the completion of briefing and decision. Once that motion is decided, it should be clear when DOE's obligation to ENG began. However, regardless of the resolution of that motion, it is clear that DOE's liability to ENG did not begin on January 31, 1998. Consequently, the entry of liability as of January 31, 1998 is inappropriate under the circumstances of this case, and ENG's motion for summary judgment should be denied.

[4] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

B. Other Decisions Of This Court, Finding That The Delivery Commitment Schedule Provisions Of The Standard Contract Do Not Define The Parties' Delivery And Acceptance Obligations Under The Contract, Render The Contract's Schedule Terms Meaningless And Render The Contract Too Indefinite To Enforce

As the Court is aware, this Court has issued two published decisions and two unpublished decisions resolving motions regarding the effect of the DCSs in the cases in which they were issued. In those cases, the Court has either determined that the DCSs are meaningless or have reserved the issue for trial. However, with all due respect, the Court's decisions in those cases do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract.

The Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), the rationale of which the Court adopted by unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.), and Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. April 7, 2004) (Merow, S.J.), rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court did not explain – from a practical standpoint – the manner in which SNF acceptance would, could, or will work absent reference to that schedule mechanism. Finding that the delivery commitment schedule ("DCS") process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify the Department of

Energy ("DOE") of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the ComEd Court failed to explain how, given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further, would make the Standard Contract virtually impossible to perform. As previously discussed, the Court should find that the DCS provisions in the Standard Contract have meaning and, given that they provide the sole means of establishing workable and practical SNF acceptance schedules, provide the basis for establishing the acceptance schedule for use in establishing damages in these cases.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that

focuses upon the wrong question. The issue presented in Indiana Michigan required a determination of the rate of SNF acceptance that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. As we establish in our motion, there is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by DOE that it was contractually binding itself to such an obligation. In fact, as discussed in our motion, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to place any such requirement in the Standard Contract. Further, the Indiana Michigan Court's finding that a "3,000-ton annual rate of delivery" is a reasonable term simply to insert into the Standard Contract has no basis and, in any event, cannot be done in a

summary judgment proceeding. Not only does it ignore the DCS process and the agreements that DOE and numerous utilities had already made, it creates a contract to which the parties had never agreed.

In fact, the trial court's decisions in all four cases eliminate the existing schedule terms from the Standard Contract, leaving the Standard Contract with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW or for allowing DOE, assuming that SNF acceptance had timely begun, to identify the SNF that it would need to accept, the dates on which it would need to accept it, and the locations at which it would need to accept. In essence, the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id. Here, the trial court in the ComEd, Indiana, and Yankee cases has eliminated the contract's own schedule mechanism and substituted, or will have a trial through which it intends to substitute, a schedule term that the Court thinks would be reasonable. Yet, the acceptance schedule that the Court in Indiana Michigan selected for the contract is not based upon any information or language in the contract itself. To the contrary, the Court dismissed any reliance upon the agreements regarding schedule that the parties had already made, as identified in approved DCSs. Instead, the Court simply inserted its own term into the Standard Contract.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement on "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such

importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif Assocs. v. United States, 226 Ct. Cl. 372, 376, 644 F.2d 4, 7 (1981). However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract, which, instead, was a 20-year lease of floor space in an office building. Here, the "missing" term that the plaintiff seeks to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiff could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court imposes into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the Government's arguments that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of what a reasonable schedule term should be. A rejection of the Government's schedule

arguments would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[5]

As established above, the Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. The parties followed that mechanism for a significant period of time. Further, DOE published its Acceptance Priority Ranking and Annual Capacity Report, which identified the acceptance schedule for the first ten years of contract performance. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis for the Court to impose its own schedule into this contract. It is beyond dispute that DOE was not obligated to accept SNF from every Standard

---

[5] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not empower the Court to supply essential missing terms if the parties fail to reach an agreement following good faith negotiations. In any event, it does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

Contract holder by January 31, 1998. Other than through the DCS process, ENG cannot identify any specific acceptance obligation, with identification of a specific date by which DOE had to begin acceptance of SNF that ran directly to ENG. Because DOE had no obligation to accept any SNF from ENG until after BECO had assigned its contract to ENG and the next due date for acceptance of SNF under that contract arose, the entry of an order finding DOE liable to ENG as of January 30, 1998 is inappropriate.

CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion for summary judgment on liability and grant the Government's cross-motion for summary judgment on liability.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

July 29, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on July 29, 2004, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.