IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENTERGY NUCLEAR GENERATION COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2626C |
| v. | ) | (Judge Lettow) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Defendant, the United States, respectfully submits this reply to "Plaintiff's Reply In Support Of Its Motion for Summary Judgment On Liability And Response In Opposition To The Defendant's Cross-Motion For Summary Judgment On Liability," dated September 13, 2004.

## DISCUSSION

### I. ENTERGY HAS IDENTIFIED NO BASIS UPON WHICH BREACH OR LIABILITY TO ENTERGY COULD EXIST PRIOR TO BOSTON'S ASSIGNMENT OF THE CONTRACT TO ENTERGY

As we explained in our cross-motion, Boston Edison Company ("Boston") assigned the contract at issue in this case to plaintiff, Entergy Nuclear Generation Company ("Entergy"), on July 13, 1999. Entergy is seeking a ruling that the Department of Energy ("DOE") breached the contract at issue here on January 31, 1998, approximately one-and-a-half years before Entergy obtained the contract through assignment, even though Boston's assignment (as it could not) did not include the assignment of any pre-July 13, 1999 claims. Entergy has not identified any judicial precedent recognizing the ability of a contract assignee, where there had been no assignment of pre-existing claims, to seek a breach or liability ruling that preceded its contract assignment. Entergy attempts to argue that its contract assignment included the right to pursue

some, but not all, claims that pre-existed the actual contract assignment. However, the assignment expressly declined to assign Boston's right to assert any pre-assignment claims: "[e]xcepting and reserving to the Assignor, however, any and all claims of Assignor related or pertaining to the Department of Energy's defaults under the DOE Contract accrued as of July 13, 1999 . . . ." Def. App. 379;[1] see Def. App. 378 (notifying DOE of assignment of contract, "with the exception of any claims against the Department of Energy accrued prior to the date of transfer").[2] Accordingly, Entergy has identified no basis upon which it can claim it was assigned Boston's pre-existing claims.

Further, and importantly, Boston was statutorily barred from assigning any pre-existing damages claims. The Assignment of Contracts Act ("Contracts Act"), 41 U.S.C. § 15, generally governs and limits the ability of Government contractors to assign their contracts without the Government's consent, while the Assignment of Claims Act ("Claims Act"), 31 U.S.C. § 3727, generally governs and limits the ability of Government contractors to assign their claims against the Government. The Nuclear Waste Policy Act, 42 U.S.C. § 10222(b)(3), creates an exception

---

[1] "Def. App. __" refers to the appendix accompanying defendant's July 29, 2004 response to plaintiff's motion for summary judgment on liability and cross-motion for summary judgment on liability. "Def. Br. __" refers to defendant's July 29, 2004 response and cross-motion. "Pl. Br. __" refers to plaintiff's reply to defendant's response to plaintiff's motion for summary judgment on liability and response to defendant's cross-motion, dated September 13, 2004. "Pl. App. _" refers to the appendix to that brief. "Def. Reply App. __" refers to the appendix to this brief.

[2] In its September 13, 2004 response brief, Entergy appears to rely upon a November 8, 1998 "Purchase and Sale Agreement" between Boston and Entergy to describe the assignment terms. Pl. Br. 5 (quoting Pl. App. 150). Under the Standard Contract, the assignor had 90 days from the date of the contract assignment to notify DOE of the assignment. 10 C.F.R. § 961.11, Art. XIV. The "Purchase and Sale Agreement," which pre-dated the actual "Assignment Of Contract" document by more than seven months, was not a part of the assignment notice provided to DOE. See Def. App. 378-79. The assignment notice that Boston provided to DOE, rather than some undisclosed assignment terms, should control the scope of any enforceable assignment.

to the limitations of the Assignment of Contracts Act, providing that the "rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved" (emphasis added), and the Standard Contract at issue in this case incorporates that provision, although the Standard Contract also requires notice within 90 days of that assignment. 10 C.F.R. § 961.11, Art. XIV, "Assignment." The language of the statute and the Standard Contract solely refer to assignment of the contract, meaning the assignment of "rights and duties" that begin upon assignment. The Standard Contract language permitting assignment, in Article XIV, does not refer to the assignment of claims – that is, pre-existing claims that arose from the contract prior to the contract assignment.

