# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| CONNECTICUT YANKEE ATOMIC POWER | ) | Case Nos.: |
| COMPANY, and MAINE YANKEE ATOMIC | ) | 98-126C |
| POWER COMPANY, | ) | 98-154C |
| Plaintiffs, | ) | 98-474C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 3888 through 4106

Place: Washington, D.C

Date: August 4, 2004

HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

Q. What was the purpose of the 1991 ACR?

A. It was to provide the contract holders what would be the waste acceptance capacity of the Federal Waste Management System and to provide them also with the allocations that they will need for filling out their delivery commitment schedules.

Q. Were you involved in the preparation of the 1991 ACR?

A. Yes, I was.

Q. And I believe you've already said this, but which office within DOE prepared this document?

A. It was the Office of Civilian Radioactive Waste Management.

Q. Thank you. Did the contracting office have any role in the preparation of the 1991 ACR?

A. Yes, they had a minor role in the preparation of the document.

Q. And what was their minor role?

A. After we had developed a draft version of it, we sent it around to several organizations for comment, and I believe they submitted some minor comments to us on the document prior to its being finalized.

Q. Was the 1991 ACR sent out by the contracting officer?

A. Yes, it was. It was sent out to all contract holders under the signature of the contracting officer.

Q. Mr. Pollog, could I direct your attention to page five of this document, please? Mr. Pollog, what is the information set forth in table 2.1 on page five of this document?

A. These are the projected waste acceptance rates starting in 1998 and going through 2007.

Q. How were these rates developed?

A. They were based primarily on the Nuclear Waste Policy Amendments Act of 1987 and restrictions placed on a monitored retrievable storage system in that Act.

Q. Could we go to Defendant's Exhibit 23? Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 23. Do you recognize this document?

A. Yes, I do.

Q. Could you explain to the Court what it is?

A. Yeah, it's an action memo from Ronald Milner, who is the associate director for the storage and transportation division at that time, to John Bartlett, seeking his approval for the publication of the 1991 annual capacity report.

1991 ACR became the document that purchasers would use for submittal of delivery purchase schedules. The prior ones were more for information and planning, but this one was the document that the purchasers would use to submit their delivery commitment schedules.

Q. Could we pull up Plaintiffs' Exhibit 52, please? Mr. Pollog, do you recognize what's been marked as Plaintiffs' Exhibit 52?

A. Yes, I do.

Q. Could you tell the Court what it is, please?

A. It is the 1987 annual capacity report.

Q. Could I direct your attention to page two of the report, that second, the first full paragraph highlighted or brought up. Would you please read the portion that's been excerpted from the document?

A. Yes. "*Beginning in 1991,* the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF/HLW that purchasers propose to deliver to the DOE Waste Management System (WMS).

Once approved, these schedules will become the basis for final delivery schedules to be submitted by the purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility."

Q. Mr. Pollog, does the paragraph you've just read comport with your understanding as to the role of the 1991 ACR?

A. Yes, it does.

Q. Was the document that's been marked as Plaintiffs' Exhibit 52 provided to standard contract holders?

A. I believe so.

Q. Can we have Defendant's Exhibit 18, please? Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 18?

A. Yes, I do.

Q. So could you tell the Court what this document is?

A. This document is the 1990 annual capacity report that was produced by the Office of Civilian Radioactive Waste Management.

Q. Direct your attention to page two of this document. Could you read the portion of the document

that's been highlighted on the computer screen?

A. Yes, I can. "As specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers. The standard contract states that, beginning in April 1991, the ACR is scheduled to be replaced by the annual acceptance priority ranking report for receipt of SNF/HLW.

The contract further states that, beginning in January 1992 and based on the acceptance priority ranking, the purchasers shall submit delivery commitment schedules to DOE identifying the range of discharge dates of the SNF/HLW that the purchasers propose to deliver to the Waste Management System."

Q. Thank you. And just so the record's clear, the second sentence that you read actually reads, "the standard disposal contract." Mr. Pollog, the portion of the document that you just read, does that comport with your understanding as to what the role of the 1991 ACR was?

A. Yes, it is.

Q. Was this document provided to standard contract holders?

A. Yes , I believe this document, along with all other ACRs, were provided to standard contract

disposal holders.

