Page 3626

normal way of doing business.

Q Do you recall that it translated into any specific requirements that you are aware of?

A No. No, sir.

Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract – I'm sorry, I already asked that question.

I believe you testified that Mr. Mills discussed with you his belief that the utilities – I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?

A That's my understanding, correct.

Q And do you recall how he conveyed that idea to you?

A Correctly.

Q Okay. Face to face?

A Yes.

Q In discussions with you in your office?

A Well, he said that, yes, it should include a rate, and I said no.

Q And why did you tell him no?

A Because that was contrary to what was in the rule-making process. That was – several of the comments from utilities had requested that. And in

Page 3627

the process of resolution and prior to publishing the final rule-making, that was denied.

Q All right, sir. Do you recall why it was that that was denied?

A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.

Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being – I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.

A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.

Q All right. So during the time the contracts

Page 3628

were formulated, did you have a plan, a specific plan to be able to do that?

A No.

Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?

A No.

Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific –

A No.

Q – rate?

A No.

Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?

A No.

MR. SHAPIRO: Objection. Leading.

Page 3629

THE COURT: Well, I take it that you are asking about specific – I'll overrule the objection. The answer can stand. I think it was a no.

BY MR. MILLER:

Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?

A No.

Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?

A No.

Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you – did you do that?

A That's simply not true.

Q What about your staff? Are you aware that your staff did that?

A No.

Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3634

whereas clause that was requested?
A No.
Q And why? For what reason did you take that – did you not include it, if you will?
A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.
Q All right, sir. We'll talk about the mission plan a little bit later. But did you – even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?
A No.
Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid – that was being paid under the contracts was in return for a specific rate of performance on DOE's part?
A I don't know that I can say that was what was specifically said, but that was certainly part of the – what I understand the message that he was transmitting.
Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?
A No. I did not agree with that.
Q All right. The question of – I'm sorry. I'll start again.
I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?
A I don't really recall.
Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?
A No.
Q Why is that?
A It was premature.
Q Why was it premature?
A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to – for us to commit to any receipt rates at that time.
Q All right.
A And that it was to be dealt with in the

Page 3636

mission plan.
Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?
A No. No.
Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?
A Yes.
Q And what was that concept?
A The concept was to take the oldest fuel first –
Q All right, sir.
A – from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.
Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?
A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.
Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?
A No.
Q And why was that, sir?
A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the – what the utilities would like to release to us.
Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?
A Yes.
Q Do you recall if that was requested by the utility?
A Yes. And then there were – during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.
Q All right, sir. I'll show you now Yankee Exhibit Number 30.
MR. MILLER: All right, Your Honor, I'm

Page 3650

Do you see that?
A Yes.
Q And it goes on to say subject to prior approval by the Department. Do you see that?
A Yes.
Q Do you understand that to refer to the exchange provision?
A Yes.
Q All right, sir. So as far as individual utilities were concerned, if they had individual storage needs after 1998, you anticipated that they could use the exchange provision to cover that?
A Yes.
Q All right, sir. Could we look at table 2-2. I'm sorry. That's table II-1. That's what I intended to refer to. Can you see that, Mr. Morgan?
A Yes, I can.
Q In the lower right-hand corner it looks like this page fell in between pages 2-2 and 2-1, right, sir?
A Yes.
Q Up at the top, that's called the Waste Acceptance Schedule. Do you see that?
A Yes.
Q All right, sir. Do you recognize this waste

Page 3651

acceptance schedule?
A Yes.
Q And what did it indicate to you?
A It indicated our goal on the first repository acceptance MTUs in 1988 for 5 years at one rate, and then subsequent years at 3,000 MTU. It shows the second repository coming on line after the first 5 years. Then it has a column of cumulative acceptance. And the remaining backlog, which doesn't start being reduced until 3 years after the second repository, or 2 years after the second repository is in place and operating.
Q All right, sir. Now, I believe you – you may have misspoken. I believe you said it shows a schedule beginning in 1988. You meant 1998, did you not?
A 1998, yes.
Q All right, sir. And once again, it's – the rates that are reflected in this table, did you consider those to be contractual requirements?
A No.
Q And why was that?
A Because the mission plan as stated in section 3 was an informational document, not a contractual document.

Page 3652

Q All right, sir. And did you ever represent to anybody in discussions with – well, any utility representatives or anyone that the mission plan reflected contractual obligations?
A No, I did not.
Q And is that, sir, because of the many uncertainties that you've already testified to that existed at the time?
A That's correct.
Q All right, sir.
Sir, the column that's entitled – the second column from the left that's entitled annual spent fuel generation, do you see that?
A Yes.
Q Mr. Mills said he believed that this column was not accurate. Did you have any reason then or do you have any reason now to doubt – to doubt the validity of the figures in that column?
A That was the information that we had at the time.
Q All right. Do you recall what the source of the information was?
A No, I don't.
Q All right, sir. But you believe that information to be accurate there?

