Entergy

**Entergy Services, Inc.**
P. O. Box 31995
Jackson, MS 39286-1995

NFL-2004-0071
September 29, 2004

U.S. Department of Energy
David Zabransky, Contracting Officer
Office of Systems Analysis and Strategy Development (RW-20E)
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Subject: Delivery Commitment Schedule
Indian Point Energy Center – Units 1 and 2
Contract No. DE-CR01-83NE44373

Dear Mr. Zabransky:

On behalf of Entergy Nuclear Indian Point 2, LLC (Entergy), this letter submits the attached Delivery Commitment Schedule (DCS) in response to the letter from the DOE Contracting Officer dated July 28, 2004 (the DCS letter). By submitting the DCS, Entergy is not necessarily agreeing that Entergy's capacity allocations set forth in the Acceptance Priority Ranking & Annual Capacity Report, DOE/RW-0567 (July 2004) are in accord with Entergy's rights under the Standard Contract. In this context, we note that Article V.B.1 of the Standard Contract entitles the Purchaser to "submit to DOE the delivery commitment schedule(s) which shall identify *all SNF and/or HLW the Purchaser wishes to deliver to DOE* . . ." (emphasis added).

The DCS letter and the accompanying instructions are based on DOE's *assumption* that DOE will begin accepting SNF in 2010. In fact, the September 30, 2004 date specified by DOE for filing DCSs is based on the *assumption* that DOE will begin to accept SNF by June 2010, i.e., 63 months after October 1, 2004. Recent developments, such as the Government's decision to accept the US Court of Appeals ruling voiding the EPA (and NRC) 10,000 year repository standard, the NRC's invalidating of the DOE's Licensing Support Network certification, and the continuing Yucca Mountain budget impasse, only reinforce the conclusion that an *optimistic* start date for SNF acceptance is 2015. Entergy's submittal of the DCS accompanying this letter is not to be considered as accepting in any way the validity of DOE's assumption that it will start to accept SNF in 2010, and further does not indicate that Entergy relieves DOE from its contractual requirement to have initiated delivery in 1998.

In addition, DOE must provide prompt notice of any change in its assumption as to the time at which acceptance will start. On DOE's acknowledgement of a delay in the 2010 acceptance start, Entergy expressly reserves the right at its option to treat the DCS accompanying this letter as void and to submit new DCSs based on the then current date for the start of

ALL-STATE LEGAL®
EXHIBIT
1

acceptance. Failure of the DOE to provide a realistic start date for acceptance will be considered a breach of its obligation of good faith and fair dealing.

Entergy is submitting the DCS accompanying this letter in response to DOE's request. This submission should not be interpreted as implying that the DCS is contractually binding. Nothing in the Standard Contract provides that DCSs are contractually binding, nor has DOE treated them as such. Submission of this DCS does not in any way relieve DOE of its responsibility under the contract to accept Entergy's SNF "as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel."

Consolidated Edison Company of New York, Inc., the previous owner of Indian Point Energy Center, Units 1 and 2, and previous contract holder of this spent fuel contract, pursuant to DOE's instructions beginning in 1992, submitted DCSs which were either approved or not acted upon by DOE. Neither the DOE letter of July 28, 2004, nor the instructions accompanying it, explain the status of those DCSs. Based upon this silence, and the fact that Entergy's allocations in the 2004 APR/ACR are based upon the same spent nuclear fuel that qualified Entergy for the earlier allocations, Entergy considers these previous DCSs null and void.

Entergy reserves the right to share allocations under all of the spent fuel contracts to which Entergy Corporation and its subsidiaries are a party such that Entergy may designate any allocation under any of the contracts to any reactor facility owned by any Entergy Corporation subsidiary. Furthermore, Entergy reserves the right to modify the attached DCS, and any future DCS, and change the reactor facility designated under any allocation.

Entergy notes that in several aspects, the DCS form provided with the DCS letter is inconsistent with the DCS form as it appears in the Standard Contract (Appendix C). This represents an unauthorized unilateral change to Entergy's contract (as well as an unauthorized change to 10 CFR Part 961). For example, the entry in Appendix C of the Standard Contract "DOE Assigned Delivery Commitment Date" does not appear in the DCS form accompanying the DCS letter. This has the effect of effectively deleting from the contract the 4 month flexibility window afforded to the Purchaser. Art. V.B.2. By submitting the DCS form accompanying this letter, Entergy does not waive any unauthorized unilateral modification to the Standard Contract, including Appendix C thereto. DOE's unilateral attempts to modify the Standard Contract reinforce the need for DOE to restart the ACR Issue Resolution Process or institute an equivalent process working jointly with the Purchasers.

