# In the United States Court of Federal Claims

No. 03-2626-C

(Filed: March 3, 2005)

***********************************

ENTERGY NUCLEAR GENERATION CO.,

Plaintiff,

v.

UNITED STATES,

Defendant.

***********************************

Spent nuclear fuel case; standing; motion for summary judgment; RCFC 56; Nuclear Waste Policy Act of 1982; exception to rules of merger and bar for damages from partial breach; *Restatement (Second) Judgments* § 26

Alexander D. Tomaszczuk, Shaw Pittman LLP, McLean, VA, for plaintiff. With him on the briefs were Jay E. Silberg, Devon E. Hewitt, Michael G. Lepre, Daniel S. Herzfeld, and Jack Y. Chu, Shaw Pittman LLP, Washington, DC.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director. Of counsel was Jane K. Taylor, Office of General Counsel, United States Department of Energy.

## OPINION AND ORDER

LETTOW, Judge.

This case involves the storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). Entergy Nuclear Generation Company ("Entergy") is the current owner of the Pilgrim Nuclear Power Station ("Pilgrim") in Plymouth, Massachusetts. Pilgrim's prior owner, Boston Edison Company ("Boston Edison"), had entered into a contract with the Department of Energy ("DOE") under the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2202 (Jan. 7, 1983) (codified as amended at 42 U.S.C. §§ 10101-10270), obligating DOE to begin disposal of Pilgrim-generated SNF no later than January 31, 1998. Entergy purchased Pilgrim from Boston Edison on July 13, 1999. At that point, DOE had not yet begun to dispose of Pilgrim's SNF, and DOE still has not done so. The purchase agreement

between Entergy and Boston Edison, as interpreted by the parties to that contract, grants Entergy the rights to claims against DOE accruing after the date of purchase.

Entergy filed suit against the United States on November 5, 2003, alleging a partial breach of contract, a breach of the implied covenant of good faith and fair dealing, and an uncompensated taking. Entergy has filed a motion for summary judgment on liability for DOE's partial breach of contract, and the government has filed its own cross-motion for summary judgment on liability. Entergy avers that DOE has failed to satisfy its obligations to pick up and dispose of Pilgrim's SNF. The government contends that Entergy lacks the necessary injury in fact to have standing, that a finding of liability prior to the date when the government would first dispose of Pilgrim's SNF under DOE's disposal procedures would be inappropriate, and that Entergy has failed to provide the requisite evidence of resultant injury to support a finding of liability. For the reasons set out below, Entergy's motion for partial summary judgment on liability is granted, and the government's cross-motion for summary judgment is denied.

## BACKGROUND[1]

The controversy surrounding the storage and disposal of SNF and HLW has been the subject of a number of opinions by the Courts of Appeals for the District of Columbia and Federal Circuits, and by the Court of Federal Claims.[2] Because the context for this suit has been described in detail elsewhere, only those facts relevant to the parties' arguments on the pending motions in this case are recounted below.

### A. *The NWPA*

On January 7, 1983, the NWPA was enacted, in part to "establish the Federal responsibility, and a definite Federal policy, for the disposal" of SNF and HLW, 42 U.S.C. § 10131(b)(2), while ensuring "that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel." 42 U.S.C. § 10131(b)(4). To accomplish these and other purposes, the NWPA authorized the Secretary of DOE to enter into contracts with any entity that generates or holds title to SNF or HLW of domestic origin for the transfer of title, transportation, and disposal of such spent fuel or waste. *Id.* § 10222(a)(1). The NWPA conditioned the renewal of facilities' licenses on their entering or negotiating in good faith to enter such contracts with DOE. *Id.* § 10222(b)(1)(A).

---

[1]The recitation of facts in this opinion does not constitute findings of fact. The facts delineated below are either undisputed or alleged and assumed to be true for the purposes of the pending motions. Where material facts are disputed, the dispute is noted and resolution is reserved for further proceedings.

