IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BOSTON EDISON COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 99-447C (J. Allegra) |

AMENDED COMPLAINT

1. This is an Amended Complaint for damages by Plaintiff, Boston Edison Company ("Boston Edison"), against Defendant, the United States of America, acting by and through the U.S. Department of Energy ("DOE"), for breach of contract and breach of the implied covenant of good faith and fair dealing, and for just compensation for uncompensated taking in violation of the Fifth Amendment to the U.S. Constitution, caused by DOE's failure to meet its obligations under the Nuclear Waste Policy Act of 1982 ("NWPA" or "Act"), as amended, 42 U.S.C. § 10101 *et seq*., and its contract with Boston Edison to begin removal and disposal of Spent Nuclear Fuel and high-level nuclear waste ("SNF") at the Pilgrim Nuclear Power Station ("Pilgrim"). This Amended Complaint incorporates Boston Edison's previously filed Complaint in this matter, and supplements and amends that Complaint as set forth herein.

2. Boston Edison was the sole owner and operator of the Pilgrim nuclear-generating facilities in Plymouth, Massachusetts.

3. Pursuant to NWPA, DOE entered into a "Standard Contract" with each of the nation's commercial nuclear power plant owners, including Boston Edison, which required DOE, in return for payments of substantial fees by the owners into a Nuclear

Waste Fund created by NWPA, to commence accepting and permanently disposing of the SNF from these nuclear facilities by January 31, 1998. The Standard Contract was an important and integral element of Boston Edison's conduct of its business of generating electricity at Pilgrim, in that it provided for the orderly disposal of SNF produced during the normal course of operations. The Standard Contract also facilitated the timely and orderly completion of post-retirement activities following the end of Pilgrim's life as a nuclear electric generating facility.

4. Boston Edison sold Pilgrim to Entergy Nuclear Generation Company, LLC ("Entergy") on July 13, 1999. As part of the sales transaction for Pilgrim, Boston Edison assigned its DOE Standard Contract (which was then in breach) to Entergy, subject to a reservation of certain rights and claims which are the subject of this complaint. By the closing date of Boston Edison's sale of Pilgrim, Boston Edison's payments into the Nuclear Waste Fund exceeded $89 million.

5. Notwithstanding Boston Edison's payments and DOE's corresponding SNF disposal obligations under NWPA, DOE did not take custody or dispose of any of Boston Edison's SNF either by January 31, 1998, the performance deadline specified in NWPA and the Standard Contract, or by the closing date of Boston Edison's sale of Pilgrim. By the closing date of Boston Edison's sale of Pilgrim, there was no prospect that DOE would take custody or dispose of SNF from the facility in the foreseeable future because DOE had not then (and has not to this day) sited, licensed, constructed, or placed in operation an SNF disposal facility, or made provisions for the temporary storage of SNF until such time as a permanent SNF facility becomes available.

6. As a direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF, Boston Edison realized significantly less

value in the sale of Pilgrim than it would have received had DOE properly fulfilled its contractual and statutory obligations. Pilgrim's value was significantly diminished when it became apparent that DOE would not begin accepting and removing SNF by January 31, 1998. This diminishment continued beyond this deadline as DOE remained in default with no SNF disposal solution in sight. This caused potential buyers either to elect not to participate in the sales process for nuclear facilities or drastically to reduce their price in order to account for the increased risk associated with the uncertain life expectancy of Pilgrim and the anticipated capital expenses associated with storing SNF indefinitely.

7. In addition, as an integral part of the Pilgrim sales process, Boston Edison was required by rules and regulations of the federal Nuclear Regulatory Commission (the "NRC") to fully fund the costs of retirement, dismantlement, decontamination, decommissioning, and SNF management of Pilgrim in such amounts as Entergy and the NRC determined sufficient. Such amounts were substantially in excess of what would have been required if DOE had met its obligations under the Standard Contract and NWPA.

8. Boston Edison also incurred significant costs associated with the interim storage of its SNF up to the closing date of its sale of Pilgrim, including additional capital expenses and related operation and maintenance expenses. These costs would not have been incurred had DOE begun the acceptance and removal of SNF by January 31, 1998, as required. Boston Edison seeks damages for such costs as it incurred up to the date of sale of Pilgrim that would not have been incurred had DOE performed its statutory and contractual obligations pertaining to SNF disposal.

9. Boston Edison's case is distinguishable from the other SNF cases presently before this Court. Those cases have been filed predominately by the existing owner/operators of the nuclear facilities seeking damages related to on-going SNF storage costs. By contrast, as a seller of a nuclear facility, Boston Edison's Complaint and Amended Complaint seek damages associated with the diminished value it realized in the sale of Pilgrim resulting from DOE's failure to meet its obligations under the Act and the Standard Contract, as well as other related costs incurred up to the closing date of the sale. Unlike the owner/operator cases, Boston Edison's damages are fixed and readily ascertainable as of the closing date of its sales transaction.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

11. Plaintiff Boston Edison is an electric transmission and distribution company subject to the regulatory jurisdiction of the Massachusetts Department of Telecommunications and Energy ("MDTE").