The distinction between the assignment of a contract and an assignment of a claim is seen in comparing the Contracts Act, 41 U.S.C. § 15, with the Claims Act, 31 U.S.C. § 3727. The fact that Congress passed one statute regarding the assignment of contracts and another statute regarding the assignment of claims is deliberate and reveals that such assignments are to be viewed and treated differently. As previously discussed, the Contracts Act establishes that no contract with the United States may be transferred to a third party:

> No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned.

41 U.S.C. § 15. The pertinent provisions of the Claims Act place separate limitations upon an entity's ability to assign its damages claims against the Government to a third party, as follows:

> (a) In this section, "assignment" means (1) a transfer or assignment of any part of a claim against the United States Government or of

> an interest in the claim; or (2) the authorization to receive payment for any part of the claim.
>
> (b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727 (formerly 31 U.S.C. § 203). Because Congress enacted two separate statutes pertaining to assignment, using one for "contracts" and one for "claims," the distinction demonstrates congressional intent to have the statutes play different roles in achieving a broad, common goal.

The permissibility of, restrictions upon, and effect of an assignment differ depending upon which Act is applied. Assignments of claims found to violate the Assignment of Claims Act, 31 U.S.C. § 3727, are invalid, returning the parties to the status quo ante. Colonial Navigation Company v. United States, 149 Ct. Cl. 242, 245, 181 F. Supp. 237, 240 (1960); see Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1349 (Fed. Cir. 2002). Under the Contracts Act, 41 U.S.C. § 15, wrongful assignments of contracts are not only invalid, but may result in annulment of the contract by the Government. Tuftco Corp. v. United States, 222 Ct. Cl. 277, 284 n.5, 614 F.2d 740, 744 n.5 (1980). Another important conceptual difference between these two statutes is that 31 U.S.C. § 3727, which expressly concerns claims, "pertains to claims for work already done," whereas 41 U.S.C. § 15, which pertains to "executory contracts, is more concerned with continuing obligations." Tuftco Corp., 222 Ct. Cl. at 284 n.4, 614 F.2d at 744

n.4 (emphasis added). Therefore, the Court should interpret the Standard Contract's assignment language based upon the NWPA's exclusive use of the word "contract" because the term draws a distinction between the assignment of a contract and the assignment of pre-existing claims.

The United States Court of Appeals for the Federal Circuit seems to draw the same distinction. In Ginsberg v. Austin, 968 F.2d 1198 (Fed. Cir. 1992), the Federal Circuit determined that pre-existing claims are not automatically transferred with the assignment of an executory continuing contract. The case involved the issue of whether the right to back rent (a pre-existing claim) was presumed transferred, if not expressly reserved, when a lease contract was assigned. Ginsberg, 968 F.2d at 1200. Because the Federal Circuit could not find any Federal law dispositive of the issue, the Court analyzed "general property and contract law principles as they . . . [were] embodied in state law pronouncements." Id. (citations omitted). As a matter of property law, the state courts uniformly have held that rents when due and owing become personal property and that the "transfer of . . . real estate subject to the lease does not carry with it any right to accrued rents then unpaid. These belong to the person who was the landlord at the time of their accrual and not to the grantee, unless assigned to him." Id. at 1201 (citations omitted). The Federal Circuit determined that, on the subject of assignments, the law of contracts was consistent with property law. Id. Various authorities agree that "the assignment of rights under a continuing contract does not imply an assignment of rights of action for previous breaches of the contract . . .." Id. (citations omitted). Consequently, the Court held that, in light of the uniform and longstanding legal authority, as a matter of Federal law, a back rent claim (that is, a pre-existing claim) was not transferred with the assignment of the continuing contract and that pre-existing claims were separate from the assignment of the contract itself.