Q. Can I direct your attention to page seven of Defendant's Exhibit 18?

MR. STOUCK: Your Honor, could I just interpose an objection for the record? I'm sorry to interrupt. We'll take this up on cross-examination. Mr. Pollog was asked at deposition, "Do you recall having any work or having any involvement in the preparation of the 1990 ACR that preceded that?

"Answer: I don't believe so."

So our objection is the testimony should be limited to reading from the documents, but we'll take it up on cross-examination.

THE COURT: Okay. You may continue, Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you see page seven of the 1990 ACR?

A. Yes, I do.

Q. I believe you testified as to a difference in rates between the 1990 ACR and the 1991 ACR. Were these the rates that you were discussing earlier?

A. Yes, they are.

Q. And I believe you talked about the lower

it says 400, 600 and 900, to that rate and then just sum up what every purchaser's allocation would be in any given year and put them into this table.

Q. Could we highlight the line for Yankee Atomic on the table, please? Mr. Pollog, if we could look at the line for Yankee Atomic Electric Company. Is 9.8 the MTU allocation for Yankee Atomic in year one?

A. Yes, it is.

Q. And similarly, is 10.1 the MTU allocation for Yankee Atomic in year 2?

A. Yes, it is.

Q. Mr. Pollog, how are utilities supposed to use the information in table 3.1?

A. They would use that information for filling out and submitting their delivery commitment schedules.

Q. Let me back up a second to the highlighted for Yankee Atomic. If there's no entry, if there's no numerical entry in a given year for, say, Yankee Atomic, at the fifth entry over, there's two dashed lines, what is meant by that?

A. That means they would have no allocation in that given year.

Q. Thank you. And specifically, how were

utilities told to use the allocations in this chart to submit their DCSes?

A. They were told to use allocations as the basis for submitting their delivery commitment schedules in any given year. The total sum of the MTUs you would ask for in your DCS should equal what you were given that year in this table of the ACR.

Q. Can we have's Exhibit 30.001? Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 30.001?

A. Yes, I do.

Q. Could you tell the Court what this is?

A. This is a letter from Michael Detmer transmitting the DCS instructions to Mr. Buchheit, who was manager of fuel procurement for New Hampshire Yankee division of the public service of New Hampshire.

Q. And what was the purpose of these instructions?

A. This was to provide the contract holders instructions on how to complete their delivery commitment schedules.

Q. Could we go back to Defendant's Exhibit 24. Table 3.1, page nine? Mr. Pollog, how come this chart presents information for 10 years?

don't know why that clause was placed in the DCS instructions, you think one possible reason is that DOE, if DOE, it was to provide for a situation where if DOE had more capacity to allocate, it could have increased the number of MTUs that particular purchasers would be allocated?

A. That's certainly, could be used in consideration with this clause, yes.

Q. Well, that's one possible explanation you gave at your deposition, do you recall that?

A. Not specifically at this point in time.

Q. You do think that's one possible explanation?

A. Yes, I think that could certainly be used in considering this clause, yes.

Q. That there might be additional capacity later to allocate it?

A. That's certainly consideration, yes.

Q. And that appears in fact to be what happened with this July 2004 ACR. There's additional allocation that the DOE wishes to allocate, additional capacity that the DOE wishes to allocate, and now, they're asking for new DCSes, is that right?

A. The acceptance rates in the 2000 ACR are greater than the ones that were in the '91 ACR or '95

ACR, yes, that is correct.
Q. So there's more capacity to allocate?
A. The acceptance rates and, hence, the capacity is larger in the 2000 ACR than it was in the earlier one, yes.
Q. Does that mean there's more capacity to allocate now?
A. Yes, I would say so.
Q. So that's consistent with your one possible use of that sentence, maybe there will be more capacity to allocate later, we have more capacity to allocate later in the 2004 ACR, right?
A. The capacity allocation is larger in the 2000 ACR, yes, that's true.
Q. Now, also just very briefly, on the question of shutdown priority, you do agree that it's always possible that DOE may grant priority in the future, right?
A. DOE does allow DOE to grant shutdown priority to reactors, yes, that is true.
Q. You agree that it's always possible that DOE may grant that in the future, right?
A. Yes.
Q. And you also mentioned in your deposition, I just want to make sure this is true, that Homeland

Page 4072

A. Yes, this document was produced prior to the Nuclear Waste Policy Act being enacted.

Q. Could I direct your attention to page eight of this document? On page eight, there seems to be a list there of several different facilities and proposed opening dates. Do you have an understanding as to how many facilities were envisioned when this document was prepared?