Page 3653

A Yes.
Q All right, sir. Now, Mr. Morgan, Mr. Mills testified that he met with you after this draft mission plan was issued to register his disappointment, the utilities' disappointment with your statement about the goal of preventing the need for additional at-reactor storage and eventually matching the generation reg. Do you recall him talking to you about that?
A I'm sure he did.
Q All right, sir. And he also said that the acceptance schedule that's reflected in this table II-1 did not comport with the agreed understanding that he had with you and other DOE officials about the acceptance rate that was expected under the contract. Do you remember that?
A I did not have an agreement with him as to acceptance rate, period.
Q All right, sir. But do you recall him expressing that opinion to you about the rates reflected in the mission plan?
A Start back over –
Q All right, sir.
A – because I'm thinking that you're still referring to agreements that I had with Mr. Mills.

Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 3, 2004

Heritage Reporting Corporation

Page 3661 to Page 3887

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3693

proceeding, there might have been a little bit of confusion on that point.
But ultimately, we're talking about the same relevancy. Thank you for your time.
THE WITNESS: You're welcome.
THE COURT: Any redirect?
MR. MILLER: Short redirect, Your Honor.
THE COURT: One more round here.

REDIRECT EXAMINATION

BY MR. MILLER:
Q. You thought you were going to get away, didn't you, Mr. Morgan?
THE COURT: I don't blame you, you want to go back to Oregon, I think.
THE WITNESS: I now live in Colorado.
THE COURT: Oh, Colorado.
BY MR. MILLER:
Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?
A. Yes.
Q. Was that a deliberate choice on your part?
A. Yes.
Q. Did DOE feel – well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?

Page 3694

A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.
Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?
A. Not in total because of the fact that NRC had not identified the requirements for licensing.
Q. Okay.
A. And quite honestly –
Q. I'm sorry.
A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.
Q. So that was a concern of yours?
A. Yes, that was a concern of mine.
Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?

Page 3695

A. Yes.
Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?
A. No.
Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?
A. No, that was not part of the Act.
Q. Was that a program goal that you had at the time you were director –
A. That was a program goal that we identified in the mission plan.
Q. And is that a goal that DOE specifically declined to put in the contract?
A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.

Page 3696

Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?
A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.
MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.
THE COURT: Anything further?
MR. SHAPIRO: Nothing further, Your Honor.
THE COURT: All right. You're excused, and thank you very much for your testimony.
THE WITNESS: Thank you, sir.
MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.
Whereupon–
BENARD C. RUSCHE
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Just take a seat.

DIRECT EXAMINATION

BY MR. MILLER:
Q. Are you all set, Mr. Rusche?

ydk008922.tif (2544x3456x2 tiff)

YL03-04-01

YANKEE ATOMIC ELECTRIC COMPANY

Telephone (508) 779-6711
TWX 710-380-7619

YANKEE

580 Main Street, Bolton, Massachusetts 01740-1398

September 25, 1992
FMD 92-621

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

Dear Sir or Madam:

Enclosed are completed Delivery Commitment Schedules for Yankee Atomic Electric Company. Please note that because the Yankee Nuclear Power Station is permanently shutdown and to facilitate decommissioning, we are requesting that DOE accept all of the spent nuclear fuel in storage at the station over a three year period starting in 1998 as indicated on the DCSs.

Please do not hesitate to call if you have any questions.

Sincerely,

R. M. Grube

R. M. Grube, Director
Fuel Management Department

RMG/JMB/cmc

Enclosure

c: U.S. Department of Energy
Chief, Logistics and Utility Interface Branch
Office of Civilian Radioactive Waste Management
RW-432
1000 Independence Avenue, S.W.
Washington, DC 20585

YDK008922

ydk008924.tif (2544x3458x2 tiff)

NWPA-830C

DISAPPROVED BY DOE December 1, 1992

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 985601442801

1.2 Contact Person:
(a) Name: J. H. Buchheit
(b) Telephone (include Area Code): 508-779-6711

1.3 Contract Number: DE-CR01-83NE44426

1.4 Reactor/Facility Information:
(a) Name: Yankee Nuclear Power Station
(b) Address: Star Route
(c) City, State & Zip Code: Rowe, MA 01367

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 37
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 1998
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 2 12 72 to 10 1 91
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 34.8 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 135 Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] — 25 June 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

YDK008924

ydk008925.tif (2544x3457x2 tiff)

NWPA-830C

DISAPPROVED BY DOE December 1, 1992

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 995601442801

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): 508-779-6711

1.3 Contract Number: DE-CR01-83NE44426

1.4 Reactor/Facility Information:
(a) Name: Yankee Nuclear Power Station
(b) Address: Star Route
(c) City, State & Zip Code: Rowe, MA 01367