In particular, Entergy notes that DOE *assumes* that each DCS is assumed to be for "Standard Fuel." General Instruction 7(f). This assumption in inconsistent with the Standard Contract, which does not require the provision of that information until 60 days before the scheduled transportation date. Art. IV.A.2(b) and VI.A.2; Appendix F. DOE should make no such assumption with respect the SNF covered by the DCS transmitted with this letter. In this context, Entergy also notes that DOE's statement in General Instruction 7(f) that "Purchaser *must* submit proposed handling/shipping procedures to DOE for evaluation and confirmation" for "other than standard fuel" is inconsistent with, and not authorized by, the Standard Contract.

Entergy's response to the DCS letter should not be construed as acknowledging that the DCS process set forth in the accompanying instructions is a workable one. In fact, Entergy remains convinced that there are numerous problems with the mechanisms currently assumed by DOE that will make real-world implementation difficult, if not impossible. Both DOE and the utility industry recognized these problems when they sought to work cooperatively in the 1990's to identify and resolve them. Some 35 implementation issues were defined and some cooperative efforts undertaken to resolve them. Unfortunately, what became known as the ACR Issue Resolution process was prematurely halted. We would urge that DOE promptly restart that process while there is still time to develop the necessary changes to the process and incorporate those changes into the Standard Contract and the individual Entergy contracts with DOE.

Entergy considers the information provided in the attached DSC to be confidential. Entergy is submitting the information on the condition that it will be treated as confidential and not publicly released. If Entergy is not correct in its understanding that the information will be treated as confidential, Entergy requests that DOE provide it with prompt notice so that Entergy can determine whether to retract and or redact such information.

Submission of this DCS does not waive, and Entergy specifically reserves, all pending or future claims or causes of action against DOE relating to its non-performance of the Standard Contract.

If you have any questions or require further information, please do not hesitate to call me at (601) 368-5750.

Sincerely,

FBR:rag
Attachment

Refs. 19, 20, 21, 22, 23, 53, 134, 151

Case 1:03-cv-02626-CFL Document 44-2 Filed 01/24/2005 Page 4 of 5
ERI Original Document – Please Return



# *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*

ALL-STATE LEGAL®
EXHIBIT
2

555

U.S. DEPARTMENT OF ENERGY

OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

SEPTEMBER 1995

Table 1-2 MGDS Receipt/Emplacement Rates

| Year | MGDS Receipt/Emplacement Rate (MTU SNF, Canisters of HLW) |
|---|---|
| 2010 | 300 MTU SNF |
| 2011 | 600 MTU SNF |
| 2012 | 1,200 MTU SNF |
| 2013 | 2,000 MTU SNF |
| 2014 | 3,000 MTU SNF |
| 2015 - 2037 | 3,000 MTU SNF + 750 HLW Canisters |
| 2038 | 3,000 MTU SNF + 175 HLW Canisters |
| 2039 | 3,000 MTU SNF + 345 HLW Canisters |
| 2040 | 1,854 MTU SNF + 576 HLW Canisters |

The acquisition costs of MPCs provided to utilities are included. Costs for deliveries of MPCs also are included, commencing in 1998 in accordance with the schedules in the ACR [Reference 4]. Full burnup credit is assumed for transportation and long-term storage for all MPCs. The capital costs for welding equipment and on-site transfer equipment required to support MPC use are included in the estimate. MPC loading expenses and costs of any materials and equipment required for criticality control are incurred by the utilities and are not included in the estimate. Capital costs for on-site storage, and all operations costs for on-site storage and transfer are borne by the utilities. All fuel stored in existing dry storage systems is loaded into MPCs or legal weight truck casks prior to acceptance at utility expense.

For the purpose of TSLCC analysis, all SNF rail shipments from reactors are assumed to be made by dedicated trains. The remaining SNF is bare fuel and is shipped by truck. DOE has not made a policy decision to use dedicated trains. Dedicated train transportation surcharges are more expensive than general freight charges, however security costs, barge, and heavy haul costs increase when general freight transportation is utilized. This assumption is made for cost estimation purposes only, and will be reassessed in the future.

The analysis assumes that five transportation cask designs are required, specifically two for truck transportation (Pressurized Water Reactor (PWR) fuel assembly casks and Boiling Water Reactor (BWR) fuel assembly casks), two for MPC rail transportation (large and small MPC), and one for HLW rail transportation. Acquisition, maintenance, and decommissioning costs of transportation casks are considered in the estimate. Cask contingencies are assumed to be sufficient to procure any specialty casks required to accommodate assemblies that cannot be stowed in one of the five designs.