[2]*See Boston Edison Co. v. United States*, ___ Fed. Cl. ___, ___ n.3, 2005 WL 375603, at *1 (Feb. 15, 2005) (listing cases that constitute part of the background for disputes over SNF disposal contracts).

After notice and a comment period, DOE promulgated a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, codified at 10 C.F.R. § 961.11 ("Standard Contract"). *See* 48 Fed. Reg. 5,458 (Feb. 4, 1983). Under the Standard Contract, nuclear utilities paid (or deferred or prorated payment with accruing interest on the unpaid portion) a one-time fee, as well as a continuing fee based on the amount of electricity a facility generated and sold. Standard Contract, art. VIII.A-B. In exchange for the utilities' payment of fees, the Secretary agreed to dispose of the HLW and SNF generated by and at a contracting nuclear plant beginning no later than January 31, 1998. *Id.*, art. II. The NWPA mandated that the deadline of January 31, 1998 for commencement of disposal services be included in the Standard Contract. 42 U.S.C. § 10222(a)(5).

B. *The Standard Contract*

The Standard Contract set up a system by which DOE could collect SNF and HLW for disposal. DOE was to issue an annual capacity report ("ACR") for planning purposes every year beginning on July 1, 1987, which report would set forth the projected capacity for DOE's disposal facility or facilities and "the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW," including a report of the capacity for the ten years following the repository's opening. Standard Contract, art. IV.B.5(b). This report was to help determine the amount of SNF that DOE would dispose in a given year. Acceptance priority rankings ("APRs") would determine which SNF would be collected, and such reports were to be issued commencing on April 1, 1991. *Id*., art. IV.B.5(a). The general rule was that the oldest fuel or waste would have the highest priority. *Id*., art. VI.B.1.

Beginning on January 1, 1992, utilities could submit delivery commitment schedules ("DCSs") identifying all SNF and HLW the utility would like DOE to collect starting sixty-three (63) months later. *Id.*, art. V.B.1. DOE was to take action on the DCS within three months of receipt. *Id.* If DOE disapproved a DCS, it was to advise the utility of the reasons for disapproval in writing and request that the utility submit a revised schedule within thirty days. *Id*. DOE was required to take action on the revised DCS within sixty days. *Id*., art. V.B.2. No later than one year prior to the scheduled delivery, utilities were scheduled to submit a final delivery schedule ("FDS"). *Id*., art. V.C. Utilities had the right to adjust the quantities of SNF and/or HLW "plus or minus (+-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule." *Id.*, art. V.B.2.

An additional right that utilities possessed under the contract was the right to engage in SNF "put-option" trading. *See* Standard Contract, art. V.E (granting utilities "the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW" provided that DOE receive notice no later than six months before the delivery date and approve the exchange). This provision enabled the market to adjust the order of SNF disposal, a possibility particularly useful to those facilities with less available storage space.

DOE has halted the approval of DCSs. At some time prior to the January 31, 1998 deadline, DOE suspended the DCS process, such that no DCS would be approved. *See* Pl.'s

App. 2, 4 (Dep. of David Zabransky, Contracting Officer, Department of Energy (Apr. 17-18, 2002)) (stating that "[u]nder the current guidance" DOE would not approve a utility's DCS).[3] The resulting hiatus extended for at least seven years. Then, in July 2004, DOE issued instructions to utilities to file new DCS applications based on a revised 2010 start date instead of the 1998 date specified in the Standard Contract. Defendant's Response to Plaintiff's Motion for Leave to Supplement Its Reply ("Def.'s Supp. Br.") at 3. Those instructions stated that DCS applications must be submitted by September 30, 2004 in order to comply with the 63-month requirement of the Standard Contract. *See* Def.'s Supp. Br., Ex. 1 (Sample Letter from David Zabransky, Contracting Officer, Department of Energy, to Contract Holder (July 27, 2004) ("Sample Letter")). However, this resumption of the DCS process was very brief. By the end of 2004, DOE had again suspended the DCS process, advising that "the resumption of the DCS process was premature" and declaring that DOE would resume the DCS process "[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository." *See* Plaintiff's Supplemental Brief ("Pl.'s Supp. Br."), Ex. 1 (Letter from David Zabransky, Contracting Officer, Department of Energy, to Frank Rives, Entergy Operations, Inc. (Dec. 1, 2004)). This aborted effort in 2004 to reinstitute the DCS process signals that no disposal of SNF will occur during 2010, taking into account the 63-month period between designation and collection, and moreover that disposal may not occur within any foreseeable time in the future. No repository is available. *See Nuclear Energy Inst. v. Environmental Prot. Agency*, 373 F.3d 1251 (D.C. Cir. 2004) (addressing issues associated with the selection of Yucca Mountain, Nevada, as the site of a nuclear waste repository for the nation). In the circumstances, the viability of DCSs submitted in the 1990s and in 2004 is questionable.[4]