12. Boston Edison is an operating subsidiary of NSTAR, a Massachusetts trust, an investor-owned energy company with approximately $3 billion in annual revenues, providing electricity, gas, and related energy services to approximately 1.4 million customers in Eastern and Southern Massachusetts.

13. Defendant is the United States of America, acting by and through DOE.

## BACKGROUND

14. For more than fifty years, the federal government systematically acted to induce electric utilities, including Boston Edison, to invest in nuclear technology on the promise, both implied and explicit, that key issues affecting utility adoption of the technology would be resolved in a timely and economic manner. Among the promises of the federal government was that it would adequately provide for assuming custody and disposal of SNF. Boston Edison relied on these representations and made substantial capital investments in the construction of Pilgrim in order to support Pilgrim's continued operation. It was reasonable for electric utilities, including Boston Edison, to have relied on the federal government to exercise its reasonable efforts to perform and fulfill its own promises.

15. On December 8, 1953, President Dwight D. Eisenhower announced to the United Nations his intent to employ nuclear materials "to provide abundant electrical energy in the power-starved areas of the world." Dwight D. Eisenhower, Address Before the General Assembly of the United Nations on Peaceful Uses of Atomic Energy, New York City (Dec. 8, 1953), *in Public Papers of the Presidents: Dwight D. Eisenhower* ¶ 256, at 821 (1953). The Atomic Energy Act of 1954 was subsequently passed on August 30, 1954. Notably, the Atomic Energy Act instructed the U.S. Atomic Energy Commission ("AEC"), the predecessor agency to the NRC, to encourage commercial development and use of nuclear energy, and to issue licenses to private companies to build and operate nuclear power stations.

16. Guided by the Atoms for Peace initiatives, the AEC announced the "Power Reactor Demonstration Program" in January 1955 with the objective of encouraging and supporting the commercial development of nuclear power.

17. In 1959, six years following President Eisenhower's Atoms for Peace speech, it was becoming clear that the then-current levels of federal promotion of commercial nuclear power plant construction were not sufficient to move the technology toward wider commercialization. In March 1962, President John F. Kennedy asked AEC Chairman Glenn Seaborg to report on the role of nuclear power in the country. Notably, Chairman Seaborg urged the President to continue to encourage and support the commitment of electric utilities to nuclear generation.

18. Throughout this period, the federal government continued to represent that it would provide mechanisms for SNF storage and disposal, among which would be the continued utilization of nuclear fuel reprocessing. Consequently, electric utilities, including Boston Edison, designed, and the AEC (and subsequently the NRC) licensed and approved for operation, nuclear power facilities with SNF pools intended only for temporary storage and for only a fraction of the plants' forty-year license lives.

19. In 1976, President Gerald R. Ford announced a moratorium on reprocessing SNF consistent with new arms control initiatives. This moratorium coincided with a surge in the number of commercial operating reactors entering service. Whereas reprocessing had previously been expected to limit the growth of SNF inventories at commercial nuclear power reactor sites, in the absence of reprocessing, the inventory of SNF at reactor sites began to rapidly increase until the limited, temporary storage capacity of the SNF pools at these plants was consumed.

20. In 1977, President Jimmy Carter announced that SNF would be transferred to a federally approved "away from reactor" facility for storage until a federal government repository became available. President Carter said the federal

government would charge a one-time fee for storage. The President also established the Interagency Review Group on Nuclear Waste Management ("IRG"). IRG issued its findings in 1979, which proposed, among other things, that the federal government construct and operate a repository for permanent SNF disposal by the early 1990s.

## THE NUCLEAR WASTE POLICY ACT OF 1982

21. NWPA was signed into law by President Ronald Reagan in January 1983. 42 U.S.C. § 10101 *et seq*. Congress passed NWPA to address and ameliorate the accumulation of SNF from nuclear reactors, and to fulfill the federal government's long-standing policy of assuming responsibility for the disposal of SNF. Recognizing that reprocessing of SNF was not a viable alternative to disposal of SNF, Congress created the Act "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." H.R. Rep. No. 97-491, pt. 1, at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792. Congress also made clear that time was of the essence, and made the disposal of SNF an immediate federal priority:

> The failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated. . . . Failures in the Federal repository development program, the collapse of the domestic spent fuel reprocessing industry and quickly deteriorating public confidence in our ability to deal safely with nuclear waste, together with other critical safety and economic issues, were seriously undermining the strength of the domestic nuclear industry.

*Id.* at 28, 1982 U.S.C.C.A.N. at 3794.