This case is on point with Ginsberg v. Austin because, even though Entergy now appears to assert that Boston could have assigned a portion of its claim for a previous breach, assignments of claims were not expressly included within the assignment provision of the Standard Contract, as evidenced by the assignment language in the NWPA. Entergy's broad interpretation of the Standard Contract's assignment language does not take into consideration the assignment provision of the NWPA, congressional enactment of separate assignment acts, and the Federal Circuit's ruling that claims that pre-date a contract assignment are distinct from the rights that accompany an assignment of the contract. A waiver of sovereign immunity must not be implicitly enlarged or extended to include causes of action not within the terms of the NWPA or the Standard Contract. See Klamath and Moadac Tribes v. United States, 296 U.S. 244, 250 (1935) and United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992) (waivers of sovereign immunity must be "unequivocally expressed"). Because the Standard Contract does not permit assignment of claims, Entergy would have to comply with the strict requirements of the Claims Act to have a valid assignment. See American Financial Assocs., Ltd. v. United States, 5 Cl. Ct. 761, 768, 771 (1984), aff'd, 755 F.2d 912 (Fed. Cir. 1985). It has made no allegation that it did so. Accordingly, both because the assignment at issue did not expressly assign pre-existing claims to Entergy and because Boston was statutorily barred from assigning any pre-existing claims, Entergy's argument that it should be permitted to base liability upon breaches that occurred prior to its contract assignment should be rejected.

## II. ENTERGY'S ASSERTION THAT DOE HAD SOME OBLIGATION TO ACCEPT ANY SNF GENERATED UNDER THE CONTRACT AT ISSUE HERE PRIOR TO JANUARY 30, 2000 IS UNSUPPORTED

Regardless of its arguments about its assignment, Entergy's argument that its assignor, Boston, was entitled to SNF acceptance prior to January 30, 2000, lacks merit and is dispositive of its request for a pre-2000 liability ruling.[3] As we established in our cross-motion, any injury that Entergy could incur from delays in SNF acceptance would result from DOE's failure to accept Entergy's SNF as identified in Entergy's approved delivery commitment schedules ("DCSs"). Def. Br. 8-13. The contract provision defining the contract's "Scope" expressly states that any SNF to be accepted "shall be specified in a [DCS] as provided in Article V . . . ." 10 C.F.R. § 961.11, Art. II. Yet, as previously established, the first approved DCS under the Standard Contract at issue in this case did not require DOE to accept any SNF under this contract until sometime between January 31, 1999, and January 30, 2000, and no DCS seeking any earlier SNF acceptance under the contract at here was ever submitted to DOE for consideration. Although Entergy seems to complain that the DCS process envisioned by the Standard Contract is meaningless and unenforceable, Entergy has failed to identify any other means by which the activities contemplated by the Standard Contract could ever proceed.

Under Entergy's theory, DOE will magically know when each contract holder wants SNF accepted; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when each wants acceptance, regardless of space, capacity, staffing, or

[3] As we established in our cross-motion for summary judgment, the existence of a breach of contract is only one element of the issue of liability. Def. Br. 6-7.

transportation limitations; and DOE will have no problem with the significant financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, Entergy has eliminated the only mechanism that would allow the parties to plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot function.[4]

Similarly, Entergy complains that the Court should ignore the 1991 Annual Capacity Report ("ACR") and the 1995 Acceptance Priority Ranking/Annual Capacity Reports ("APR/ACR"), which identified the SNF allocations that DOE anticipated it would be able to commit itself to satisfying during the first 10 years of SNF acceptance and which did not identify any allocations for the Standard Contract that Entergy now in the first 10 years of SNF acceptance, because the allocations there are "counterfeit." Pl. Reply 18; see 10 C.F.R. § 961.11, Art. IV.B.5 (identifying requirement for issuance of APR and ACR). First, Entergy's assertion that these allocations are "counterfeit" is unfounded. The 1991 ACR, the 1992 ACR, and the 1995 APR/ACR all contain the same acceptance rates, compare Def. App. 411 & 473 with Def.

---

[4] Entergy suggests that the submission of "a DCS form was not a condition precedent to DOE's obligation to take SNF from Plaintiff (or any other utility) under the Standard Contract." Pl. Reply 13. Yet, absent submission of a DCS for acceptance of SNF covered by the Standard Contract at issue here and DOE's approval of it, Entergy has not identified any practical manner in which activities contemplated under the Standard Contract, including the significant development time necessary for DOE to prepare transportation casks and coordinate their use for SNF acceptance from various contract holders, see 10 C.F.R. § 961.11, Art. IV.B.2, could ever be performed.

App. 294, and, in fact, contains a higher rate than the "lower bounding case" proposed in the 1990 ACR for use with a Monitored Retrievable Storage ("MRS") facility. Pl. App. 63, 65.