A. Yes, it appears this document is envisioning six different facilities.

Q. And could I ask you to turn to the next page, page nine, and I believe Mr. Stouck read footnote C into the record. Based on what's depicted there on that chart, do you have an understanding as to what this document envisioned as to the number of facilities and the acceptance rate of each of those facilities?

A. Yes, I do. It appears that there are six facilities, and it lays out the acceptance rate by facility in table 2 on page nine.

Q. Mr. Pollog, could I direct your attention to Plaintiffs' Exhibit 54, which is the 1988 annual capacity report?

A. Yes.

Q. Do you have that in front of you?

Page 4073

A. Yes, I do.

Q. Could I ask you to turn to page five, please?

A. Yes, I'm at page five.

Q. Mr. Pollog, do you have an understanding, based on the section in this document that Mr. Stouck asked you to read, what this document assumed in terms of start date for the MRS and the repository?

A. Yes, it appears that both the MRS and repository will be starting in 2003.

Q. And do you have an understanding as to whether the 10,000 MTU limitation would apply to an MRS facility if the repository were operating?

A. The 10,000 metric ton uranium limitation would no longer apply.

Q. Mr. Pollog, could I direct your attention to Defendant's Exhibit 24, which is the 1991 annual capacity report, page four of that document? And could you highlight the middle paragraph on that page? And, Mr. Pollog, could you read that paragraph, please?

A. Yes. "The acceptance rates in table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 metric ton

Page 4074

storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007."

Q. Mr. Pollog, does the paragraph you've just read capture your understanding as to the basis for the rates set forth in the 1991 ACR?

A. Yes, it does.

THE COURT: I should note for the record that AFR means away from reactor.

MS. SULLIVAN: I appreciate that.

BY MS. SULLIVAN:

Q. Do you know, with that clarification from the Court, do you know what that means?

A. I believe, away from reactor, yes, I do think I know what that means.

Q. What is an AFR facility?

A. Well, I think it's a storage facility that's not located at the reactor site.

Page 4075

Q. Is that a term that's been used by DOE since you've been with the program?

A. Not to my knowledge, no.

Q. Mr. Pollog, just to clear up a question that I believe His Honor asked you, is your view as to the binding nature of DCSes tied to the existence of a specific facility?

A. No, it is not. It's not.

Q. But the rates in the ACR upon which the DCSes are to be based, is it your understanding that these rates are dependent upon a facility?

A. Yes, they were developed with a facility in the system in mind.

Q. Are the rates in the 1991 ACR and the 2004 ACR different?

A. Yes, they are.

Q. Why?

A. The 1991 ACR was based upon having a MRS in the system in the Waste Management System. The 2004 ACR assumes there will be no MRS in the Waste Management System.

Q. And that has an effect on the rates?

A. Yes, it does. The 2004 would assume that the spent fuel was being transported from the reactor right to the repository.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) |
| CONNECTICUT YANKEE ATOMIC POWER | )Case Nos., |
| COMPANY, and MAINE YANKEE ATOMIC | ) 98-126C |
| POWER COMPANY, | ) 98-154C |
| Plaintiffs, | ) 98-474C |
| | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ
ROBERT SHAPIRO, ESQ
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:

MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY

JOSEPH D. FAY, ESQ
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ
HEIDE L. HERRMANN, ESQ
F. ALAN MILLER, ESQ
KEVIN B. CRAWFORD, ESQ
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily

THE COURT: Okay

MS. SULLIVAN: The government calls David Zabransky

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN.

Q Good morning, Mr. Zabransky Are you currently employed at the Department of Energy?

A Yes, I am.

Q And to what office within the Department of Energy are you currently assigned?

A I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.

Q. What are your current responsibilities?

A. I report to Chris Kouts, and I work on issues related to the standard contract, other

So we'd have to make sure that we just didn't take from one utility to advance to another one, and then wind up not being able to serve that utility that had already been in line.

Q. Mr. Zabransky, does the Office of Civilian Radioactive Waste Management try to manage the waste management program in an efficient and cost-effective manner?

A. I think, as federal employees, we always try to do our jobs in an efficient, cost-effective manner. It's a goal of the program to operate in an efficient, cost-effective manner, and I think we do things to try to ensure that happens.