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 37
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 2 12 72 to 10 1 91
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 45.1 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 194 Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature illegible] [date illegible]
Authorized Purchaser Signature Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative Title Date

4.2

Contracting Officer Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

YDK008925

ydk008926.tif (2544x3452x2 tiff)

NWPA-830C

DISAPPROVED BY DOE December 1, 1992

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 005601442801

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): 508-779-6711

1.3 Contract Number: DE-CR01-83NE44428

1.4 Reactor/Facility Information:
(a) Name: Yankee Nuclear Power Station
(b) Address: Star Route
(c) City, State & Zip Code: Rowe, MA 01367

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 37
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck X ; Rail ____ ; Barge ____
2.4 Proposed Delivery Date: 2000
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 2 12 72 to 10 1 91
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 47.1 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR ____ PWR 204 Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] — Authorized Purchaser Signature — Date: 25 Sept 1992

3.2 Rudolph H. Grube — Name (Please Type or Print)

3.3 Director, Fuel Management Department — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative ____ Title ____ Date ____

4.2 Contracting Officer ____ Date ____

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

YDK008926

dk037423.tif (2544x3380x2 tiff)

# MEMORANDUM

## YANKEE ATOMIC - BOLTON

| | | | |
|---|---|---|---|
| To | R. M. Grube | Date | September 25, 1992 |
| | | Group # | FMD 92-616 |
| From | J. M. Buchheit | W.O.# | |
| Subject | YANKEE DELIVERY COMMITMENT SCHEDULES (DCS) | LMS.# | Y-L03-04-01 |
| | | File # | |


SUMMARY/RECOMMENDATION

The Standard Contract for spent fuel disposal requires Yankee to submit a Delivery Commitment Schedule (DCS) to DOE for at least the first year of operation of DOE's Waste Management System (WMS), currently considered by DOE to be 1998, by September 30 1992. DOE's instructions for DCS submittal specify that the quantity which DOE will accept must not exceed allocations specified in the December 1991 Annual Capacity Report (ACR). Along with year one, DCSs can also be submitted for any of succeeding year's allocations listed in the ACR. We recommend that Yankee deviate from DOE's instructions to comply with ACR allocations and request that DOE accept all of Yankee's spent fuel in the first three years of WMS operation.


DISCUSSION

The Standard Contract for Disposal of Spent Nuclear Fuel/High Level Radioactive Waste requires that purchasers who have allocations for spent fuel disposal in the 1991 ACR in the first year of WMS operation, currently considered by DOE to be 1998, must submit a DCS for this allocation to DOE by no later than September 30, 1992. Failure to do so will result in Yankee loosing its place in the queue; i.e. Yankee would have no allocation rights in year one. A copy of the DCS form is attached. A purchaser's allocation is based on the 1991 Acceptance Priority Ranking which is a listing of all domestic spent fuel discharged through December 1990 in chronological order, with oldest fuel first.

Although a purchaser is only required to submit a DCS if it has an allocation in the first year, DOE does not prohibit submittals for any of the purchaser's allocations during the 10 years of WMS operation shown in the ACR. In fact, DOE requests that each purchaser submit DCSs for as many allocations as possible to assist them in the planning of the WMS.

I have attached the schedule from the ACR showing Yankee's projected delivery allocation during the initial 10 years of WMS operation. It shows that DOE will accept a total of 56.1 MTU of spent fuel during the period. Deliveries are scheduled in years one through four and six and eight. This quantity is less than half the fuel in the pool. Although, instructions for completing

YDK037423

dk037424.tif (2544x3376x2 tiff)



the DCSs say DOE will reject those which do not correspond with the allocations shown in the 1991 ACR, it is recommended that we deviate from DOE's instructions and request DOE accept all of YNPS spent fuel during the first three years of WMS operation. In doing this we will not jeopardize our right to an allocation in the initial year of WMS operation. However, DOE has the right to reject our request and if rejected will require us to submit revised DCSs. Further, if DOE does not accept the revised DCSs, we are required to negotiate an acceptable schedule with DOE.

Acceptance of all YNPS spent fuel within three years of WMS startup is consistent with Yankee's desire to remove spent fuel from the site as soon as possible to permit orderly decommissioning. It should also be logistically possible to remove all of the spent fuel over a three year period with the proper compliment of multi-element truck casks. More significantly, our request to deliver all YNPS spent fuel on an accelerated schedule will highlight the importance to us for timely acceptance and removal of spent fuel from YNPS. Hopefully, our request will have positive effects especially for those reactors which are decommissioned or are currently contemplating decommissioning; i.e. that it will play a role in convincing DOE to either give priority to permanently shutdown reactors or perhaps increase acceptance rates as a means of assuring timely decommissioning.

J. M. Buchheit
Sr. Nuclear Fuels Engineer

c: A. C. Kadak
A. A. H. Koch
F. X. Quinn
R. A. Mellor

YDK037424