---

[3]Entergy alleges that "DCS forms submitted after 1995 would not have been approved by DOE." Pl.'s Reply in Support of Its Motion for Summary Judgment ("Pl.'s Reply") at 16. Entergy avers that starting in March 1997, DOE issued letters stating that it would not approve or disapprove of DCS submissions, and unilaterally voided DCSs that had been previously approved in 1996. *Id.* The precise date on which this suspension took place is an issue of fact to be determined, if necessary, at trial.

[4]The DCS process initiated by DOE in 2004 was premised on a total yearly disposal capability of a repository that was more than double that used for planning purposes in the 1990s. *Compare* Pl.'s App. 144 (DOE Acceptance Priority Ranking and ACR (July 2004)) (projecting capacity for 10-year period to be 22,200 MTU), *with* Def.'s App. 239 (DOE Acceptance Priority Ranking and ACR (March 1995)) (projecting capacity for 10-year period to be 8,200 MTU). In all events, the backlog of SNF and HLW to be deposited has grown substantially over the years, and the position of particular holders of SNF and HLW in the queue for priority of disposal may well have shifted. In 2004, DOE encouraged "the submittal of DCSs for all the years in which you [utilities] have allocations." Def.'s Supp. Br., Ex. 1, at 1 (Sample Letter). An official of the Tennessee Valley Authority then raised questions about whether DOE had "abandoned" the DCSs that had been submitted and approved in the 1990s. Def.'s Supp. Br., Ex. 2 (Letter from John Carden, Contracting Manager, Tennessee Valley Authority, to David Zabransky, Contracting Officer, Department of Energy (Aug. 24, 2004)). DOE responded that "it will be difficult to plan for acceptance of SNF based upon the previously approved DCSs" and that "new DCSs that are approved will replace, rather than supplement, the previously approved DCSs,"

C. *Pilgrim Nuclear Power Station*

Pilgrim's prior owner, Boston Edison, signed a Standard Contract with the Department of Energy on June 17, 1983. Plaintiff's Proposed Findings of Uncontroverted Fact ("PFUF") ¶ 1; Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ("DRPFUF") ¶ 1. This contract included a provision that stated "[t]he rights and duties of the [utility] may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer." Standard Contract, art. XIV. This contractual provision implemented a specific statutory authorization in the NWPA for assignments. *See* 42 U.S.C. § 10222(b)(3) ("The rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved."). Boston Edison exercised its right to make an assignment of the Standard Contract on July 13, 1999, when it sold the Pilgrim facility to Entergy. PFUF ¶ 2; DRPFUF ¶ 2. On that same date, Boston Edison notified DOE of the sale, stating that "such sale includes the transfer and assignment of Boston Edison's rights and obligations under the captioned contract, with the exception of any claims against the Department of Energy accrued prior to the date of transfer." Def.'s App. 378 (Letter from James Judge, Senior V. P. and Treasurer, Boston Edison, to DOE (July 13, 1999)). The parties have interpreted the agreement to mean that Boston Edison reserved any claims against the government that accrued prior to the closing date, and Entergy acquired all later accruing claims. Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact ("PRDFUF") ¶ 44. Boston Edison and Entergy have both filed claims in this court.[5]