22. Congress recognized in 1982 that neither reprocessing nor a federal waste repository would be available for at least ten years, and that interim storage of SNF would be needed. *Id.* at 31, 37-38, 67, 1982 U.S.C.C.A.N. at 3797, 3803-04, 3833. Notwithstanding this, Congress did not specifically authorize any particular interim

storage program or facility, leaving to nuclear licensees the burden of safely storing SNF on-site until such time as DOE would take custody. Congress gave DOE until January 31, 1998, a full sixteen years, to complete what Congress felt could be accomplished in less time. Twenty-one years have now passed and DOE still cannot state when, or if, a national SNF repository will be available.

23. Pursuant to NWPA, DOE became obligated to carry out three primary tasks. First, the DOE Secretary was to establish a schedule for siting, constructing, and operating repositories for SNF disposal, and, in furtherance thereof, to publish written criteria setting forth the terms and conditions under which disposal was to occur. 42 U.S.C. §§ 10131(b)(1), 10222(a)(6). Among these terms was a requirement that title to SNF pass to DOE at the time it was to be transported from the power plant site to a DOE facility. *Id.* § 10222(a)(1),(5)(A). Second, DOE was required to begin acceptance and disposal of SNF no later than January 31, 1998. *Id.* § 10222(a)(5)(B). Third, DOE's obligations were to be formalized in contracts between DOE and the generators of SNF. *Id.* § 10222(a). Thus, NWPA established the federal government's exclusive responsibility for the disposal of SNF beginning in January 1998. This responsibility was not tied to or contingent upon the availability of a permanent SNF storage facility.

24. NWPA also provided that the costs of fulfilling DOE's obligations as specified in the statute were to be borne by the generators of SNF in the form of annual fees levied by DOE on a per kilowatt hour basis from electric generation produced by the SNF to be disposed of by DOE. Such fees are paid into a Nuclear Waste Fund established by NWPA. In order to match DOE costs incurred in providing for permanent SNF disposal with Nuclear Waste Fund fee revenues, NWPA specified that the DOE Secretary was to conduct an annual review of the fees collected to determine if

fee revenues were sufficient to cover the costs associated with SNF disposal activities undertaken pursuant to NWPA. 42 U.S.C. § 10222(a)(4). In the event that the DOE Secretary determined that either insufficient or excess funds were being collected, then an adjustment to the fee schedule was to be proposed by the Secretary to Congress, which had ninety days to reject the Secretary's fee adjustment proposal. *Id.* Unless the Secretary's fee adjustment proposal was rejected by Congress, it automatically went into effect. *Id.*

25. NWPA vested DOE with the sole authority to accept title to, transport, and dispose of SNF. The Act authorized DOE to contract with utilities and other producers of high-level nuclear waste to collect and take custody of SNF. Accordingly, in 1983, DOE drafted a Standard Contract for use with participants in the program, published it in the Federal Register, and accepted comments from the public regarding the terms of the Standard Contract.

## THE STANDARD CONTRACT

26. On or about April 18, 1983, DOE codified the Standard Contract in the Code of Federal Regulations. *See* 10 C.F.R. § 961.11. The Standard Contract provides that DOE would begin acceptance of SNF no later than January 31, 1998 in return for a one-time fee for pre-1983-generated nuclear waste, as well as for an ongoing fee assessed by DOE against SNF generators. *Id.* Arts. II, VIII. A. The fee was initially set at 1.0 mill per kilowatt hour (1 mil/kwh) electricity generated and sold by Standard Contract holders. *Id.* Art. VIII.A. DOE was authorized under the Standard Contract to collect only those fees which were sufficient to achieve full cost recovery for a nuclear waste disposal program that was in compliance with the requirements of NWPA. With respect to DOE's performance obligations, the Standard Contract provides that "[t]he

services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." *Id.* Art. II.

27. The fees paid by all Standard Contract holders pursuant to the Act were intended to fund DOE's development and implementation of a national SNF disposal facility and program as contemplated by Congress. All such fees have been, and continue to be, paid into a Nuclear Waste Fund established by DOE.

28. DOE, since the passage of NWPA, has been under an ongoing obligation to implement an on-time program for the construction and operation of a permanent, national repository for SNF by January 31, 1998, and to fully recover the costs of meeting this objective. In addressing the fee payment obligations the utilities were to assume under NWPA, the Congressional Budget Office noted on April 26, 1982, when the bill was before Congress, that in order to match program funding with the mandated January 31, 1998 repository operational date, "[i]t is expected that the majority of the costs of this bill will be incurred by the year 2000 when repository construction is expected to be completed and the facility operational." H.R. Rep. No. 97-491, pt. 1, at 67, 1982 U.S.C.C.A.N. at 3833.

29. Utilities and other producers of SNF, including Boston Edison, have been required to pay, through Nuclear Waste Fund fees assessed by DOE, all of the costs associated with the SNF disposal program. Since its inception, consumers of nuclear-generated power nationwide have paid in excess of $19 billion, directly and through earned interest, into the Nuclear Waste Fund.