The plaintiff's argument regarding the 1991 ACR and the 1995 APR/ACR is based essentially upon its theory that, once DOE began acceptance and after a short ramp-up period, DOE was contractually obligated to accept 3,000 Metric Tons Uranium ("MTUs") of SNF from contract holders every year. Pl. Reply 19. Yet, it has identified no contract language containing any such requirement, and, in fact, DOE specifically declined to include any such obligation in the contract. Def. App. 4-5, 35, 36, 105; Def. Reply App. 44-48; see 10 C.F.R. § 961.11. This Court has recently stated, in response to four SNF plaintiffs' requests that "the contract be reformed to provide an allegedly 'reasonable' post-1998 annual industry-wide acceptance rate of 3,000" MTUs, that this assertion appears unfounded:

> Plaintiffs appear to provide no objective basis for this reformation, relying instead on equitable principles and a widely-shared impression, among jurists and others, that the agency should be punished for transgressing against public safety. None of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations.

Florida Power & Light Co. v. United States, No. 98-483C, slip op. at 9 n.12 (Fed. Cl. Oct. 14, 2004) (Sypolt, J.) (unpublished order).

Further, the acceptance rates contained in various planning documents to which Entergy cites at page 19 of its reply brief, including the recently issued 2004 APR/ACR, are generally based upon an assumption that an operating repository will be available when SNF acceptance begins. See also Def. Reply App. 41-42 ("Receipt rates in this table are only applicable if a CISF is approved"). However, as the United States Court of Appeals for the District of Columbia has

recognized, DOE was not obligated to have an operating repository available in 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276, 1277 (D.C. Cir. 1996). Instead, it was obligated only to begin SNF acceptance in 1998 in some type of facility, such as an MRS facility, and the Standard Contract expressly permits DOE to accept SNF for delivery to a facility other than a repository. 10 C.F.R. § 961.11, Art. I(10) (defining "DOE facility"); see 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983) (preamble to final rule creating Standard Contract terms: "The definition of 'DOE facility' (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository"). DOE expressly informed contract holders in early ACRs that, beginning with the 1991 ACR, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers. Each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

Pl. App. 16 (1987 ACR); see Pl. App. 38 (1988 ACR), 60 (1990 ACR); Def. App. 204 (1985 Mission Plan), 220, 222 (1991 ACR); Def. Reply App. 38-40; see also Def. App. 209 (1987 ACR: "projections in this initial report are based on current plans and best available information;

they are not contractually binding"). Given that DOE was entitled under the Standard Contract to accept SNF at an MRS facility in 1998, rather than directly at a repository, proposed rates for SNF acceptance at a repository do not somehow become contractually binding obligations upon DOE. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"). Accordingly, Entergy cannot base its theory of liability upon DOE's obligation to use higher acceptance rates than those that DOE had proposed to use for SNF acceptance at an MRS.[5]

In any event, neither Entergy nor Boston ever contested or complained about those allocations until they filed their respective lawsuits in 2003 and 1999, respectively. Entergy's suggestion that it can wait 12 years after the issuance of those acceptance allocations in 1991 and then, and only then, complain that the allocations granted were "counterfeit" and that damages should be based upon some scenario not in existence 12 years earlier. Established precedent of this Court and its predecessor, the Court of Claims, which requires the contractor to protest a material breach of contract upon learning of that breach, or else waive the breach. Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146, 475 F.2d 630, 637 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26, 455 F.2d 546, 551 (1972)); see Aleutian

---

[5] Entergy suggests that the Court should use the 2004 ACR that DOE recently published as establishing the mandatory minimum annual acceptance rate to impose into the Standard Contract. Pl. Reply 19. However, the 2004 ACR assumes the existence of a repository in 2010, and the acceptance rates that it contains are based upon that assumption. Pl. Reply App. 144 ("projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain Geologic Repository" (emphasis added)); Def. Reply App. 29. It certainly is irrelevant to a "mandatory" rate applicable to SNF acceptance at an MRS in 1998.

Constructors v. United States, 24 Cl. Ct. 372, 384 (1991); Government Sys. Advisors, Inc. v. United States, 21 Cl. Ct. 400, 411, vacated on other grounds, 25 Cl. Ct. 554 (1990).