Q. What types of things does RW do to try to manage the program in an efficient and cost-effective manner?

A. Typical things like procurements are done in a competitive fashion, to invest value for government whenever possible. And when we look at planning the system, we try to plan a system that meets the needs we have to take into account from our utility customers, but to be reasonable in doing it, so we don't overbuild systems that don't get utilized.

Q. Does this goal of being efficient and



cost-effective translate into a specific acceptance rate?

A. No, it doesn't, that I know of.

Q. Do you understand the term "full cost recovery" as that term is applied to the waste management system?

A. Yes, I do.

Q. What does that term mean to you?

A. Well, to me, that term means that the users of the system, those who we have contracts with, pay the full cost of us developing and operating the system, which includes developing the transportation equipment, the facility, Yucca Mountain, and ultimately closing that facility in the future, and those costs are all borne by the users.

MS. SULLIVAN: One moment, Your Honor. Nothing further at this time, Your Honor. I would move for admission of Plaintiffs' Exhibit 81, which was the letter that Mr. Zabransky sent to Alan Brownstein.

THE WITNESS: Your Honor, if I could take just a two-minute break?

MS. SULLIVAN: Hang on just a minute.

THE WITNESS: Sorry.

MS. SULLIVAN: Let's do this.



MR. SHAPIRO: Your Honor, we don't have any objection to the admission of Plaintiffs' Exhibit 81, although we would want to check to make sure that there aren't any additional documents that should appropriately be considered along with this one in order to have a complete record of this, but as far as this document goes, we don't have any objection.

THE COURT: Plaintiffs' Exhibit 81 is admitted.

(Plaintiffs' Exhibit Number PX-81 was received in evidence.)

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Why don't we take a break, 10 minutes?

MS. SULLIVAN: That's fine.

(Whereupon, a short recess was taken.)

MR. SHAPIRO: Good morning, Your Honor.

CROSS-EXAMINATION

BY MR. SHAPIRO:

Q. Good morning, Mr. Zabransky.

A. Good morning.

Q. I'd like to start with some questions about the delivery commitment schedule process. I believe you testified that starting in the 1997 time frame, the Department of Energy stopped approving or



disapproving delivery commitment schedules proposed by utilities?

A. Yes, and I think it was in early '97, we stopped processing the submittals from utilities.

Q. And DOE also stopped processing approvals or disapprovals of submittals of final delivery schedules from utilities?

A. We never processed any, so we never started those.

Q. And instead, DOE sent letters to utilities responding to those proposed final delivery commitment -- final delivery schedules stating they were being neither approved nor disapproved, isn't that correct?

A. I believe that's correct, yes.

Q. But the contract doesn't contain language that provides DOE that option to be either approving or disapproving, isn't that correct?

A. That's correct.

Q. And it was your opinion at the time, as contracting officer's technical representative, that the contracting provide that option, correct?

A. I was a technical representative. I didn't make contract interpretations as to what it provided or didn't provide with respect to provisions, but,

Page 4147

no. I didn't think it provided that provision at that time.
Q. And the reason that the Department took the position of neither approving nor disapproving delivery commitment schedules or final delivery schedules is because the Department's lawyers advised OCRWM to take no action?
A. No, the Department's lawyers advised the contracting officer.
Q. And that was done on the advice of counsel?
A. Yes, but they advised the contracting officer, not OCRWM.
Q. But ultimately, it was the lawyers that caused that to happen, counsel?
A. Counsel's advice to the contracting officer was that they no longer approve DCSes, so, yes, I would say.
Q. And because of the advice that the contracting officer, DOE, received from the lawyers, at this point, the Department has not reviewed delivery commitment schedules since early 1997, since then, has it?
A. It hasn't reviewed any since then for allocations that were predicated upon the '98 acceptance date, no.

Page 4148

Q. And since the Department has stopped reviewing delivery commitment schedules, there's been no way for a utility to get a delivery commitment schedule approved, at least not until the Department has issued its July 2004 annual capacity report last week. Isn't that correct?
A. That's correct.
Q. And it is the Department's position that utilities must submit delivery commitment schedules based on the most recent annual capacity report?
A. And I guess -- the Department's position is that, yes, the DCSes should be based upon the most recent annual capacity report for the period of time that's covered, yes.
Q. I believe you said in your direct examination, Mr. Zabransky, that when you were at WEPCO and also when you were the contracting officer's technical representative, it was your understanding that delivery commitment schedules, that utilities could only place on those the amount of fuel that they, for which they had an allocation in that most current ACR. Was that your testimony?
A. I think I said that, yes.
Q. But there's nothing in the standard contract itself that limits the amount of fuel that a