---

depending upon agreements reached in writing:

> Because of the increased anticipated acceptance rates and the currently anticipated acceptance dates, *it will be difficult to plan for acceptance of SNF based upon the previously approved DCSs*, which contain allocations that do not conform to the current anticipated rates. In addition, Purchasers may now wish to change the location from which the SNF is to be accepted or the dates of discharge identified in the original DCS submissions. Accordingly, any new DCSs that Purchasers submit may reflect these changes or request acceptance of the additional SNF covered by the new allocations granted. We anticipate that *any new DCSs that are approved will replace, rather than supplement, the previously approved DCSs*. To eliminate any potential confusion regarding the relationship between previously approved DCSs and new DCSs, *we will seek, prior to approving new DCSs from any Purchasers with previously approved DCSs, an agreement in writing that any new DCSs that are approved actually replace, rather than supplement, the previously approved DCSs*. That agreement will be reflected in any future DCS approvals.

Def.'s Supp. Br., Ex. 3, at 2 (Letter from David Zabransky, Contracting Officer, Department of Energy, to John Carden, Contracting Manager, Tennessee Valley Authority, (Nov. 3, 2004)) (emphasis added).

[5]In *Boston Edison*, this court recently denied a motion by the government to dismiss, or, in the alternative, for summary judgment on, Boston Edison's claims. *See Boston Edison*, ___ Fed. Cl. at ____, 2005 WL 375603, at *20.

Boston Edison had submitted, and DOE had approved, a DCS in 1993 for acceptance of SNF between January 31, 1999 and January 30, 2000. Defendant's Proposed Findings of Uncontroverted Fact ("DFUF") ¶ 37; PRDFUF ¶ 37. DOE had also approved Boston Edison's DCS for acceptance of SNF in 2000 and 2001. DFUF ¶ 38; PRDFUF ¶ 38; Defendant's Cross-Motion for Summary Judgment ("Def.'s Cross-Mot.") at 13. In 1998, Boston Edison had also submitted a DCS for 2004, but DOE had returned it to the utility, waiving the requirement of resubmittal within 30 days. PRDFUF ¶ 37. Thereafter, Boston Edison did not submit an FDS because DOE's suspension of the DCS process rendered such action futile. *See Boston Edison*, ___ Fed. Cl. ___, 2005 WL 375603, at *2. During the brief period that DOE had restarted the DCS process in 2004, Entergy did not submit a DCS application because DOE required submissions only for the 2010 year. Nonetheless, one of its sister companies, Entergy Services, Inc., submitted a DCS in 2004 on behalf of Entergy Nuclear Indian Point 2, LLC, in which it reserved "the right to share allocations under all of the spent fuel contracts to which Entergy Corporation and its subsidiaries are a party such that Entergy may designate any allocation under any of the contracts to any reactor facility owned by any Entergy Corporation subsidiary." Plaintiff's Supplemental Reply Brief ("Pl.'s Supp. Reply Br."), Ex. 1, at 2 (Letter from Frank Rives, Entergy Services, Inc. to David Zabransky, Contracting Officer, Department of Energy (Sept. 29, 2004)); Pl.'s Supp. Reply Br. at 2 n.1.

D. *This Lawsuit*

Entergy filed its complaint on November 5, 2003, alleging that the government had partially breached the Standard Contract and the implied covenant of good faith and fair dealing, and that the failure to remove Pilgrim's SNF constituted an uncompensated taking. *See* Compl. ¶¶ 22-34. It subsequently filed a motion for summary judgment on liability under the partial-breach-of-contract claim. The government responded by filing a cross-motion for summary judgment on liability, presumably relating to all three claims, challenging Entergy's standing to sue on the claims, arguing that the DCS process should determine the date of breach, and stating that Entergy had not shown that it had been damaged by DOE's partial breach. According to the government, the appropriate date of breach was January 30, 2000, the last possible date to collect Pilgrim's SNF under the DCS process. Entergy replied by noting that the DCS process was suspended in 1997 or earlier, that it was not binding, and that it was being used improperly by the government to minimize its losses once it had become evident the January 31, 1998 deadline would not be met. A hearing was held on January 7, 2005 to address these motions. Thereafter, at the parties' request, supplemental briefs were filed, with the last such brief being filed on January 24, 2005.