30. Execution of the Standard Contract was mandatory for generators of high-level nuclear waste. NWPA provided that commercial nuclear plant owners or

operators seeking an operating license from the NRC shall not have such license issued or renewed to them by the NRC unless these owners or operators have signed the Standard Contract. 42 U.S.C. § 10222(b)(1)(A). NWPA also requires that holders of nuclear electric generating licenses issued by the NRC shall not be entitled to dispose of SNF either through DOE's federal repository program, or through any other means or facility, without first having executed the Standard Contract.

31. On June 17, 1983, Boston Edison and DOE entered into a Standard Contract (No. DE-CR01-83-NE44368). Boston Edison has at all times relevant hereto fully and timely complied with all of its obligations under the Standard Contract. By the time of the closing date of Boston Edison's sale of Pilgrim, Boston Edison had paid in excess of $89 million into the Nuclear Waste Fund. At the time of such closing, Boston Edison assigned its Standard Contract to Entergy, reserving all claims arising under that contract against DOE up to the date of closing. By such date, it was clear that DOE had not begun acceptance of Boston Edison's SNF by January 31, 1998, as required by NWPA and the Standard Contract, nor had such acceptance of SNF begun by the closing date of Boston Edison's sale of Pilgrim. DOE has not commenced removal of SNF at Pilgrim or at any of the country's nuclear facilities to this day.

## DOE'S BREACH OF THE STANDARD CONTRACT

32. In the two decades since the enactment of NWPA, DOE has failed to develop and implement the SNF disposal program that Congress defined as a "national priority."

33. In 1987, Congress designated Yucca Mountain, Nevada as the only candidate site eligible for permanent status as a repository to store high-level radioactive waste and SNF. DOE was obligated to develop a schedule for the

construction and operation of the Yucca Mountain repository and publish terms and conditions for acceptance and removal of SNF that are compliant with NWPA. 42 U.S.C. §§ 10131(b)(1), 10222(a)(6).

34. Despite its statutory and contractual obligations, DOE failed to timely adhere to its obligations and responsibilities as established by NWPA and the Standard Contract. These failures had a significant negative impact on DOE's ability to adhere to a program schedule, particularly as it related to the establishment of a geological repository for the disposal of SNF.

35. In 1995, DOE published a "Final Interpretation of Nuclear Waste Acceptance Issues" ("Final Interpretation") in the Federal Register. The Final Interpretation purported to disclaim DOE's obligations under NWPA and the Standard Contract, stating that DOE was not obligated to begin accepting SNF by January 31, 1998 because it did not have an SNF repository.

36. Several Standard Contract holders sought review of the Final Interpretation in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit held that NWPA imposed an unconditional obligation on DOE to begin accepting SNF on or before January 31, 1998. *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996). The court found that DOE's obligations were reciprocal to the obligation of the nuclear generators to pay fees into the Nuclear Waste Fund. The court rejected DOE's Final Interpretation and stated:

> DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998. . . . Under the plain language of the statute, the utilities anticipated paying fees "in return for [which] the Secretary" had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain.

*Id.* at 1276.

37. Without regard for the court's ruling, DOE took no steps to commence acceptance and disposal of SNF by the January 31, 1998 date. Instead, in late 1996, DOE for the first time acknowledged in letters sent to all Standard Contract holders, including Boston Edison, that it would not meet the statutory and contractual deadline of January 31, 1998 to begin acceptance and removal of SNF from the nation's nuclear facilities. DOE maintained that its failure to meet the January 31, 1998 deadline was excused under the terms of the Standard Contract because its delay was "unavoidable." DOE took no note of and in fact ignored, the reciprocity between its obligation to commence disposal by January 31, 1998 and the Standard Contract holders' obligation to pay fees that was at the heart of the court's ruling in *Indiana Michigan*.

38. Several Standard Contract holders filed a petition for a writ of mandamus to compel DOE to comply with the court's earlier mandate in *Indiana Michigan*. *Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997). In ruling upon the new petition, the D.C. Circuit reiterated DOE's unconditional statutory and contractual obligation to begin accepting SNF on or before January 31, 1998, and issued a writ of mandamus barring DOE from asserting that its failure to meet the January 31, 1998 deadline was unavoidable:

> [T]he Department has endeavored to proceed according to Article IX of the Standard Contract, by first informing the parties of its anticipated delay, and then evaluating whether its own delay is "unavoidable." Article IX] describes an unavoidable delay as a party's "failure to perform its obligations . . . aris[ing] out of causes beyond the control and without the fault or negligence of the party failing to perform." . . . As we pointed out in *Indiana Michigan*, the NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility. DOE cannot now render its obligation contingent, and free itself of the costs caused by its delay, by advancing the same failed position we rejected before.

*Id.* at 759-60.

39. Subsequent to January 31, 1998, the owners of several nuclear facilities filed lawsuits in the U.S. Court of Federal Claims ("COFC") alleging, among other counts, breach of the Standard Contract. DOE maintained that the COFC lacked jurisdiction over the breach of contract claims because the "Disputes" clause in the Standard Contract required the petitioners to first proceed through an administrative process. The U.S. Court of Appeals for the Federal Circuit ultimately ruled that the COFC was an appropriate forum for such claims. *See Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed. Cir. 2000); *Northern States Power Co. v. United States,* 224 F.3d 1361 (Fed. Cir. 2000).