Further, Entergy asks this Court to create a legal fiction excusing its assignor's failure to take action in response to the 1991, 1992, or 1995 ACRs. To obtain any basis for SNF acceptance in 1998, 1999, or any other year, Entergy's assignor, Boston Edison Company ("Boston"), would have had to have submitted a DCS at least 63 months in advance of the desired SNF acceptance date, 10 C.F.R. § 961.11, Art. V.B.1, and, because "[i]t is well-established that an assignee stands in the shoes of assignor, and that by assignment could acquire no greater rights than its assignor," National City Bank of Evansville v. United States, 143 Ct. Cl. 154, 163 F. Supp. 846, 852 (1958), Entergy did not obtain rights through its contract assignment beyond those that Boston had obtained. See Smith v. Tobacco By-Products & Chemical Corp., 243 F.2d 188, 191 (C.C.P.A. 1957) (assignee can acquire no greater rights than assignor); General Casualty Co. of Am. v. United States, 130 Ct. Cl. 520, 127 F. Supp. 805, 808 (assignor "could not, by assignment, transfer greater rights than he had himself"), cert. denied, 349 U.S. 938 (1955). Accordingly, for a 1998 acceptance, Boston had to submit a DCS in 1992. Entergy, in essence, asks this Court to ignore Boston's failure to protest and its failure to submit any DCSs.[6] Entergy fails to explain how Boston ever could have obtained acceptance rights for

[6] Entergy complains that DOE violated the Standard Contract because it "did not allow utilities to submit DCSs identifying 'all SNF and HLW [they wished] to deliver to DOE" because the 1991 ACR and separate DCS instructions "required" that "utilities submit DCS forms identifying for delivery *only* those SNF allocations reflected in DOE's most recent ACR." Pl. Br. 17. Although DOE, in its DCS instructions, indicated that it had notified contract holders of the acceptance allocations to which it would be willing to commit itself through the 1991 ACR and the DCS instructions, contract holders were certainly entitled to submit DCSs requesting other allocations, subject to DOE's right to disapprove them and subject to the contract holder's right to utilize the Standard Contract's "Disputes" provision, 10 C.F.R. § 961.11, Art. XVI, to resolve any

specific amounts of SNF on specific dates without having complied with the contractual requirements. It has identified no basis for excusing Boston's failure to protest.

## III. HAVING RELIED UPON A PARTIAL BREACH THEORY, ENTERGY CANNOT ATTEMPT TO SEEK DAMAGES FOR PARTIAL BREACHES THAT PRECEDE ITS CONTRACT ASSIGNMENT

Entergy claims that it "suffered damages and continues to suffer damages based on the Government's January 31, 1998 breach." Pl. Br. 10. Entergy's assertion conflicts with the type of breach that it has claimed. Here, Entergy is seeking damages for a partial, not a total, breach.[7] "The terms total breach and partial breach are frequently used by the courts in determining the remedies available to the injured party." 9 A. Corbin, Corbin on Contracts § 946, at 717-18 (interim ed. 1979). "A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." 9 A. Corbin, supra, § 946, at 718; see Restatement (Second) of Contracts § 236(1), at 214 (1981) ("[a] claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance"). If the non-breaching party, however, elects to regard the breach as partial, it may "proceed with [its] own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." 9 A. Corbin, supra, § 947, at 720, quoted in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (Fed. Cl. 2004), appeal

disagreement about the DCS disapproval. In fact, other contract holders exercised their right to submit DCSs with allocation requests different from those in the 1991 ACR. See, e.g., Def. Reply App. 49-52, 53-54. Clearly, contract holders understood that the DCS instructions did not eliminate their contractual rights.

[7] To the extent that it believes that there was a total breach of contract on January 31, 1998, that concluded the parties' continuing performance obligations at that time, Boston had no contract to assign on July 13, 1999, and Entergy has no basis for seeking damages for a pre-assignment total breach.

pending, No. 04-5122 (Fed. Cir.); see Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract").