Page 4149

utility can put on a proposed delivery commitment schedule. That limitation just was imposed by the contracting officer in the latter one, wasn't it?
A. Well, the contracting officer provided guidance as to how to interpret and complete the DCS scheduling process. Was it unilateral, yes, they sent a letter out saying, Here's how it should be done. When I was at Wisconsin Electric, we did it that way, and I think most utilities did it that way. I don't think anybody protested the fact that it shouldn't be done that way.
Q. And there's nothing in the contract that provides that interpretation that comes from the contracting officer?
A. But it's the contracting officer's job to interpret the contract for administration purposes.
Q. I'm not sure that you answered, before I move on, I'm not sure you answered my last question. Mr. Zabransky, you're the current contracting officer, correct?
A. Yes, I am.
Q. Is there something in the contract that provides that utilities can only list on delivery commitment schedules the amount of fuel set forth in an ACR allocation?

Page 4150

MS. SULLIVAN: Objection, asked and answered. I believe he did answer that question.
THE WITNESS: I've answered that and said no.
BY MR. SHAPIRO:
Q. Now, we discussed just a moment ago, Mr. Zabransky, that the Department has stopped approving final delivery commitment schedules. The Department did receive some proposed final delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, mischaracterizes the witness' testimony.
THE WITNESS: I think I said the Department has never processed or approved any FDSes, and, yes, utilities sent some in for deliveries in 1998, 1999, I believe.
BY MR. SHAPIRO:
Q. And the decision to stop approving delivery commitment schedules and never to start processing final delivery commitment schedules, that was based on a belief by DOE that approving those delivery commitment schedules would commit the Department to an obligation, and the Department didn't want to do that?
A. I believe that the Department, the basis

Page 4151

for the decision to stop processing was based upon a belief that the DCSes were binding commitments, and we should not enter into binding commitments that we know we couldn't meet at that point in time.

Q. And in fact, not only did the Department stop approving those delivery commitment schedules and not even start processing final delivery schedules because of its desire not to commit itself, but on the advice of counsel, you actually went back and voided some previously approved delivery commitment schedules, isn't that correct?

A. There were a number of documents that were in the process of being approved, but had never been transmitted to the utilities. So these were documents that because, again, all correspondence goes through a review and legal review, was part of that review, that were in the system to be processed, that I had signed off on and sent on to the contracting officer, and that the contracting officer, in some cases, had signed off on, but had never been transmitted. And prior to the final transmittal to the utilities, the review was, it was concluded that those should not be processed, and they were voided.

Q. But nevertheless, if I understand what

Page 4152

you've just said correctly, there were indeed some delivery commitment schedules submitted by utilities that reached not only your approval as contracting officer's technical representative, but the final sign-off by the contracting officer, and yours might have been the final sign-off in some occasions, yet nevertheless, those final approvals were voided?

A. Well, again, my approval as COTR would have just merely advised the contracting officer the form was ready for her to approve, so it wouldn't have been final in any case if I had signed off on it. There were a few that Beth Tomasoni, I believe was the CO at the time, signed off on, that prior to transmittal, she rescinded.

Q. And you would not have taken the action to void those except under the direction of counsel, correct?

A. Counsel provided us advice that it would no longer be appropriate to keep signing those documents, yes.

Q. And that's why you voided those?

A. Yes.

Q. And although counsel instructed you to void your signature on some of those approved delivery commitment schedules, isn't it correct that you would

Page 4153

not presume that once you had received an approved document, that it could be voided unilaterally by the Department, isn't that correct?

MS. SULLIVAN: Objection, mischaracterizes the witness' previous testimony.

THE COURT: When you say, when the utility had received it or?

BY MR. SHAPIRO:

Q. No, I'm talking about simply, once the Department, once Mr. Zabransky and the contracting officer have approved it, that Mr. Zabransky's belief that, is that, but for the advice of counsel, that the Department was not free simply to void those unilaterally?

A. But, again, the Department never communicated its approval. The documents never left the Department. They were, the ones that the CO voided were voided before they were ever transmitted. The approval never really took place from that perspective.

Q. But you would not presume once you had received an approved document that it could be voided unilaterally?

THE COURT: I don't get the "received an approved document."