**STANDARD FOR DECISION**

Courts should grant summary judgment only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c). *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). The party moving for summary judgment bears the initial burden of showing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court should resolve any doubts in favor of the non-moving party, but if no rational trier of fact could find for the non-moving party, the

motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). When considering cross-motions for summary judgment, both motions should be considered on their own merits, and the court should deny both motions if genuine disputes over material facts exist. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

**ANALYSIS**

Federal courts address threshold issues of jurisdiction before considering the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998). This court has subject matter jurisdiction over Entergy's claims under the Tucker Act, 28 U.S.C. § 1491. *See Boston Edison*, ___ Fed. Cl. ___, 2005 WL 375603, at *5-10. *Contra Florida Power & Light Co. v. United States*, ___ Fed. ___, 2005 WL 318678 (Jan. 31, 2005).

Jurisdictionally, the government has challenged Entergy's standing to assert claims for a partial breach in addition to resisting Entergy's motion for partial summary judgment and supporting its own cross-motion. *See* Def.'s Cross-Mot. at 4-8. Consequently, the court will first analyze the government's arguments on standing before proceeding to address the other grounds pertinent to the cross-motions for partial summary judgment.

*STANDING*

Every plaintiff in a federal court must satisfy the constitutional minimum for standing, which includes the requirement that the plaintiff suffer an injury in fact. For this purpose, an injury must be concrete and particular to the plaintiff, as well as actual or imminent, fairly traceable to the actions of the defendant, and redressable by a favorable decision on the merits. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Because this case is at a summary judgment stage, plaintiff's burden to show standing corresponds to the standards for summary judgment. *Id.* at 561. The government challenges Entergy's injury in fact prior to its purchase of Pilgrim on July 13, 1999. Def.'s Cross-Mot. at 6-8. Entergy replies that it is not seeking damages incurred prior to the date of purchase. Pl.'s Reply at 2. Because the present suit does not seek any damages prior to July 13, 1999, the court need not address whether Entergy would have standing to pursue such claims.[6]

Entergy's injury in fact is demonstrated by the circumstances that arose following its purchase. Even accepting the government's contentions for purposes of argument, DOE has failed to collect 3.88 metric tons uranium ("MTU") of SNF prior to January 30, 2000, and 25.42 MTU of SNF prior to January 30, 2001, amounts that were approved through the DCS process. DFUF ¶¶ 37-38. Entergy has had to store this SNF that DOE was contractually bound to collect. Pilgrim allegedly incurred damages in storing its SNF after the closing date, July 13, 1999. Pl.'s

---

[6]The government also argues that utilities are prohibited by the Assignment of Claims Act, 31 U.S.C. § 3727, from assigning pre-existing claims against the Department of Energy to another utility. Def.'s Reply at 2-6. Because Entergy is not seeking to recover any damages incurred prior to its purchase of Pilgrim, the court need not decide this issue.

Reply at 11.[7] The central dispute between the parties concerns the nature and extent of the damages suffered, including whether the costs and losses encompassed by Entergy's damage claims were directly attributable to that breach.[8] These disputes must be resolved via trial. The injury allegedly suffered by Entergy is sufficient to satisfy standing requirements.

---

[7]Entergy claims that racks were added to their spent fuel pool in 1994 and 2000, and that preparations are being made to add additional racks in 2007. Hr'g Tr. 21, 23. The government resists this claim on the ground that re-racking costs in 2000 and costs to prepare for a further re-racking in 2007 have not been established through documentary evidence that would be admissible at trial. *Id*. at 29, 31. Entergy's re-racking claims mirror those made by Boston Edison's separate claims for damages attributable to an alleged breach by DOE of the Standard Contract applicable to Pilgrim. *See Boston Edison*, __ Fed. Cl. __, 2005 WL 375603, at *15. As the court noted in *Boston Edison*, "'[r]e-racking essentially is removing existing fuel racks [from a pool] and replacing them in a tighter formation so the same pool can accommodate more fuel rods. The newer "high density" racks provide additional capacity for fuel assemblies.'" *Id.* (quoting *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 643 (2004)).