40. The Federal Circuit further held that DOE's failure to begin acceptance of SNF by January 31, 1998 amounted to a violation of NWPA and a breach of the Standard Contract, thereby allowing Standard Contract holders to pursue claims for damages against DOE. The court stated, in pertinent part:

> In brief, we hold that the unavoidable delays provision [in the Standard Contract] deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.

*Northern States Power,* 224 F.3d at 1367.

41. On May 18, 1998, DOE announced a fee collection and expenditure plan for the nuclear waste disposal program through the year 2010 (the "1998 DOE Plan"). The 1998 DOE Plan asserted that DOE would be unable to meet its statutory and contractual obligations to begin removal and disposal of SNF until 2010 at the earliest. As of May 1998, the unspent balance in the Nuclear Waste Fund was approximately $8 billion. The 1998 DOE Plan also anticipated annual expenditures

averaging $340 million, or approximately $4 billion in total, through 2010, the new date specified by DOE for the fulfillment of DOE's SNF disposal obligations under the Act. The Nuclear Waste Fund balance as of May 1998 of approximately $8 billion, not including the interest to be accumulated thereon through 2010, was twice the amount necessary to fully fund the entire nuclear waste program spending plan as announced by DOE in May 1998. Nonetheless, the 1998 DOE Plan projected that DOE would continue to collect fees from Standard Contract holders at the existing 1 mil/kwh fee rate through at least 2010, which would perpetuate aggregate collections into the Nuclear Waste Fund in excess of $600 million annually.

42. The Standard Contract provides that DOE "will annually review the adequacy of the fees and adjust the 1 mil/kwh fee, if necessary, in order to assure full cost recovery by the Government." 10 C.F.R. § 961.11 Art. VIII.A.4. The nuclear waste program expenditures contemplated by the 1998 DOE Plan to complete Yucca Mountain by 2010 would be fully funded, without any further collections of the 1 mil/kwh fee from utilities, by the then-existing Nuclear Waste Fund balance, and would in fact leave a balance in 2010 in excess of $4 billion, even disregarding the substantial interest that would accrue to existing Nuclear Waste Fund balances between 1998 and 2010. Nonetheless, the 1998 DOE Plan signaled DOE's intention to continue fee collections at the 1 mil/kwh rate. DOE continues to collect Nuclear Waste Fund fees from Standard Contract holders at the 1 mil/kwh rate to this day.

43. The 1998 DOE Plan acknowledged that DOE intended to collect Nuclear Waste Fund fees in excess of those authorized by NWPA, and to divert a major portion of Nuclear Waste Fund fee payments that would otherwise be due and payable for purposes proscribed by NWPA. The 1998 DOE Plan explicitly contemplated that

fee collections at the rate projected in the plan would exceed DOE's programmatic requirements to such an extent that between $2.8 and $5 billion which would otherwise inure to the Nuclear Waste Fund could be used to defray costs incurred by nuclear utilities to mitigate the consequences of DOE's failure to commence SNF disposal by the January 31, 1998 date specified in NWPA and the Standard Contract. While that portion of the 1998 DOE Plan proposing diversions of Nuclear Waste Fund fee payments was never put into effect, it confirms DOE's intention to assess and collect Nuclear Waste Fund fees in excess of those required for a statutorily compliant program.

44. After the publication of the 1998 DOE Plan, it was clear to prospective buyers of nuclear generating facilities including Pilgrim, which were themselves Standard Contract holders for plants that they already owned, that they should factor the continuing fee payments announced in the 1998 DOE Plan into their valuation models and reduce their purchase prices accordingly.

45. To date, 29 cases have been filed in the COFC against DOE related to its breach of the Standard Contract, predominantly by owner/operators of nuclear facilities seeking damages related to on-going SNF storage costs. Boston Edison was the Standard Contract holder for Pilgrim at the time of DOE's breach on January 31, 1998, and subsequently sold Pilgrim under circumstances which were profoundly affected, influenced, and altered by the DOE breach. In its capacity as a Standard Contract holder at the time of the DOE breach and a seller of a nuclear facility, Boston Edison seeks damages directly and proximately caused by the DOE breach, including DOE's Nuclear Waste Fund fee assessment practices, as measured by the diminished value it realized in the sale of Pilgrim as a result of DOE's failure to meet its obligations under

NWPA and the Standard Contract. Boston Edison also seeks damages for other related costs incurred up to the closing date of Boston Edison's sale of Pilgrim, all stemming from DOE's failure to meet its statutory and contractual obligations pertaining to SNF.

## THE PILGRIM NUCLEAR POWER STATION

46. Pilgrim is a nuclear-generating facility in Plymouth, Massachusetts. Pilgrim was issued an operating license by the NRC in December 1972 and has been in commercial operation to this day. At the time of the sale of the facility, Pilgrim had a net capacity rating of approximately 670 MWs.