The concept of "partial" breach is particularly applicable to contracts that involve a requirement for a series of performances, or installments, over an extended period of time. Professor Corbin has described the election that the non-breaching party to an installment contract can make when the other party fails to satisfy the requirements of an installment of the contract:

> If the seller of goods delivers an instalment of nonconforming goods, in breach of some warranty, even though the breach may be such as to operate as a total breach the buyer is not required to treat it so. He may keep the defective instalment, retaining his right to damages or recoupment, and demand delivery of the remaining instalments required by the contract. When sued for the price of the instalments received by him, he may recoup for breach of warranty and claim damages for the seller's failure to deliver the subsequent instalments. The seller has committed one breach, treated by the buyer as partial, and a second breach that is total.

9 A. Corbin, supra, § 946, at 720. Professor Corbin considers a contract that requires continuing performance similar to an installment contract and potentially capable of a series of partial breaches:

> There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each "partial" breach a separate action is maintainable, just as in the case of an "instalment" contract: and for a series of "partial" breaches

> occurring before any action is brought only one action is maintainable.

Id. § 956, at 746.[8]

Here, Entergy cannot "suffer damages" from DOE's failure to accept other contract holder's SNF. Although it claims that the January 31, 1998 breach "caused a domino effect on DOE's ability to timely accept delivery of SNF from all other utilities in the queue," Pl. Br. 10-11, Entergy not only fails to support its assertion, it is irrelevant to the issue of when DOE "breached," or partially breached, a duty to Entergy. As previously explained, DOE's obligation to accept any SNF generated under the Standard Contract that Entergy has been assigned would be based upon the first DCS that was approved for that SNF: the period between January 31, 1999 and January 30, 2000. Because no "right" to acceptance of the SNF generated under the Standard Contract for the Pilgrim nuclear reactor existed until the conclusion of that period ending January 30, 2000, and because the nature of the type of breach claim that Entergy has asserted involves a series of partial breaches rather than a single "breach" that creates a single large indeterminate liability, Entergy has no basis for claiming that "the" partial breach on January 31, 1998, which preceded its contract assignment by more than a year-and-a-half, caused Entergy damage. At best, the first actionable partial breach in this case would not arise until January 30, 2000.

---

[8] Professor Corbin concluded that there is "no essential difference between a 'continuing' contract and an 'instalment' contract." 9 A. Corbin, Corbin on Contracts § 956, at 748.

## IV. ENTERGY'S EXPLANATIONS ABOUT THE REASONS THAT BOSTON NEVER SUBMITTED A DELIVERY COMMITMENT SCHEDULE FOR 1998 ACCEPTANCE ARE UNSUPPORTED

Entergy further argues that the Court should not couple any liability ruling to the DCS provisions of the Standard Contract because, it says, any attempt to submit a DCS after 1995 would have been futile because DOE stopped responding to DCS submissions and, beginning in 1997, expressly refused to approve or disapprove submitted DCSs. Pl. Reply 16-17. Yet, to obtain an approved DCS for SNF acceptance in 1998, Entergy's assignor, Boston, could have submitted its DCS in 1992 if it had thought that DOE should dispose of its SNF beginning in 1998. In fact, many other utilities did just that, beginning in 1992, to establish the amount of SNF that DOE would accept within 63 months of submission of the DCS, beginning January 31, 1998. Accordingly, Entergy's argument here regarding DOE's actions in 1995 or 1997 are irrelevant to the pending motions. Further, Entergy has submitted no evidence that its assignor, Boston, declined to submit DCSs because it would be "futile" or because the DCS process was somehow flawed, as Entergy now argues. Instead, Boston's first SNF acceptance allocation was for acceptance between January 31, 1999, and January 30, 2000, Def. App. 415, 477, and Boston did not utilize the Standard Contract's disputes resolution process to challenge the lack of an allocation in 1998. 10 C.F.R. § 961.11, Arts. V.B.1, V.B.2, & XVI.A. Boston's failure to submit a DCS in 1992 and to challenge any denial of that DCS under the contract's "Disputes" provision is fatal to its argument here that the Court should allow Entergy to recover damages on some basis other than DCSs.[9]

[9] To the extent that this Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), conflicts with this position, we respectfully disagree with the Court's conclusions in that case.

CONCLUSION

For the foregoing reasons, the Court should grant our motion for summary judgment regarding liability and deny plaintiff's motion.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

November 4, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on November 4, 2004, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.