Page 4154

THE WITNESS: I'm not sure who's receiving what in your question.

THE COURT: What do you mean by "received an approved document"?

BY MR. SHAPIRO:

Q. If you get back from the contracting officer an approved document, an approved delivery commitment schedule, you wouldn't think that you could simply void that, would you?

A. I didn't void her signature. She voided her signature.

Q. Didn't you void some delivery commitment schedules yourself, some approved delivery commitment schedules yourself?

A. I only voided my signature, to my knowledge.

Q. And did your signature appear on the approved delivery commitment schedule?

A. Yes.

Q. And you voided that?

A. The contracting officer decided not to transmit and execute the final approved DCS, and we voided them, yes.

Q. And you voided your own signature as well?

A. I did, yes.

Page 4155

THE COURT: Does any of this relate to a delivery commitment schedule binding the Plaintiffs, or is this –

MR. SHAPIRO: No, it goes, Your Honor, to Mr. Zabransky's testimony that he thinks that the delivery commitment schedules have some significance, that they were binding, he thought, when they were at WEPCO, and they're important at DOE. But it would seem that the Department also feels that they can void them at the Department's whim, and that they're otherwise subject to counsel's direction to the Department not to grant them at all. That's the line of questioning.

THE COURT: I just wanted to make sure you weren't talking about Yankee Atomic or Connecticut Yankee or Maine Yankee DCS.

MR. SHAPIRO: I don't believe any of those were voided.

THE WITNESS: And, again, I think you mischaracterized what I said. The Department didn't void any DCSes that were approved and sent out and received by utilities. It recognized that once they received them, they were approved, and they had those approved DCSes. It ceased sending them out. It ceased the approval process in

Page 4156

mid-process. Transmittal letters transmitting them to the utilities were never signed, and they were never sent out by the contracting officer.

BY MR. SHAPIRO:

Q. Now, approved delivery commitment schedules are of limited value, aren't they? For example, despite having approved delivery commitment schedules when you were at WEPCO, you didn't rely on those approved delivery commitment schedules as a solution for WEPCO's near term fuel storage needs, did you?

A. When I was at WEPCO and we were contemplating needing additional storage in the '92 time frame when those schedules came up, I think it was our belief that there was some uncertainty as to whether the Department would actually come forth and perform in 1998. And as a result, we built into our thinking for storage at Point Beach, that we needed to have reliance to keep the plan operating on our own ability to store the spent fuel. And that the commitments that we have from the Department of Energy, we were glad we happened to sign them, because we thought there might be some recourse someday, but we weren't going to rely on them to put the plant in jeopardy.

Page 4157

So, again, we relied on them in the effect they were a contractual commitment, but we also made sure we had the capability to maintain the plant in operation in case the Department didn't follow through or wasn't able to follow through on that commitment.

Q. So the answer to my question is, yes, WEPCO did not rely on its approved delivery commitment schedules to provide for its, a solution for its near term spent fuel storage needs?

A. And I think that sort of mischaracterized what I said, is we went and got off as soon as we could as many commitments as we could, in case they would, for some reason, stop processing them, so we had some recourse, pursuant to the contract. But, yes, we also built facilities that made sure that, in case something happened, we weren't putting our facilities in jeopardy.

Q. Well, the reason I'm asking the question more than once is I'm not sure you're answering my question. You're concerned about putting in a caveat that I don't understand, Mr. Zabransky. So the bottom line is that, notwithstanding the fact that WEPCO had approved delivery commitment schedules and maybe had some recourse down the line,

Page 4158

WEPCO didn't rely on those to provide for its near term spent fuel storage needs, correct?

A. And I think, like I said, the answer is, yes, it has no – as would anybody else with a valuable asset that needed to make it operate, continue to operate, wouldn't put it in jeopardy solely on something beyond its control.

Q. And isn't it true that when DOE approved delivery commitment schedules, that it conditioned the approvals on the existence of a repository?

A. I think there was a point in time where DOE did that. The original DCSes in the early years, and I don't know when it changed, did not contain that conditioned statement.

Q. Well, what about the ones at WEPCO?

A. Those –

Q. That was one of the reasons you didn't rely on those is because DOE conditioned those, isn't that correct?

A. I don't believe those contained any kind of conditional statement.

Q. But others did contain conditions?

A. At some point, that was the Department's policy or was advised a statement saying these were conditioned upon the existence of the facility