The costs of re-racking, if proven at trial, would constitute an incidental loss compensable as damages should the evidence show that the re-racking was done to mitigate Entergy's loss due to the breach. *Boston Edison*, __ Fed. Cl. __, 2005 WL 375063, at *15. The court agrees with the government that Entergy could have provided more admissible evidence than it did to establish its injury in fact based upon re-racking costs. Nonetheless, Entergy has made the requisite showing that it has standing. When a plaintiff challenges a governmental action or inaction and the plaintiff, rather than a third party, is the object of that action or inaction, "there is ordinarily little question that the action or inaction has caused him injury." *Lujan*, 504 U.S. at 561-62. Given this relatively low threshold, Entergy's allegations and the attendant circumstances show that Entergy has allegedly suffered sufficient injury in fact to maintain the present suit.

[8]The government contends that its obligation to pick up and dispose of SNF from Pilgrim under the Standard Contract turns on the DCSs submitted by Boston Edison and Entergy for SNF from Pilgrim and approved by DOE. Def.'s Cross-Mot. at 8-13. That proposition seems dubious in light of the determinations by the D.C. and Federal Circuits that "the NWPA imposes an unconditional obligation on the Department [of Energy] to begin disposal of the SNF by January 31, 1998." *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 761 (D.C. Cir. 1997). *See also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000); *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1275-76 (D.C. Cir. 1996). For this and other reasons, the government's argument based on DCSs has not been accepted in other decisions by this court. *See, e.g.*, *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 503-05 (2005); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 655-56 (2003).

At this juncture, it is not necessary to rule definitively on the government's contention regarding the role of DCSs because the government concedes that "the delivery commitment schedules submitted by B[oston Edison], and subsequently approved by DOE, establish that DOE's first post-assignment obligation to accept SNF and/or HLW [from Pilgrim] would have occurred between January 31, 1999 and January 30, 2000." Def.'s Cross-Mot. at 8. It is undisputed that the government did not pick up SNF from Pilgrim on this schedule.

For a plaintiff to have standing to pursue a contract claim in this court, it must be in privity of contract with the government or the third party beneficiary of a contract with the government. *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003). In this instance, Entergy is the assignee of a contract that Boston Edison signed in privity with the government. The NWPA expressly allows the assignment of Standard Contracts, 42 U.S.C. § 10222(b)(3), quoted *supra* at 5, and Article XIV of the Standard Contract specifies the notice that must be given for an assignment of the contract. *See supra*, at 5 (quoting art. XIV). The Pilgrim contract was assigned to Entergy in accordance with these provisions and the requisite notice was supplied, giving Entergy privity of contract with the government. Accordingly, the government's motion for summary judgment on standing is denied.

*PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

Plaintiff moves for summary judgment on the issue of liability for partial breach of contract. Plaintiff argues that the Standard Contract required that DOE dispose of Pilgrim's SNF beginning no later than January 31, 1998. Because DOE has still not begun disposing of its SNF over seven years later, DOE has partially breached the contract. Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") at 1-3. Entergy argues that the partial breach occurred on January 31, 1998, and that the breach has caused ongoing damages inclusive of costs incurred in storing the SNF that DOE should have disposed. *Id.*; Pl.'s Reply at 10-11. As described in detail in *Boston Edison*, the date of the breach in this case is an issue of fact to be determined at trial. *See* ___ Fed. Cl. at ___, 2005 WL 375603, at *16, 19. The January 31, 1998 date does not necessarily carry the import Entergy suggests. Nonetheless, the evidence is sufficient to support the conclusion that DOE had partially breached the Standard Contract for Pilgrim prior to Entergy's purchase of the facility.