47. As Pilgrim was designed and constructed prior to the enactment of NWPA, all SNF produced at that facility was originally expected to be shipped off-site for reprocessing following each refueling outage. As a result, the need for significant on-site storage capacity was not contemplated in the construction design of the facility. With the adoption of NWPA and the elimination of SNF reprocessing, Boston Edison was compelled to rely on the federal government to accept and dispose of its SNF in accordance with the Standard Contract.

## THE PILGRIM SALES TRANSACTION

### The Regulatory Environment

48. In 1996, the Federal Energy Regulatory Commission ("FERC") issued FERC Orders 888 and 889. These FERC Orders were intended to eliminate institutional and structural barriers to achieving a national competitive market for electricity by requiring public utility companies, such as Boston Edison, to provide open-access transmission services across their local transmission systems. FERC determined that, by requiring the restructuring of the transmission segment of the nation's electric industry, local electric utilities would no longer be able to exercise vertical market

power to inhibit the desired growth of a competitive electric generation industry. In response to the federal initiative to open energy markets to increased competition on a national level, a number of states, including Massachusetts, initiated their own industry-restructuring programs designed to promote open competition for energy services at the state level.

49. In 1996, MDTE issued an Order in Docket No. DPU96-100 which set forth its generation divestiture restructuring policy in furtherance of energy competition in Massachusetts and also approved Boston Edison's Restructuring Settlement Agreement ("Settlement Agreement"). The Settlement Agreement required that Boston Edison divest its fossil-fired generation units by competitive auction, and value its nuclear assets by competitive sale or administrative determination by December 31, 2002.

## THE AUCTION PROCESS

50. In April 1998, Boston Edison commenced to sell Pilgrim through a competitive auction process. Boston Edison identified and solicited the interest of 175 potentially eligible bidders that were operationally and financially qualified to obtain an NRC operating license for Pilgrim. Each of the potential bidders was sent an Early Interest Letter ("EIL") that described in general terms the assets to be marketed and the sales process that would be followed. EIL recipients were invited to express their interest in participating in the auction.

51. The EIL process produced only ten potential bidders that expressed an interest in the auction. Each of those bidders was provided a confidential Offering Memorandum and afforded the opportunity to engage in initial due diligence.

Confidentiality was maintained throughout the auction process regarding the number and identity of the bidders.

52. At the conclusion of Phase 1, the bidders were invited to submit non-binding indicative bids for Pilgrim. Only three Phase 1 bidders submitted indicative bids to continue commercial operation of Pilgrim. These bidders were invited to participate in Phase 2 , during which additional detailed information regarding the facilities and operations of Pilgrim was provided.

53. At the conclusion of Phase 2, each of the Phase 2 bidders submitted final, binding bids. Entergy was ultimately selected as the winning bidder, and Boston Edison and Entergy entered into a Purchase and Sale Agreement (the "PSA"), dated November 18, 1998.

54. By Petition dated December 3, 1998, Boston Edison sought approval from MDTE of the terms and conditions of the PSA for Pilgrim, which approval was granted on March 22, 1999.

55. The PSA expressly reserves to Boston Edison all claims against DOE related to the Standard Contract up to the closing date of the sale.

56. On information and belief, the low level of participation in the auction process for Pilgrim was due, in large part, to the enhanced risks perceived by potential buyers associated with the uncertainties created by DOE's breach on both decommissioning and SNF disposal issues.

57. On July 12, 1999, Boston Edison filed its Complaint in this matter alleging breach of contract and breach of the covenant of good faith and fair dealing. Boston Edison alleged, among other things, that the value of Pilgrim was diminished due to DOE's failure to meet its obligations under NWPA and the Standard Contract.

This Amended Complaint incorporates Boston Edison's Complaint, and supplements and amends that Complaint.

## DAMAGES SUFFERED BY BOSTON EDISON

58. When on January 31, 1998 DOE reneged on its sixteen year-old statutory and contractual obligations to commence disposal of SNF, this failure on DOE's part to perform significantly diminished the value of Pilgrim. When Pilgrim was divested, this diminished value was reflected in the auction process, and ultimately in the terms and conditions of sale for an otherwise extremely valuable electric generating asset. DOE's failure to timely and completely fulfill its mandates under NWPA and its commitments under the Standard Contract directly resulted in such prospective purchasers, as were actually willing to entertain acquisition of nuclear electric generating facilities such as Pilgrim, to account for the increased costs, risks, and uncertainties brought about by DOE in their respective valuations of the asset.

59. As a direct and proximate result of DOE's failure to perform its statutory and contractual obligations, Boston Edison suffered significant monetary damages. These damages generally fall into two categories: (a) diminution of the market value of Pilgrim which caused Boston Edison to realize less value in the sale of the facility than it would have received had DOE met its obligations under NWPA and the Standard Contract; and (b) increased costs incurred by Boston Edison to store and maintain SNF, and other related costs.