The government emphasizes in its response that plaintiff's motion is for summary judgment on liability, not merely for partial breach of contract, and that a judgment on liability requires a minimal showing of damages. *Puritan Assocs. v. United States*, 215 Ct. Cl. 976, 978 (1977) ("[E]ven if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so for the reason stated."). "[T]here must be *some* evidence of damage . . . sufficient to demonstrate that the issue of liability is not purely academic; that some damage has been incurred." *Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605-06 (Ct. Cl. 1971) (explaining the long-established rule of *injuria absque damnum*). The government argues that plaintiff has failed to provide even the slightest evidence of damages, and thus it should not be awarded a summary judgment on liability. Hr'g Tr. at 28-35. Entergy's evidence of resultant injury, similar to its evidence of injury in fact to support standing, is sufficient to sustain its motion. Entergy has had to store the SNF that DOE was supposed to have collected years ago. And, DOE's failure to collect SNF from any facility in the industry has abrogated Pilgrim's option under Article V.E of the Standard Contract to engage in SNF "put-option trading," *i.e.*, it has not been able to "exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW." Standard Contract, art. V.E. Because Pilgrim was built to hold only a relatively small amount of spent fuel on-site, *see Boston Edison*, __ Fed. Cl. __, 2005 WL 375603, at *13, put-option trading would be

potentially important to Pilgrim. Correlatively, because DOE has not accepted any SNF for disposal from any utility, it is quite likely that DOE will reinitiate the DCS process if and when a storage facility becomes available, and in that event "the administrative costs of the DCS process may constitute an additional loss." *Boston Edison*, __ Fed. Cl. __, 2005 WL 375603, at *16. Trial on damages will determine the precise sum of damages, but Entergy has satisfactorily shown that it has suffered resultant injury. Entergy's motion for summary judgment on liability is granted.

*GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT*

The government's cross-motion for summary judgment adds the contention that the Standard Contract is an alternative contract. Def.'s Supp. Br. at 8-12.[9] An alternative contract is one where "a party promises to render some [sic] one of two or more alternative performances either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." 11 Arthur L. Corbin, *Corbin on Contracts* § 1079 (2004). Traditionally, in the case of a breach of such a contract, the amount of damages awarded to the promisee is the value of the least valuable service the promisor could have chosen. *Restatement of Contracts* § 344 (1932) ("damages for breach of an alternative contract are determined . . . in [the] case of breach without an election, in accordance with the alternative that will result in the smallest recovery."). The justification for this rule "is that the court may not place the promisee in a better position than had the contract been performed – it presumes that the promisor had bargained for the flexibility of the alternatives and, therefore, should be liable for no more than the least expensive alternative he could have chosen." *Koby v. United States*, 53 Fed. Cl. 493, 501 (2002). The government argues that DOE had sufficient discretion in its DCS and FDS approval processes under the Standard Contract such that it should be required to pay the minimal value of the services it could have provided Entergy.

The government misconceives the discretion it has under the Standard Contract and is incorrect that such discretion would constitute an alternative contract. An alternative contract requires that the parties deem the alternative means of performance as roughly equivalent to the consideration of the promisee. *See* 11 *Corbin on Contracts* § 1079. In this case, for the Standard Contract to be an alternative contract, both parties would have had to agree at the time the contract was signed that any of the range of alternatives DOE now says it can pursue to adjust collection of SNF under the Standard Contract would support the consideration provided by the fees paid by the utilities. *See Bellevue Sch. Dist. No. 405 v. Bentley*, 684 P.2d 793, 796 (Wash. Ct. App. 1984) (noting that "[t]he time at which the value of the alternatives is to be judged is at the time of contracting"). The government has offered no evidence to suggest such a mutual understanding between DOE and Entergy.

---

[9]The government's cross-motion does not directly address Entergy's claims that DOE breached the implied covenant of good faith and fair dealing and that DOE's actions constituted an uncompensated taking. Because the government has not shown the court any reason to grant summary judgment in its favor on these counts, the court denies the government's motion for summary judgment to the extent it seeks judgment on either of these counts.