## DIMINISHED VALUE REALIZED BY BOSTON EDISON

60. DOE's failure to perform its statutory and contractual obligations to remove SNF caused a number of potential purchasers for nuclear electric generating facilities such as Pilgrim to be artificially and improperly constrained, thereby reducing

the beneficial effects of a competitive auction for these assets. Due to the increased risk and anticipated expense associated with storing SNF on-site indefinitely, potential buyers elected not to participate in the sales process for Pilgrim, thereby shifting market power to a limited universe of potential buyers who were prepared to entertain assumption of SNF risks in the face of DOE's defaults. Had DOE been performing its SNF obligations, Boston Edison would have received the benefits of a more competitive sales process, and the perceived future economic benefits of Pilgrim as a source of electric sales revenues would have been significantly greater and more assured. However, DOE's failure to perform resulted in Boston Edison receiving less value for Pilgrim than it would and should have received had DOE fulfilled its statutory and contractual SNF obligations.

61. DOE's failure to meet its obligations under NWPA and the Standard Contract diminished the market value of Pilgrim because the remaining useful economic life of the facility could not be determined. Absent a place to store the SNF or confidence DOE would fulfill its statutory and contractual obligations at any particular time, if ever, the continued operation of the plant for any significant period would not be possible. As a result, the value of the plant was substantially depleted, since the future prospects of electric sales revenues were uncertain. The value of the plant was also diminished because the re-use value of the site will be deferred indefinitely until decommissioning and SNF removal are complete. Prospective purchasers of Pilgrim reflected this limitation of prospects for assured future operation and re-use in their value assessments.

62. The "All-Full Date" ("AFD") for Pilgrim will be when its NRC license expires in 2012. The AFD represents the date at which Pilgrim will no longer have available on-site storage capacity for SNF, and will need to be shut down.

63. When Entergy submitted its bid for Pilgrim, Entergy knew that it would need to install a costly on-site dry cask storage facility in order to continue commercial operation of Pilgrim beyond the end of its current operating license period. There is no certainty to obtaining the necessary local and federal permits for a dry cask storage facility.

64. Dry cask storage involves the construction of a large facility at the nuclear plant site within which SNF that has been removed from wet storage and placed in enormous casks weighing up to 100 tons each will be stored. The pursuit of a campaign to utilize dry cask storage technology at a particular site involves the design, local and federal permitting, and construction of the actual storage facility, equipment procurement and installation, and extensive procedure development and personnel training. A dry cask storage facility can take up to five years or longer to complete and make operational, assuming that all objections can be overcome and permits obtained, and can cost in the tens of millions of dollars. Each separate cask utilized in a dry cask storage facility costs approximately $1 million, with the initial cask order for a facility of Pilgrim's size typically being more than a dozen casks. Further, at the time of the Pilgrim sale, there was no assurance that such a facility would be approved, whether capacity would be restricted, or as to what the nature of any permit or license conditions imposed and associated costs might be.

65. The operating license for Pilgrim will expire in 2012. On information and belief, at the time Entergy submitted its bid for Pilgrim, Entergy knew that absent

an on-site storage facility for SNF at Pilgrim, it would not be able to renew its license for continued commercial operation of Pilgrim.

66. On information and belief, the costs and risks associated with installing a dry cask storage facility at Pilgrim were included in Entergy's valuation, and had the direct effect of reducing the price that Entergy paid for the facility. On information and belief, Entergy also factored into its valuation and reduced the price for Pilgrim to reflect the additional expenses associated with on-site storage of SNF, including the continuation of payments into the Nuclear Waste Fund.

67. Obtaining NRC approval of the license transfer for Pilgrim was an essential and critical element of the sales transaction between Boston Edison and Entergy. An integral element of obtaining, maintaining, and transferring an NRC license for a nuclear power plant such as Pilgrim is the obligation of the license holder to provide sufficient funds to cover the full costs of decommissioning the licensed facilities in accordance with NRC requirements, including the management and subsequent removal of all SNF from the site. Entergy assured the NRC that all future costs it would be required to bear as part of the decommissioning of Pilgrim, including those costs related to the long term on-site maintenance of SNF, were being covered as part of the sales transaction, including the funds that Boston Edison was required to transfer at closing. These costs were significantly greater than would otherwise have been the case due to DOE's failure to perform its obligations under NWPA and the Standard Contract.

68. Under the Standard Contract, DOE was entitled to assess and collect, and the Standard Contract holder was obligated to pay into the Nuclear Waste Fund, only such fees as were authorized by NWPA. By the time of the Pilgrim sales

transaction, it was evident to potential buyers that DOE intended, and had already begun, to disregard the fee provisions of the Standard Contract, and instead to assess and collect amounts in excess of those authorized by NWPA and the Standard Contract. The 1998 DOE Plan made it clear that DOE intended to continue the over-collection of fees essentially indefinitely. However, the Standard Contract does not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its liability as would ultimately be determined by the COFC and to embark upon a program of pre-collecting such amounts from Standard Contract holders; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to Standard Contract holders cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE engaged in just such activities, which deprived Boston Edison of the value of its assets and its entitlements under the Standard Contract, and, contrary to the provisions of the Standard Contract, improperly required Boston Edison as the Pilgrim Standard Contract holder to suffer the financial consequences of DOE's unauthorized actions.