Realistically, this argument is a reprise of the contention made by the government to the D.C. Circuit that its pick up and disposal obligations under the Standard Contract were ineluctably linked to the availability of a repository, a contention that the D.C. Circuit firmly rejected. *See Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1275-76 (D.C. Cir. 1996). In effect, the government seems to be arguing that DOE has virtually unfettered discretion to determine its obligations under the contract, through the DCS process or otherwise, especially where no respository is available. Such an unbounded discretion would render a contract illusory. *See Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (internal citations omitted) (stating that an unenforceable illusory promise is characterized by words that "do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action subject to his own future will"). Even if the contract were an alternative contract, it would violate the implied covenant of good faith and fair dealing for the government to agree to dispose of fuel in exchange for fees and then ultimately to decide that it could accept no fuel at all. *Cf. Tennessee Valley Auth. v. United States*, 60 Fed. Cl. 665 (2004) (holding that plaintiff utility could recover damages after DOE refused to act on its DCS application). In all events, the Standard Contract is not an alternative contract.

*ENTERGY'S DAMAGES*

Given the court's holding that DOE is liable for a partial breach of contract, and the likelihood that Entergy's damages will continue beyond 2010, the court should consider what damage claims it will address at trial. Trial on damages will lead to a final judgment, and as a general rule, "[w]hen a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see [*Restatement (Second) Judgments*] §§ 18, 19 [1982]), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Restatement (Second) Judgments* § 24(1). *See also Young Eng'rs, Inc. v. International Trade Comm'n*, 721 F.2d 1305, 1314-15 (Fed. Cir. 1983); *Tennessee Valley Auth.*, 60 Fed. Cl. at 676-78. This case, however, falls into one of the exceptions to the general rule of merger and bar. *Restatement (Second) Judgments* § 26(1), ensures that

> the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant [when] . . . (b) The court in the first action has expressly reserved the plaintiff's right to maintain the second action; or . . . (e) For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an option to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course.

The court hereby adopts the exceptions to the rules of merger and bar set out in *Restatement (Second) Judgments* § 26(1)(b) and (e). At trial, the scope of Entergy's claims for damages resulting from the partial ongoing breach of the Standard Contract shall be limited to those damages incurred between July 13, 1999 (the date Entergy purchased Pilgrim) and the end of Entergy's most recently closed fiscal year prior to the date of the trial. Entergy shall retain the

right to bring subsequent actions for damages it sustains after the period encompassed by this trial. *See Tennessee Valley Auth.*, 60 Fed. Cl. at 677-78.[10]

**CONCLUSION**

For the reasons set out in this opinion, Entergy's motion for partial summary judgment on liability is GRANTED, except that the date of the breach is an issue of fact to be resolved, if necessary, at trial. The government's cross-motion for summary judgment is DENIED.

Trial of issues regarding the date of breach and measure of damages is necessary. The scope of Entergy's claims for damages shall be limited to those damages incurred between the date of Entergy's purchase of the Pilgrim plant and the close of the most recent fiscal year prior to a trial in this case. Entergy shall retain claims for damages it incurs after the most recent fiscal year prior to trial. The parties shall submit a joint status report on or before April 11, 2005, setting forth a plan for completion of discovery and a proposed schedule for further proceedings in this case, addressing the requirements of RCFC Appendix A ¶¶ 5 and 12 (final sentence).

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

[10]As in *Tennessee Valley Authority*, this court's statute of limitations does not preclude this procedure. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Claims do not accrue until the claimant has suffered damages, but such damages need not be calculable with precision. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (quoting *Terteling v. United States*, 167 Ct. Cl. 331, 339 (1964)). Entergy's future claims for damages will accrue for purposes of this court's statute of limitations at the time such damages are incurred. Consequently, to satisfy this court's statute of limitations, Entergy must file future claims for recovery within six years of incurring the relevant damages.