69. On information and belief, Entergy factored into its valuation and reduced the price for Pilgrim to reflect all known and anticipated additional expenses associated with on-site storage of SNF and future Nuclear Waste Fund fees announced by DOE in the 1998 DOE Plan.

## <u>INCREASED SNF-RELATED COSTS INCURRED BY BOSTON EDISON</u>

70. Prior to its sale of Pilgrim, Boston Edison had been harmed as a direct and proximate result of DOE's failure to meet its statutory and contractual SNF

obligations. That harm took the form of capital and operational expenditures it was obligated to incur due to DOE's misconduct which would otherwise not have been necessary.

71. As a result of DOE's inaction, Boston Edison made substantial pre-closing capital and operating/maintenance expenditures to store and maintain Pilgrim SNF. These outlays would not have been necessary had DOE fulfilled its obligation to begin accepting and disposing of SNF by January 31, 1998. As a result of DOE's failure to begin acceptance of SNF for disposal, Boston Edison was required to incur costs in order to accommodate additional on-site SNF storage. Boston Edison also incurred significant costs related to Pilgrim's SNF storage, including developing an on-site dry cask storage facility, which costs would not have been incurred had DOE met its statutory and contractual SNF-related obligations.

## COUNT I

## BREACH OF CONTRACT

72. Boston Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 71 above.

73. The Standard Contract creates unconditional obligations on DOE to begin accepting Boston Edison's SNF by January 31, 1998. In consideration thereof, Boston Edison paid more than $89 million into the Nuclear Waste Fund.

74. DOE has failed to perform its obligations under the Standard Contract to begin accepting SNF by January 31, 1998 (and has not done so to this day). DOE's failure to do so constitutes a breach of the Standard Contract for which Boston Edison is entitled to damages.

75. DOE's breach of the Standard Contract severely diminished the market value of Boston Edison's nuclear facilities as reflected in the purchase price and other terms of the sales transaction, including the requirement to excessively fund the decommissioning trust accounts. Boston Edison also incurred additional pre-closing costs and other damages associated with the interim storage of SNF.

**COUNT II**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

76. Boston Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 75 above.

77. The Standard Contract contains an implied covenant of good faith and fair dealing. This covenant requires DOE to cooperate with Boston Edison and to reasonably and in good faith perform its duties under the Standard Contract and not to take actions that are detrimental to Boston Edison's contractual rights.

78. DOE has breached the implied covenant of good faith and fair dealing by failing to take appropriate action to meet its contractual commitment to begin accepting Boston Edison's SNF for disposal by January 31, 1998. Prior to the closing date of Boston Edison's sale of Pilgrim (and to this day), DOE failed to provide a commitment as to when, if ever, it would accept SNF for disposal.

79. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, Boston Edison has suffered damages as alleged above.

## COUNT III

## UNCOMPENSATED TAKING

80. Boston Edison repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 79 above.

81. DOE was unconditionally obligated under NWPA to begin acceptance of Boston Edison's SNF by January 31, 1998. NWPA conferred upon Boston Edison a right to have DOE dispose of Boston Edison's SNF in a manner consistent with the intent of Congress.

82. DOE's failure to dispose of Boston Edison's SNF by January 31, 1998 as required by the Act deprived Boston Edison of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities. This failure constitutes a taking of Boston Edison's vested property rights without just compensation.

83. DOE's failure to begin acceptance of Boston Edison's SNF has destroyed Boston Edison's reasonable, investment-backed expectations arising from NWPA. DOE's conduct has deprived Boston Edison of the full economic use of its nuclear facilities and related property, and reduced Pilgrim's tangible and intangible value without just compensation.

84. By reason of the foregoing, DOE has taken Boston Edison's property in violation of the Fifth Amendment to the U.S. Constitution and is liable to Boston Edison for just compensation.

## PRAYER FOR RELIEF

WHEREFORE, Boston Edison respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(1) On Count I, for damages in an amount to be established at trial;

(2) On Count II, for damages in an amount to be established at trial;

(3) On Count III, for just compensation in an amount to be established at trial;

(4) Pre-judgment and post-judgment interest as permitted by law;

(5) Costs of suit, including reasonable attorneys' fees, as permitted by law; and

(6) Such other and further relief as this Court may deem proper.

Date: January 13, 2004

Respectfully submitted,

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

*Counsel of Record for*
*Boston Edison Company*

Of Counsel: David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

Neven Rabadjija, Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street, 17th Floor
Boston, Massachusetts 02199-0228
(617) 424-2223