**No. 98-483C**
**(Judge Baskir)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**FLORIDA POWER AND LIGHT COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION TO COORDINATE DISCOVERY AND DEVELOP A LITIGATION PLAN FOR THE SPENT NUCLEAR FUEL CASES

---

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**U.S. Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**ALAN J. LO RE**
**Senior Trial Counsel**

**MARIANA T. ACEVEDO**
**JOSEPH E. ASHMAN**
**ANDREW P. AVERBACH**
**PATRICK B. BRYAN**
**CHRISTOPHER J. CARNEY**
**LISA M. DONAHUE**
**SCOTT R. DAMELIN**
**STEPHEN P. FINN**
**JEREMIAH M. LUONGO**
**ANTHONY W. MOSES**
**SONIA M. ORFIELD**
**SCOTT C. SLATER**
**SHARON SNYDER**
**Trial Attorneys**
**Commercial Litigation Branch**
**U.S. Department of Justice**

**GREGORY G. KATSAS**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**MARIAN E. SULLIVAN**
**Senior Trial Counsel**
**Commercial Litigation Branch**
**U.S. Department of Justice**
**Attn: Classification Unit,**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 307-0365**
**Fax: (202) 307-2503**

**August 21, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. NATURE AND GENESIS OF THE SNF LITIGATION. . . . . . . . . . . . . . . . . . . . 5

II. STATUS OF THE SNF LITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. Proceedings Before This Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. Appellate Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. COURSE OF DISCOVERY AND THE PRESSING NEED FOR COORDINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV. THE GOVERNMENT'S CONSISTENT REQUESTS FOR COORDINATED DISCOVERY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I. THE COURT HAS AUTHORITY TO DIRECT THE COORDINATION OF DISCOVERY AND LITIGATION ON A CASE-WIDE BASIS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II. THE COURT SHOULD INSTITUTE COORDINATED DISCOVERY PROCEEDINGS IN THE SNF CASES.. . . . . . . . . . . . . . . . . . . . 20

III. IN CONJUNCTION WITH COORDINATED DISCOVERY, THE COURT SHOULD IMPOSE A LITIGATION PLAN THAT WOULD RESULT IN RESOLUTION OF THE REMAINING SNF CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES


CASES PAGE(S)

Boston Edison Co. v. United States,
80 Fed. Cl. 468 (2008), appeal docketed, No. 08-5066 (Fed. Cir. April 17, 2008). .......... 8, 11

California Fed. Bank v. United States,
39 Fed. Cl. 753 (1997). .......... 19

Carolina Power & Light Co. v. United States,
82 Fed. Cl. 23 (2008). .......... 8

Christopher Village, LP v. United States,
50 Fed. Cl. 635 (2001). .......... 20

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003). .......... 12

Dairyland Power Coop. v. United States,
77 Fed. Cl. 330 (2007). .......... 15

First Fed. Sav. Bank of Hegewisch v. United States,
63 Fed. Cl. 790 (2005). .......... 19

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003). .......... 12

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005). .......... 3, 8

Northern States Power Co. v. United States,
78 Fed. Cl. 449 (2007), appeal docketed, No. 08-5037 (Fed. Cir. Feb. 11, 2008). .......... 8

Northern States Power Co. v. United States Department of Energy,
128 F.3d 754 (D.C. Cir. 1997). .......... 9

Pacific Gas & Elec. Co. v. United States,
73 Fed. Cl. 333 (2006), appeal docketed, No. 07-5046 (Fed. Cir. Jan. 24, 2007). .......... 4, 8, 9

Suerr v. United States,
2008 WL 3089952 (Fed. Cir. Aug. 7, 2008). .......... 19, 20

Southern Nuclear Operating Co. v. United States,
77 Fed. Cl. 396 (2007), appeal docketed, No. 08-5020 (Fed. Cir. Jan. 3, 2008). .......... 8

TABLE OF AUTHORITIES (CONT'D)

CASES PAGE(S)

System Fuels, Inc. v. United States,
79 Fed. Cl. 37 (2007), appeal docketed, No. 08-5025 (Fed. Cir. Jan. 9, 2008). .................... 8

Tennessee Valley Auth. v. United States,
69 Fed. Cl. 515 (2005). .................... 8

Yankee Atomic Elec. Co. v. United States,
54 Fed. Cl. 306 (2002). .................... 15

Yankee Atomic Elec. Co. v. United States,
2008 WL 3089032 (Fed. Cir. Aug. 7, 2008). .................... 6

STATUTES AND RULES

10 C.F.R. § 961.11. .................... passim

42 U.S.C. §§ 10101-10270 (1994). .................... 5

RCFC 40.2, Cmt. Note 2002 Revision . .................... 17, 18, 19

RCFC 42. .................... 18

# INDEX TO APPENDIX

DOCUMENT PAGE

Excerpts of Transcript of Status Conference,
Spent Nuclear Fuel Discovery v. United States (April 30, 2004). . . . . . . . . . . . . . . . . . . . . . . . A 1

Excerpts of Status Report Regarding "Pre-Discovery Conference,"
Niagara Mohawk Power Corp. v. United States (May 7, 2004). . . . . . . . . . . . . . . . . . . . . . . . A 12

Excerpts of Deposition of Robert L. Morgan,
Yankee Atomic Electric Co., et. al. v. United States (March 21, 2002). . . . . . . . . . . . . . . . . . A 21

Excerpts of Deposition of Robert L. Morgan,
Northern States Power Co. v. United States (November 15, 2006). . . . . . . . . . . . . . . . . . . . A 31

Letter from G. Smith to Hon. E. J. Damich with attached Report
of the Ad Hoc Committee on Related Cases of the CFC Advisory Council
(May 27, 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 38

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLORIDA POWER AND LIGHT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-483C |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO COORDINATE DISCOVERY AND DEVELOP A LITIGATION PLAN FOR THE SPENT NUCLEAR FUEL CASES

Pursuant to Rules 1, 40.1, 40.2, and 42 of the Rules of the Court of Federal Claims ("RCFC"), and consistent with the recent recommendation of the Advisory Council regarding the manner in which this Court should approach related cases, defendant, the United States, respectfully requests that this Court assign a panel of three Judges to consider and issue a case management order for all cases involving claims for partial breach of the Standard Contract for the Disposal of Spent Nuclear Fuel or High-Level Radioactive Waste, 10 C.F.R. § 961.11 ("Standard Contract"), by the United States Department of Energy[1] ("DOE"), including the establishment of a litigation plan for resolving the remaining spent nuclear fuel ("SNF") cases pending before this Court.

[1] Pursuant to RCFC 40.2, a party may file notice of "directly-related" or "indirectly-related" cases captioned in the name of the earliest-filed case. Florida Power & Light Co. v. United States, No. 98-483C (Fed. Cl.), is the earliest spent nuclear fuel case pending before the Court. Because RCFC 40.2(a) directs that notice of directly-related cases be filed in "all related cases," we are filing this motion, which bears the Florida Power caption, in all of the pending spent nuclear fuel cases. The pending cases to which this motion is applicable are identified in Attachment A.

## SUMMARY OF ARGUMENT

As the Court is aware, the United States Court of Appeals for the Federal Circuit recently issued decisions in several appeals which involve issues that are essential to the Court's evaluation of causation and damages issues in all of the SNF cases that remain pending before this Court. In addition, one remaining appeal is expected to address the issue of whether the Government may invoke the "Unavoidable Delays" clause of the Standard Contract as a defense against liability in all of these cases. Numerous cases before this Court have been stayed pending the resolution of these appellate cases. Presumably, when the decisions become final (following the resolution of any petitions for rehearing or other requests for further review), the rationale underlying the existing stays in many, if not all, of the cases that remain pending before this Court will dissipate. In anticipation of the additional demands upon the Court's resources, we respectfully request that the Court take this opportunity to create a litigation and discovery plan for the development and resolution of the remaining SNF cases so that, once the appropriate appellate guidance is final, the parties are in a position efficiently and effectively to take action to resolve these remaining SNF cases.

Recently, by letter dated May 27, 2008, the United States Court of Federal Claims Advisory Council forwarded to the Chief Judge the Report of the *Ad Hoc* Committee on Related Cases. A. 38-48.[2] In that report, which the Advisory Council approved on May 21, 2008, the Committee, by unanimous vote, recommended that the Chief Judge designate a standing panel of three Judges, one of which will be assigned as the Presiding Officer of the panel, to resolve issues and develop litigation plans for related cases. The panel of three Judges would have the

[2] "A. __" refers to the appendix to this motion.

authority to transfer cases, consolidate cases, adopt coordinated discovery schedules, or take other action that the panel determines is the most efficient means of developing the related cases.

Consistent with the Advisory Committee's recommendation, the United States respectfully requests that the Court create a panel of three Judges of this Court to consider this case management request. We further request that the three-Judge panel institute a case management plan coordinating the resolution of the remaining cases and discovery and through which all further discovery issues arising in the remaining SNF cases still pending before the Court would be resolved. In addition, the United States requests that the Court automatically include all future SNF cases in this litigation plan.[3]

As explained below, this Court is authorized to direct the coordination of case management and discovery in the SNF litigation. Moreover, the Court has a proven record of successfully coordinating case management and discovery in complex litigation involving multiple cases. Of particular precedential significance to this case, the Court in the Winstar litigation devised a plan for the coordination of discovery in more than 120 cases. The implementation of a similar coordinated discovery plan in the SNF cases would prevent the parties' duplicative and redundant discovery efforts and, thereby, avoid the unnecessary costs and delay associated with the current discovery scheme. Further, coordination of discovery will

---

[3] To date, five utility plaintiffs have filed new complaints seeking to recover damages incurred since the cutoff for damages from their first suit. Northern States Power Co. v. United States, Fed. Cl. No. 07-608C; Yankee Atomic Electric Co. v. United States, Fed. Cl. No. 07-876; Connecticut Yankee Atomic Power Co. v. United States, Fed. Cl. No. 07-875; Maine Yankee Atomic Power Co. v. United States, Fed. Cl. No. 07-877; and, Alabama Power Co., et. al, v. United States, Fed. Cl. No. 08-237C. Pursuant to the Federal Circuit's guidance in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), the Government expects that all utility plaintiffs will continue to file suits until DOE begins performance.

promote consistency in the Court's discovery rulings. Without coordinated case management and discovery, the Court and parties – in particular, the Government – will continue to be over burdened by the lack of an organized process.

As part of this litigation plan, we respectfully request the three-Judge panel to order that, once the Federal Circuit issues final decisions in the recently argued appeals,[4] all remaining SNF plaintiffs will be required to provide the Government with detailed damages claims and take any further necessary discovery from the Government within a specified time frame. As the Court is aware, several DOE witnesses have been required to sit for a multitude of depositions, each time being asked similar questions about DOE's program for disposal of commercial nuclear utility SNF. In addition, various plaintiffs' counsel in different SNF cases have been able to make duplicative requests for discovery and document production from different Judges of this Court, creating for themselves multiple opportunities to attempt to obtain the same documents and discovery from the Court. In several instances, after being denied an overbroad discovery scope by one or more Judges in a particular area, another Judge will then grant that discovery, effectively allowing all plaintiffs access to that previously-denied area of discovery. By creating a single coordinated discovery plan, the Court will be able to control costs, deter Judge-shopping, and expedite resolution of the remaining SNF cases. Further, the Court will be better able to

---

[4] Specifically, the Federal Circuit has provided guidance in resolving causation and damages issues in the remaining SNF cases in decisions in the following appeals: Yankee Atomic Electric Co. v. United States, Nos. 07-5025, -5026, -5027, -5031, -5032, -5033 (Fed. Cir.); Pacific Gas & Electric Co. v. United States, No. 07-5046 (Fed. Cir.); and Sacramento Municipal Utility District v. United States, Nos. 07-5052, -5097 (Fed. Cir.). In addition, the Federal Circuit's decision in Nebraska Public Power District v. United States, No. 07-5083 (Fed. Cir.), will likely provide guidance regarding the United States' ability to raise the "unavoidable delays" clause as a defense in the SNF cases.

coordinate discovery by the Government from the various plaintiffs in different SNF cases to minimize costs both to the Government and to the plaintiffs.

## BACKGROUND

### I. NATURE AND GENESIS OF THE SNF LITIGATION

The Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (1994) ("NWPA"), authorized the Secretary of Energy to enter into contracts with commercial nuclear power utilities and other entities through which DOE would accept and dispose of the contract holders' SNF in return for their payment of fees into the Nuclear Waste Fund. Ultimately, DOE entered into approximately 76 such contracts, all of which mirrored the Standard Contract set forth at 10 C.F.R. § 961.11.[5] While the Standard Contract called for DOE to "begin" SNF acceptance "not later than January 31, 1998," 10 C.F.R. § 961.11, Art. II, the contract contained no rate or schedule governing DOE's acceptance of SNF. Rather, it entitled DOE to establish the rate of acceptance by identifying the total amount of SNF that it would receive annually during the contract's performance. See 10 C.F.R. § 961.11, Arts. IV.B & V. Once DOE settled upon the rate, DOE and the individual contract holders were to determine which of the entities would receive allocations in specific years, thereby prescribing the contractual schedule of acceptance. This schedule applied equally to all contract holders, allocating to each an amount of SNF acceptance based upon the program-wide acceptance amount for a given year and the sums to be accepted from other contract holders.[6]

---

[5] Consolidation in the nuclear industry and corresponding assignments of Standard Contract rights has reduced the number of entities currently holding such contracts to 32.

[6] The operation of two other contractual provisions also affected DOE's schedule of acceptance. The first of these provided contract holders a right to "exchange" with others their

The enormous complexities associated with developing and commissioning a facility for the storage or disposal of SNF, including certain statutory restrictions upon DOE's ability to accept SNF and funding limitations that Congress imposed upon the program, prevented DOE from commencing acceptance under the Standard Contract in 1998. DOE currently anticipates that it will be unable to begin contractual performance until at least 2020. In the meantime, contract holders and their assignees have filed numerous lawsuits seeking billions of dollars in damages for DOE's alleged "partial" breach of the Standard Contract, with many of these entities also pursuing takings claims under the Fifth Amendment to the United States Constitution.

All of the SNF cases before this Court turn on common issues of fact and law. As the Federal Circuit recently held in Yankee Atomic Electric Co. v. United States, 2008 WL 3089032 (Fed. Cir. Aug. 7, 2008), key to the resolution of each matter is a determination of the parties' obligations under the Standard Contract, including their intent and understanding of contractual rights and duties. Throughout the SNF litigation, the question of what rate of acceptance was envisioned by the Standard Contract has emerged as a central issue for the Court's consideration in analyzing causation and damages. The Court also has struggled to resolve whether the Standard Contract obligated DOE to accept Greater-than-Class C radioactive waste ("GTCC"), the interplay between the contractually mandated oldest-fuel-first provision and the separate clause providing for exchanges, and the ramifications of potential interim storage of SNF. In many cases, it has also faced arguments regarding prejudgment interest recovery, the enforceability of assignments of claims and contracts, and the effect of a party's non-payment of

approved delivery commitment schedules, while the second governed "priority acceptance" for shut-down reactors. See 10 C.F.R. § 961.11, Arts. V.E., IV.B(1)(b).

a mandatory one-time fee. Discovery in these cases has focused repeatedly on these and other recurring themes. Plaintiffs have expressly recognized the pervasive commonality of this litigation by filing substantively similar complaints – which in some instances are virtually identical – but have generally opposed the consolidation or coordination of these cases.

The decisions recently issued by the Federal Circuit, while not yet final, provide guidance on the rate of acceptance to be applied by the Court as well as regarding whether the Standard Contract requires acceptance of GTCC waste, whether the Government may recoup the one-time fee from any damages award, and whether theories regarding exchanges of SNF acceptance allocations constitute a viable basis for increasing damages awards. Future appeals are expected to decide other issues common to these cases. Given the demonstrated commonality among these cases, the Court is now in a position to ensure that the remaining SNF are resolved through an organized process.

## II. STATUS OF THE SNF LITIGATION

### A. Proceedings Before This Court

To date, private sector utility companies have filed 71 cases arising from DOE's delay in accepting SNF pursuant to the Standard Contract. Of these, 18 cases have proceeded to trial, seven have settled, and three were withdrawn. The Court has issued final decisions in 15 of the

SNF cases to have been tried.[7] Presently, 46 cases remain pending before the Court. Of these, ten are in active litigation and four are scheduled for trial before the end of 2009.

One of the reasons discovery has not gone forward in all of the SNF cases is that many of them were stayed shortly after they were filed. Typically, the implementation of such stays followed agreement by plaintiffs and the Government to proceed at a future point, when certain SNF issues had been clarified by this Court and/or the United States Court of Appeals for the Federal Circuit. Currently, 27 of the SNF cases are stayed. The Court, however, recently lifted the stays in two SNF cases where the plaintiffs in those cases, despite the lack of Federal Circuit guidance, decided that they wanted actively to pursue their claims.[8] Further, once the Federal Circuit decisions concerning the pending SNF issues become final, the rationale for many, if not all, of the remaining stays will dissipate. Absent the adoption of a case management plan, many of the SNF cases likely will proceed through discovery on roughly parallel schedules in the near future.

---

[7] See Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005); Yankee Atomic Elec. Co. v. United States, Connecticut Yankee Atomic Power Co. v. United States, and Maine Yankee Atomic Power Co. v. United States, 73 Fed. Cl. 229 (2006), appeals docketed, Nos. 07-5025, 07-5027 & 07-5026 (Fed. Cir. Dec. 2006); Tennessee Valley Auth. v. United States, 69 Fed. Cl. 515 (2005); Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333 (2006), appeal docketed, No. 07-5046 (Fed. Cir. Jan. 24, 2007); Sacramento Mun. Util. Dist. v. United States, 74 Fed. Cl. 727 (2006), appeal docketed, No. 07-5052 (Fed. Cir. Feb. 6, 2007); Southern Nuclear Operating Co. v. United States, 77 Fed. Cl. 396 (2007), appeal docketed, No. 08-5020 (Fed. Cir. Jan. 3, 2008); System Fuels, Inc. v. United States, 79 Fed. Cl. 37 (2007), appeal docketed, No. 08-5025 (Fed. Cir. Jan. 9, 2008); Northern States Power Co. v. United States, 78 Fed. Cl. 449 (2007), appeal docketed, No. 08-5037 (Fed. Cir. Feb. 11, 2008); Boston Edison Co. v. United States, 80 Fed. Cl. 468 (2008), appeal docketed, No. 08-5066 (Fed. Cir. April 17, 2008); Carolina Power & Light Co. v. United States, 82 Fed. Cl. 23 (2008), appeal filed (Fed. Cir. Aug. 15, 2008).

[8] This Court recently lifted stays of proceedings in PSEG Nuclear, L.L.C. v. United States, No. 01-551 (Fed. Cl.), and Detroit Edison Co. v. United States, No. 02-926 (Fed. Cl.).

B. Appellate Proceedings

The Federal Circuit recently issued decisions in Yankee Atomic Electric Co. v. United States, Nos. 07-5025, -5026, -5027, -5031, -5032, -5033 (Fed. Cir.); Pacific Gas & Electric Co. v. United States, No. 07-5046 (Fed. Cir.); and Sacramento Municipal Utility District v. United States, Nos. 07-5052, -5097 (Fed. Cir.). In each of these decisions, the Federal Circuit made determinations regarding the appropriate SNF acceptance rate to apply for purposes of evaluating causation and damages in these cases. In addition, the appellate court decided issues relating to whether GTCC waste is covered by the Standard Contract, whether plaintiffs can rely upon a theory of "exchanges" of SNF acceptance allocations as affecting causation and damages analyses, and whether the United States is entitled to recoup unpaid one-time fees from damages awards. As we have seen in other SNF cases, regardless of the manner in which the appellate court finally resolves these issues, there will likely be additional efforts to take additional discovery upon these and other topics that, in other SNF cases, have previously been thoroughly subjected to extensive discovery.

Another case, Nebraska Public Power District v. United States, No. 07-5083 (Fed. Cir.), remains pending on appeal.[9] This appeal involves the issue of whether the Government may invoke the "Unavoidable Delays" clause of the Standard Contract as a defense against liability in the SNF cases. Currently, a writ of mandamus that the United States Court of Appeals for the District of Columbia Circuit issued in Northern States Power Co. v. United States Department of

[9] There are pending appeals in six other cases at the Federal Circuit. The briefing on four of these appeals has been stayed pending the outcome of the appeals noted above. Once the recent decisions of the Federal Circuit become final, the Government will have to determine which of these appeals should be remanded in light of the Federal Circuit's guidance.

Energy, 128 F.3d 754 (D.C. Cir. 1997), precludes the Government from invoking this defense, but this Court in Nebraska Public Power found the District of Columbia Circuit's writ to be void. Should the Federal Circuit hold in the appeal of that interlocutory decision that the Government may raise the defense, the SNF plaintiffs could seek a significant amount of discovery from the Government regarding that issue, and that discovery would likely be highly duplicative in each of the SNF cases. Because the District of Columbia Circuit has previously barred the Government from raising the "unavoidable delays" defense, there has been no discovery to date regarding that issue.

## III. COURSE OF DISCOVERY AND THE PRESSING NEED FOR COORDINATION

On January 8, 2001, the Government sought to consolidate before a single Judge all of the 14 then-pending SNF cases. See The United States' Motion To The Chief Judge To Reassign To A Single Judge Cases Involving Alleged Breaches Of The Standard Contract Published At 10 C.F.R. Part 961. Initially, the Court deferred ruling upon the Government's motion and, instead, directed the parties to engage in coordinated discovery proceedings. On July 10, 2001, the plaintiffs and the Government moved jointly regarding the scope and procedures to be employed in the coordinated discovery proceedings. The parties agreed that these proceedings would concern "schedule issues," including "the order, pace, and rate of acceptance of spent nuclear fuel and high-level radioactive waste pursuant to the Standard Contract, any priority for shutdown reactors, exchanges of acceptance slots, and the Government's obligation to accept and time of acceptance of Greater-Than-Class C radioactive waste." On September 26, 2001, the Court entered a stipulated order memorializing this agreement.

A Discovery Judge initially presided over the coordinated discovery proceedings and resolved various discovery disputes between the parties. By order dated February 1, 2002, the Court permitted plaintiffs to take 10 depositions to defend against the Government's pending motions for partial summary judgment regarding the rate of acceptance and GTCC. By order dated March 25, 2002, the Court granted the utility plaintiffs' request not to include in their allotment of ten depositions any RCFC 30(b)(6) depositions, but cautioned that "future depositions will be permitted only upon showing that (1) the information sought from the additional deponents is critical to responding to the pending dispositive motions, and (2) such information could not have been obtained in prior depositions or through other methods of discovery."

In response to plaintiffs' requests for production, the Government produced 795,834 pages of documents through the coordinated discovery period. The Government also made 10 fact witnesses available for deposition, and three additional witnesses testified on behalf of the Government in five separate Rule 30(b)(6) depositions addressed to 10 core SNF topics. These coordinated discovery depositions occupied 34 days between February 19, 2002, and May 21, 2002.[10]

---

[10] In recent filings in Boston Edison Co. v. United States, No. 99-447C (Fed. Cl.), and Dairyland Power Coop. v. United States, No. 04-0106C (Fed. Cl.), plaintiffs cited to the Court's February 1, 2002 order as evidence that the scope of coordinated discovery was unnecessarily or improperly limited. This is not the case. Although the Court's order facially limited discovery to issues associated with the Government's pending motions for partial summary judgment, those motions concerned the same issues identified in the parties' original joint motion for coordinated discovery proceedings (including order, pace, and rate of SNF acceptance, and the Government's obligations with respect to GTCC). Moreover, the Government designated witnesses to testify on all 10 RCFC 30(b)(6) topics identified by the plaintiffs, although some of these topics arguably fell outside the scope of the Government's pending motions.

On February 24, 2003, the Court granted leave for the Government to file a motion for renewed consideration of its still-pending motion to the Chief Judge for the reassignment of all the SNF cases to a single Judge. By order dated April 16, 2003, the Chief Judge entered an order directing that six SNF cases be designated as "lead" cases for the purpose of deciding the Government's summary judgment motions and suggested to the various Judges that all remaining SNF cases be stayed pending resolution of the lead cases. In 2003, the Court issued divergent decisions in five of these cases.[11]

Because the lead cases were proceeding without further coordination, and because some Judges presiding over SNF cases did not elect to follow the Chief Judge's suggestion that non-lead cases be stayed, the Government renewed its motion to consolidate all of the pending SNF cases, requesting that the Court do so in order to decide the rate and schedule of acceptance under the Standard Contract. See Defendant's Second Motion To Renew Its Motion To Consolidate, filed July 29, 2003. By order dated January 30, 2004, the Court denied the Government's second motion to consolidate based upon a determination that "consolidation – even as to the particular issues of rate of acceptance and schedule of acceptance – would not effectuate any greater efficient administration of justice than that of letting the six lead cases proceed with their dispositive motions and/or trial on damages."

On April 30, 2004, in response to the filing of additional SNF cases, the Court convened a Court-wide status conference. At that hearing, or in status reports to the Court, counsel for many of the plaintiffs represented that they would not pursue duplicative discovery in their

---

[11] See Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003); Yankee Atomic Elec. Co. v. United States, No. 98-126C, slip op. (Fed. Cl. June 26, 2003); Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003).

individual cases against the Government. A. 3-8 and 14-15. In reality, exactly the opposite result has occurred. The Government has spent the past four years defending against a discovery onslaught by SNF plaintiffs that has literally consisted of repetitive and duplicative depositions of the same witnesses on the same topics in which various plaintiffs' counsel utilize, often, the same deposition questions. Compare, e.g., A. 23-30 with 33-37. The statistics set forth below illustrate the absurd nature of discovery in the SNF cases, which, although currently uncoordinated in this Court, is highly coordinated amongst the various SNF plaintiffs' counsel. Without the ability to coordinate discovery and litigation before this Court, the Government has been forced to respond repeatedly to redundant discovery requests and conflicting responses from different Judges of this Court to discovery demands by the plaintiffs.

As of this date, the Government already has responded to 631 individual requests for the production of documents, produced more than 2.4 million pages of documents, and defended 117 witness depositions occupying 164 days. The Government's four principal witnesses, David Zabransky, Christopher Kouts, Thomas Pollog, and Robert Morgan, have spent approximately 266 hours over the course of 50 days providing deposition testimony to the plaintiffs. David Zabransky, for instance, has endured 19 days of deposition, testifying as either a RCFC 30(b)(6) deponent or a fact witness. Moreover, these same witnesses also have testified live and by designation at trial on 70 occasions. Whether at deposition or trial, the Government's principal witnesses have offered consistent testimony regarding core SNF issues – i.e., development of DOE's waste management system and implementation of the Standard Contract. Notwithstanding this veritable library of Government testimony, SNF plaintiffs consistently notice Messrs. Zabransky, Kouts, Pollog, and Morgan to testify again and again on these very

same topics at deposition in individual cases. All but Mr. Morgan, for example, provided additional RCFC 30(b)(6) and fact testimony on April 22 and/or 23, 2008, in Dairyland Power Coop. v. United States, No. 04-0106C (Fed. Cl.).

Moreover, the plaintiffs have propounded upon the Government numerous duplicative requests for the production of documents. For example, we have responded to 71 identical or substantially similar requests for documents relating to the following four core subjects: general date of performance by DOE, GTCC disposal, development and interpretation of the Standard Contract, and the general rate of SNF acceptance by DOE.

A representative sample of the duplicative efforts undertaken by the Government in fielding SNF discovery requests appears below:

Duplicative Deposition Testimony (All Government Witnesses)

| Type of Discovery | Fact Witnesses Deposed | Days of Fact Witness Depositions | 30(b)(6) Witnesses Deposed | Days of 30(b)(6) Depositions |
|---|---|---|---|---|
| Coordinated | 10 | 27 | 3 | 7 |
| Individual | 79 | 102 | 19 | 24 |
| Totals | 89 | 129 | 24 | 31 |

Redundant Requests for Production of Documents (by Plaintiffs)

| Type of Discovery | Date of Performance Generally | GTCC | Standard Contract | Acceptance Rate Generally |
|---|---|---|---|---|
| Coordinated | 2 | 2 | 2 | 2 |
| Individual | 27 | 13 | 9 | 14 |
| Totals | 29 | 15 | 11 | 16 |

Since the conclusion of coordinated discovery, the SNF plaintiffs also have repeatedly filed duplicative challenges to the Government's discovery objections and privilege claims before multiple Judges of this Court in an effort to reverse prior discovery rulings favoring the

Government. For instance, during the course of coordinated discovery in 2002, the plaintiffs challenged the Government's assertions of deliberative process privilege over certain documents. The Discovery Judge upheld the Government's assertions, finding "precise and certain reasons for invoking the privilege . . . ." By order dated October 9, 2002, the Discovery Judge denied the plaintiffs' motion to compel the production of privileged documents, upholding the Government's assertions of deliberative process privilege, attorney-client privilege, or attorney work product protection over 300 documents. See Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306 (2002).

By motion dated March 6, 2003, counsel for Yankee Atomic Electric Company ("Yankee Atomic") again challenged the Government's assertions of privilege before Senior Judge Merow, including the assertions already upheld by the Discovery Judge. This time, the Court directed the production of some documents, but sustained the remainder of the Government's assertions. In 2005, Pacific Gas and Electric Company ("PG&E") filed yet another motion, this time with Judge Hewitt, to compel the production of many of the very same documents at issue in the two previous challenges, as well as all of the Government's subsequent deliberative process assertions. On January 18, 2007, counsel for Dairyland Power Cooperative, who also represented Yankee Atomic and PG&E, filed a similar motion, urging the Court in briefing to direct the Government to produce the challenged documents to all of the utility plaintiffs, thereby "put[ting] an end to repetitive litigation of the deliberative process issues." In its June 29, 2007 order, the Court acknowledged "Dairyland's attempt 'to champion the cause of other spent nuclear fuel plaintiffs,' as Defendant characterizes it," recognizing that this "amount[ed] in a practical sense to judge-shopping." Dairyland Power Coop. v. United States, 77 Fed. Cl. 330,

336 (2007). Ultimately, however, the Dairyland Court ordered the Government to produce more than one million pages of documents that the Court in other cases previously had determined had been properly withheld as privileged or had been withheld as far beyond the scope of reasonable discovery. Similarly, on July 13, 2007, Energy Northwest moved to compel the production of 256 documents withheld by DOE on the basis of deliberative process privilege, including all of the documents that PG&E had previously moved to compel, with the exception of documents relating to the issue of GTCC waste.

This unnecessary relitigation of discovery issues has proved enormously burdensome to the Government, and it has resulted in the inefficient utilization of scarce judicial resources by the Court. Common legal and factual issues continue to predominate discovery in individual SNF cases. As discussed below, directing the coordination of discovery before a single Judge could eliminate, or at the very least minimize, the duplicative, wasteful, and abusive practices that have characterized SNF discovery by plaintiffs to this point.

## IV. THE GOVERNMENT'S CONSISTENT REQUESTS FOR COORDINATED DISCOVERY

Following the Court's January 30, 2004 denial of the Government's second motion for renewed consideration of our motion for the reassignment of all SNF cases to a single Judge, we have consistently prevailed upon the Court to coordinate pre-trial discovery in these matters. Most recently, on September 28, 2007, acting pursuant to a Court order dated September 21, 2007, issued in Dairyland Power Cooperative v. United States, No. 04-106C (Fed. Cl.), we submitted to the Chief Judge a letter (at the Court's order requesting a letter submission) urging the reconstitution of coordinated discovery on a case-wide basis and summarizing the

justifications for coordination. Only 14 days earlier, on September 14, 2007, we filed a motion in Energy Northwest v. United States, No. 04-10C (Fed. Cl.), for the entry of a protective order precluding the plaintiff's noticed RCFC 30(b)(6) deposition on topics about which Government representatives had thoroughly and repeatedly testified. That motion contained a request in the alternative for the reinstitution of coordinated discovery. Since March 2004, we have filed similar requests in numerous SNF cases pending before this Court asking for coordination of the SNF cases.[12]

## ARGUMENT

### I. THE COURT HAS AUTHORITY TO DIRECT THE COORDINATION OF DISCOVERY AND LITIGATION ON A CASE-WIDE BASIS

Pursuant to RCFC 1, the Rules of the Court of Federal Claims "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." RCFC 1. Indeed, this Court's rules unquestionably recognize that cases with common issues of fact may warrant consolidated pretrial management "[i]n the interests of efficiency and the conservation of resources." RCFC 40.2, Rules Committee Note, 2002 Revision. Specifically, RCFC 40.2 contemplates that litigants may seek a coordinated discovery schedule from the Court "[w]henever it appears . . . there are two or more cases before the court that present common issues of fact", and adoption of such a schedule would "significantly promote the efficient

---

[12] We also discussed the need for coordinated discovery with the Court during status conferences before Chief Judge Damich on September 20, 2007 and August 7, 2007, and the Discovery Judge on April 30, 2004.

administration of justice."[13] RCFC 40.2(b)(1) (emphasis added).[14] The Judge assigned to the "earliest-filed case shall call a meeting of all of the assigned judges to determine what, if any, action is appropriate." RCFC 40.2(b)(3).

Further, if multiple cases before the Court involve "a common question of law or fact", the Court may, among other things, "make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." RCFC 42(a) (emphasis added). To facilitate case coordination, a Judge of this Court may by order transfer a case to another Judge upon agreement of both Judges "[t]o promote docket efficiency, to conform to the requirements of any case management plan, or for the efficient administration of justice." RCFC 40.1(b). Moreover, this Court's "chief judge may reassign any case if the chief judge deems such action necessary for the efficient administration of justice." RCFC 40.1(c).

Recently, in a report forwarded to the Court on May 27, 2008, the Court's Advisory Committee recommended an amendment to RCFC 40.2 that would provide for the establishment of a standing three-Judge panel which would evaluate related case management plans and institute coordinated litigation proceedings when deemed appropriate. A. 43. This panel would have the authority to "order transfer, consolidation, adoption of a coordinated discovery schedule, or other action not prohibited by [the Court's] rules for the related cases." A. 44. In addition, the panel could "order that the related cases proceed in accordance with the procedures applicable to

---

[13] RCFC 40.2 does not have a counterpart in the Federal Rules of Civil Procedure. RCFC 40.2, Rules Committee Note, 2002 Revision.

[14] Pursuant to RCFC 40.2(b)(1), a party may file a Notice of Indirectly Related Case(s) to seek a coordinated discovery schedule. Given the permissive language regarding the notice, RCFC 40.2 does not explicitly foreclose the Court from issuing a coordinated discovery schedule on a motion of a party to one of the continuing cases. See RCFC 40.2(b).

multi-district litigation in federal district courts." Id. Although the Advisory Committee has recommended a modification to RCFC 40.2 to incorporate this recommendation on a permanent basis, the language of the current version of RCFC 40.2, as discussed above, currently allows the Chief Judge to institute appropriate coordinated litigation proceedings when appropriate. Accordingly, although modification of RCFC 40.2 to incorporate the recommendations of the Advisory Committee and to render them permanent is appropriate, the Chief Judge, under the current version of RCFC 40.2, currently possesses the authority to institute the type of three-Judge panel identified in the Advisory Committee's recommendation to consider and institute a coordinated case management plan for the SNF cases.

In addition to the previous coordinated discovery efforts in this case as described above, this Court has successfully worked with parties to coordinate discovery in complex litigation involving multiple cases. For example, this Court in the Winstar litigation devised a plan for the coordination of, among other things, discovery in more than 120 cases relating to the effect of the Financial Institutions Reform, Recovery, and Enforcement Act on contracts allegedly executed between the United States and banks and their owners. See First Fed. Sav. Bank of Hegewisch v. United States, 63 Fed. Cl. 790, 791 (2005). Pursuant to an omnibus case management order, issued by then-Chief Judge Loren A. Smith on September 18, 1996 ("CMO"), all Winstar-related cases were reassigned to a single so-called Managing Judge "to provide consistent treatment of all matters related to Winstar cases, to conserve the resources of the Court and the parties, and for the efficient administration of justice . . . ." CMO at ¶ 2.a.; California Fed. Bank v. United States, 39 Fed. Cl. 753, 756-57 (1997), rev'd on other grounds, Suerr v. United States, 2008 WL 3089952 (Fed. Cir. Aug. 7, 2008) (one of the goals of common management of the Winstar cases

was minimization of "the onerous litigation and discovery burdens facing the government."). This coordinated approach to litigation of related cases has extended to other types of cases as well. See, e.g., Christopher Village, LP v. United States, 50 Fed. Cl. 635, 645 n.10 (2001) (noting that the Court has "worked with parties to coordinate discovery or briefing on related issues found in separate cases, where the cases share common legal issues but the individual claims for damages are predicated on very different factual questions.").

## II. THE COURT SHOULD INSTITUTE COORDINATED DISCOVERY PROCEEDINGS IN THE SNF CASES

Given this Court's authority pursuant to the RCFC and its proven coordination of discovery in the Winstar litigation, the Court, acting through a three-Judge panel as recommended by the Advisory Committee, could and should fashion a similar plan to coordinate discovery on related issues in the SNF cases. As we previously discussed, the Federal Circuit has just issued decisions in several pending appeals of SNF decisions from this Court that directly implicate issues that are common to many, if not all, of the SNF cases. Given that many of the cases currently stayed will now move forward when these decisions become final, the Court should implement a litigation plan to coordinate the development of these cases and ensure that common issues are resolved in an efficient manner. Further, as past history has evidenced, there has been a tremendous amount of duplicative discovery by plaintiffs in the SNF cases, as well as efforts to obtain a broad scope of discovery for the SNF plaintiffs from a Judge in one case that other Judges of the Court have previously denied. The Court's coordination of discovery in the SNF cases would help to avoid the unnecessary costs and delay associated with the current discovery scheme and, thereby, promote the efficient administration of justice. As described in

detail above, SNF plaintiffs have taken duplicative depositions and made redundant discovery requests. Moreover, plaintiffs have filed duplicative challenges to the Government's discovery objections and privilege claims before multiple Judges in this Court. Plaintiffs' duplicative challenges have, in some instances, resulted in incongruous and conflicting rulings on the same discovery issues. Coordinated discovery in the SNF cases would allow for efficient adjudication of common legal issues and increased judicial economy.

Further, a single Discovery Judge – like the Discovery Judge in the Winstar litigation – would gain expertise with respect to recurring SNF issues. As a result, the Discovery Judge will be able to establish consistency with regard to prevention of abusive discovery tactics and deal efficiently with discovery disputes. The existence of a central authority for the resolution of discovery issues also will prevent further discommoding of all the Judges as to repetitious SNF discovery questions. Absent coordination, the duplication of discovery in the SNF cases will compound exponentially, as more cases reach the discovery stage. When this occurs, the Court will be increasingly called upon to resolve piecemeal disputes that otherwise could have been resolved in a single, coordinated effort. As many cases return to active status following the Federal Circuit's decisions, there should be coordinated approach to discovery, with all of the remaining plaintiffs taking whatever additional discovery they can justify at the same time. Discovery coordinated and overseen by a single Judge, who would be able to have a working knowledge of the issues in the cases and would be able to ensure consistent and uniform treatment of discovery in all of the SNF cases, would eliminate the Court's concern in Dairyland about the possibility of Judge shopping and the tremendous costs that result from it.

## III. IN CONJUNCTION WITH COORDINATED DISCOVERY, THE COURT SHOULD IMPOSE A LITIGATION PLAN THAT WOULD RESULT IN RESOLUTION OF THE REMAINING SNF CASES

As the Court is aware, many of the remaining SNF cases have been stayed pending resolution of the appeals before the Federal Circuit. We believe that, through a coordinated approach that would allow the parties to take any remaining discovery in a consistent and coordinated manner, the parties should be in a position to resolve their claims more efficiently. Although the Government to date has produced over two million pages of documents which are available to all SNF plaintiffs, the Government has yet to obtain any discovery from the plaintiffs in the stayed cases.

To assist in expediting the resolution of the remaining SNF cases, while allowing the plaintiffs to develop their damages claims in light of the guidance that the Federal Circuit provided to the parties in the pending appellate cases, we request that, as part of the creation of coordinated discovery proceedings, the Court order each remaining SNF plaintiff in any case to provide a detailed claim, supported by any reports from damages experts and other experts upon which any plaintiff intends to rely, within 60 days after the final resolution of the Yankee Atomic, PG&E, Sacramento Municipal, and Nebraska Public Power appeals. In addition, each plaintiff should be required within that 60 days to provide the Government with its production of documents and information consistent with the requirements of RCFC 26(a).

If our plan is adopted, within 60 days after the SNF plaintiffs provide these materials to the Government, the Government will respond in two ways: (1) the Government will serve written discovery requests to the various plaintiffs in all of the remaining cases following the Government's review of the plaintiffs' claim materials; and (2) the Government will submit a

suggested scheduling plan, based upon the apparent complexity of the various SNF plaintiffs' submissions and the likely additional time for completion of discovery in each case, regarding the scheduling of further proceedings, including dispositive motions and/or trials, in the remaining cases. Subsequently, the Court would impose a scheduling plan that coordinates the various SNF cases through expedited resolution procedures, taking account of the comparative complexities of the various cases. Such a procedure also will allow for resolution of other common issues among the cases.

Absent such a schedule, these cases will continue to be resolved in a haphazard manner, with unnecessary and extensive costs for the parties and, in particular, the Government. Through this motion, we seek to place limits upon the need to incur unnecessary expenses that could easily be avoided by appropriate coordination of the cases at the Court. Assignment of a single Judge to monitor these cases through discovery – who would develop a solid working knowledge of the various issues in the cases and the discovery that has occurred in the past – would greatly assist in this effort. Further, coordination would likely result in a more efficient and expedited resolution of the remaining SNF cases. To accomplish these goals, we respectfully request that the Court adopt this litigation plan for the remaining cases.

## CONCLUSION

For the foregoing reasons, the Government requests that the Court assign a panel of three Judges to evaluate the Government's request for a case management plan and, further, that the three-Judge panel issue a case management order through which (1) a single Judge will preside over discovery issues arising in all cases involving claims for partial breach of the Standard

Contract and (2) the Court will establish a litigation plan for the resolution of each the remaining SNF cases in a coordinated and cost-efficient manner.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Marian E. Sullivan
MARIAN E. SULLIVAN
Senior Trial Counsel
Commercial Litigation Branch
U.S. Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0365
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
Office of General Counsel
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

MARIANA T. ACEVEDO
JOSEPH E. ASHMAN
ANDREW P. AVERBACH
PATRICK B. BRYAN
CHRISTOPHER J. CARNEY
LISA M. DONAHUE
SCOTT R. DAMELIN
STEPHEN P. FINN
JEREMIAH M. LUONGO
ANTHONY W. MOSES
SONIA M. ORFIELD
SCOTT C. SLATER
SHARON SNYDER
Trial Attorneys
Commercial Litigation Branch
U.S. Department of Justice

August 21, 2008

Attorneys for Defendant

## ATTACHMENT A

Cases Under Submission:

Wisconsin Electric Power Co. v. United States, Fed. Cl. 00-697C (Merow, S.J.)
System Fuels, Inc. v. United States, Fed. Cl. 03-2624C (Braden, J.)
Dominion Resources, Inc. v. United States, Fed. Cl. 04-83C (Bruggink, S.J.)
Dominion Resources, Inc. v. United States, Fed. Cl. 04-84C (Bruggink, S.J.)
Dairyland Power Cooperative v. United States, Fed. Cl. 04-106C (Damich, C.J.)

Cases in Active Discovery:

Detroit Edison Co. v. United States, Fed. Cl. 99-926C (Williams, J.)
PSEG Nuclear v. United States, Fed. Cl. 01-551C (Futey, S.J.)
Vermont Yankee Nuclear Power Corp. v. United States, Fed. Cl. 02-898C (Wheeler, J.)
Consumers Energy Co. v. United States, Fed. Cl. 02-1894C (Damich, C.J.)
Entergy Nuclear Indian Point 2 v. United States, Fed. Cl. 03-2622C (Wheeler, J.)
Entergy Nuclear Vermont Yankee v. United States, Fed. Cl. 03-2663C (Wheeler, J.)
Arizona Public Service Co. v. United States, Fed. Cl. 03-2832C (Hodges, S.J.)
Energy Northwest v. United States, Fed. Cl. 04-10C (Damich, C.J.)
Consolidated Edison Co. of New York v. United States, Fed. Cl. 04-33 (Wheeler, J.)
Southern California Edison Co. v. United States, Fed. Cl. 04-109C (Baskir, J.)

Cases That Are Stayed Or Not Active:

Florida Power & Light Co. v. United States, Fed. Cl. 98-483C (Baskir, J.)
Power Authority of the State of New York v. United States, Fed. Cl. 00-703C (Damich, C.J.)
Nebraska Public Power District v. United States, Fed. Cl. 01-116C (Allegra, J.)
General Atomics v. United States, Fed. Cl. 03-2505C (Wolski, J.)
System Fuels, Inc. v. United States, Fed. Cl. 03-2621C (Williams, J.)
Entergy Gulf States, Inc. v. United States, Fed. Cl. 03-2625C (Williams, J.)
Entergy Nuclear Generation Co. v. United States, Fed. Cl. 03-2626C (Lettow, J.)
Entergy Nuclear Fitzpatrick v. United States, Fed. Cl. 03-2627C ( Damich, C.J.)
Portland General Electric Co. v. United States, Fed. Cl. 04-9C (Bruggink, S.J.)
Canal Electric Co. v. United States, Fed. Cl. 04-35 (Hodges, S.J.)
Interstate Power & Light Co. v. United States, Fed. Cl. 04-67C (C. Miller, J.)
Constellation Generation Group, LLC v. United States, Fed. Cl. 04-68 (Margolis, S.J.)
Cleveland Electric Illuminating Co. v. United States, Fed. Cl. 04-69C (Wolski, J.)

PPL Susquehanna v. United States, Fed. Cl. 04-70C (Baskir, J.)
Wisconsin Public Service Corp. v. United States, Fed. Cl. 04-71C (Block, J.)
FPL Energy Seabrook v. United States, Fed. Cl. 04-88C (Hodges, S.J.)
Union Electric Co. v. United States, Fed. Cl. 04-97C (Hodges, S.J.)
TXU Generation Co. v. United States, Fed. Cl. 04-98C (Williams, J.)
Kansas Gas & Light Co. v. United States, Fed. Cl. 04-99C (C. Miller, J.)
Texas Genco, LP v. United States, Fed. Cl. 04-100C (Wolski, J.)
General Electric Co. v. United States, Fed. Cl. 04-107C (Wolski, J.)
General Electric Co. v. United States, Fed. Cl. 04-108C (Wolski, J.)
Rochester Gas & Electric Co. v. United States, Fed. Cl. 04-118C (Margolis, S.J.)
Niagara Mohawk Power Co. v. United States, Fed. Cl. 04-124C (Margolis, S.J.)
Niagara Mohawk Power Co. v. United States, Fed. Cl. 04-125C (Allegra, J.)
Illinois Power Co. v. United States, Fed. Cl. 04-133C (Damich, C.J.)
Northern States Power Co. v. United States, Fed. Cl. 07-608C (Wiese, S.J.)
Connecticut Yankee Atomic Power Co. v. United States, Fed. Cl. 07-875C (Merow, S.J.)
Yankee Atomic Electric Co. v. United States, Fed. Cl. 07-876C (Merow, S.J.)
Maine Yankee Atomic Power Co. v. United States, Fed. Cl. 07-877C (Merow, S.J.)
Alabama Power Company v. United States, Fed. Cl. 08-237C (Merow, S.J.)

# APPENDIX

# INDEX TO APPENDIX

DOCUMENT PAGE

Excerpts of Transcript of Status Conference,
Spent Nuclear Fuel Discovery v. United States (April 30, 2004). . . . . . . . . . . . . . . . . . . . . . . . . A 1

Excerpts of Status Report Regarding "Pre-Discovery Conference,"
Niagara Mohawk Power Corp. v. United States (May 7, 2004). . . . . . . . . . . . . . . . . . . . . . . . . A 12

Excerpts of Deposition of Robert L. Morgan,
Yankee Atomic Electric Co., et. al. v. United States (March 21, 2002). . . . . . . . . . . . . . . . . . . A 21

Excerpts of Deposition of Robert L. Morgan,
Northern States Power Co. v. United States (November 15, 2006). . . . . . . . . . . . . . . . . . . . . A 31

Letter from G. Smith to Hon. E. J. Damich with attached Report
of the Ad Hoc Committee on Related Cases of the CFC Advisory Council
(May 27, 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 38

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPENT NUCLEAR FUEL DISCOVERY | ) |
| Plaintiffs, | ) Docket Nos.: 03-2505; |
| | ) 03-2621; 03-2622; 03-2623; |
| v. | ) 03-2624; 03-2625; 03-2626; |
| | ) 03-2627; 03-2663; 03-2832; |
| UNITED STATES, | ) 04-009; 04-010; 04-033; |
| | ) 04-034; 04-035; 04-036; |
| Defendant | ) 04-037; 04-067; 04-068; |
| | ) 04-069; 04-070; 04-071; |
| | ) 04-074; 04-075; 04-083; |
| | ) 04-084; 04-088; 04-096; |
| | ) 04-097; 04-098; 04-099; |
| | ) 04-100; 04-101; 04-102; |
| | ) 04-103; 04-104; 04-106; |
| | ) 04-106; 04-107; 04-108; |
| | ) 04-109; 04-118; 04-124; |
| | ) 04-125; 04-129; 04-133. |

Courtroom 4. Room 501
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Friday,
April 30, 2004

The parties met, pursuant to adjournment, at 2:10 p.m.

BEFORE: HONORABLE DIANE GILBERT SYPOLT
Judge

APPEARANCES:

<u>For the Plaintiffs</u>:

Brad Fagg, Esquire
Morgan Lewis
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

APPEARANCES (CONT'D)

For the Defendant:

Harold D. Lester, Esquire
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 10150
Washington, D.C. 20044-0146
(202) 307-6288

changed. And observing these matters over the past few years, it is apparent that things can change and we would have the ability to go and seek other means from the --

THE COURT: Okay.

MR. FAGG: So that is the position of all of the parties that we represent. I think that sort of answers the question as to the coordinated discovery.

We, unlike the litigating utilities that have been at this for some time, have not had access to or reviewed the extensive files that has been developed in the prior proceedings. Quite frankly, we hope never to have to do that and there is at least a reasonable possibility in our view that that may be the case.

For that reason, we do not desire to begin now in any sort of coordinated discovery process --

THE COURT: Okay.

MR. FAGG: -- with the hope that it may never be necessary.

THE COURT: Right.

MR. FAGG: If it is to be necessary, though, that is at some point in the future. We could then assess whether any additional discovery is necessary or whether we could make use of all of the prior work

that has been done.

THE COURT: Perhaps we should take this time -- at this point, to say what we mean by coordinated discovery. Because what the government said was that it wanted an order from the judges, as I recall, to the Plaintiffs to coordinate among themselves. So it doesn't necessarily mean a discovery judge.

Is that correct from the government's perspective?

MR. LESTER: Your Honor, I think that we are open to however --

THE COURT: Any kind of suggestion.

MR. LESTER: -- suggestions from your part.

THE COURT: But that's what you said in the motion.

MR. LESTER: Right. Obviously, we had a discovery judge before.

THE COURT: Right.

MR. LESTER: It seemed, in our opinion, to work well, at least to help resolve disputes in a consistent manner. We do have a concern about lots of different judges dealing with different issues --

THE COURT: Yes.

MR. LESTER: -- because nobody is really completely familiar with things. But, again, that is

other cases on the SNF docket. We are not operating utilities; we are dead plants; we are not plants seeking to move around in the queue. The clients that I represent are clients who have sold their interests in plants a long time ago, the so-called "Sellers' Club."

THE COURT: Right.

MR. CONWAY: We are much more efficient cases, much more narrowly defined, much easier to prosecute. The standard rate-of-acceptance argument, as you can see from our filing, we don't think has anything really to do with liability issues in our case on the matured -- or has anything to do with damages.

THE COURT: Okay.

MR. CONWAY: A Class C waste, I don't think applies to us, etc. etc. We don't think all the government's standard issues that have been raised really apply to us. So we don't see any reason for us to get caught up in the maelstrom of all these other cases with all their huge issues in terms of rate of acceptance and whether it is 3,000 tons or a hundred tons, greater than Class C waste, who is going to go on the queue, all those issues.

Similarly, we haven't seen any of what the

government says are the 833,000 pages of documents or the 65 depositions. We haven't been in this case before Your Honor. We haven't seen them in large part because a lot of it is subject to a protective order. So we don't know what is in there as far as --

THE COURT: How much would you be interested in looking at?

MR. CONWAY: Well, I --

THE COURT: As far as you can tell at this point? I'm planning to go through it all.

MR. CONWAY: I have tried to get an index of what is in there and I have not been able to, Your Honor. Once I see an index, I can figure out what I want to see. My sense is probably very little.

THE COURT: Okay, good.

MR. CONWAY: Now, to the extent that there is something in there that interests me or there is a deposition or two or three that interest me, I would be glad to take those in lieu of conducting my own discovery. My clients are not interested in spending money on legal fees if they don't have to. They just want to move their cases along and we don't want to get into the vortex of what's going to happen when all of these other cases start going to trial and issues come out, and then there are stays to go to the

THE COURT: Yes.

MR. TOMASCZUK: Then we can focus on damages.

THE COURT: Yes. But that doesn't seem to be an issue that is going to take up as; much effort in deciding as some of the others in all this discovery.

MR. TOMASCZUK: With respect to discovery, Your Honor. With acceptance rate discovery, I think we have been exposed to most of that. There might be some minimal updating required in terms of document production. I can't articulate exactly what would be needed at this point in time, but my hope and expectation would be that any updating would be brief.

THE COURT: Would you be amenable to a stay that excluded certain issues like liability, the liability issue and holding off on acceptance, additional acceptance-rate discovery, or anything else that is likely to be happening in about six months or twelve?

MR. TOMASCZUK: If the government wants to hold off on briefing the acceptance-rate issue in some of these newly filed cases, I think that's fine. I think there are other things we can do.

THE COURT: Well, I assume that that is

MR. HIRSCH: And that case is going to trial in November. So I think it is four cases that is practical now.

With respect to this issue of coordinated discovery, Your Honor, we absolutely agree with the opinions that have been expressed here by Plaintiffs' counsel that there is no reason to engage in coordinated discovery at this time. We believe and we said that given what has gone before we think that that discovery will likely be of limited scope and more in the nature of updates.

With respect too the stay, Judge, the positions taken by our clients vary a little bit because of their history in the litigation. In the case of the South Carolina case, and the Energy Northwest case, those are cases that were filed in January 2004. As we stated in our response in those cases, those clients do not believe that a complete stay is appropriate. They believe that it makes sense for the parties to conduct some pretty limited discovery, basically consisting of the mandatory disclosures that are required under this Court's rules and essentially our clients production of documents. We recognize that the government has produced most of their documents in this case.

some of the common issues resolved in some of the earlier filed cases, with the one exception of that General Electric case, where we need to figure out if we need to do something procedurally, fine; the Connecticut Yankee, they are partial beneficiaries.

THE COURT: What are you going to do about the question of whether you are going to be filing an answer or I assume you won't be filing a motion to stay. These cases would be stayed even before the answer?

MR. LESTER: Well, first of all, some of the Judges have actually ordered us to file the answers, despite our motions to stay.

THE COURT: Right.

MR. LESTER: So, we are certainly complying with those orders. Judge Baskir has ordered us to exchange initial disclosures. We will comply with the Court's orders in all the cases.

The Court is correct in that we did not file motions to stay yet in the cases that were filed last year because, quite honestly, we didn't know how many cases we were going to get and we hadn't decided exactly how we were going to proceed with these.

So I would presume that we will file motions to stay in those earlier filed cases as well. Other

cases where we haven't filed where there was potentially a legal issue that we might be able to resolve in the case without prior to a stay being imposed. However, I am going to take what we all have discussed here today back to my boss and discuss with him how to proceed to the many cases with regard to requesting stays or motions. And in Mr. Conway's cases, I will discuss that with him.

One thing that we do want to request, or at least to make clear is our position on coordinated discovery. I heard inkling that we should move forward with liability rulings in the cases or certain motions in other cases. And those would only involve perhaps a certain limited small amount of discovery. We must oppose any request that discovery proceed at all in these new cases, unless we are going to have some kind of a coordinated discovery where everyone is on board and everyone takes it and is complete with it.

What we have found, despite the coordinated discovery proceeding we had before where it did seem to work well during those proceedings, we did have lengthy depositions but at least the witnesses were not inconvenienced on multiple occasions. We are finding in the damages part of these cases that we are

starting to face what we feared would happen in the schedule issues, and that is: Government witnesses being sought for depositions repeatedly. The same people over and over again. Granted we only have had three cases that have gone into real damages discovery at this point in time, but it is the same three witnesses that are being called. I think that is because the government's defenses to these cases are all about the terms of the contract and various actions that DOE is going to take and everybody wants to depose people on those issues and they are all the same people.

THE COURT: Also, some of them have been deposed before on those very same issues.

MR. LESTER: They have. They have deposed three times: ConEd, Indiana, Yankees. Our concern is that this is going to happen repeatedly. It is a huge disruption to the program for these people who have other jobs. They are supposed to be working to try to get Yucca Mountain up and other matters with regard to that. Unfortunately, I fear that they are going to become professional witnesses.

THE COURT: But that does not seem to be a big issue because my sense of what most of the Plaintiffs are saying is they are willing to agree to

| | | |
|---|---|---|
| **NIAGRA MOHAWK POWER CORPORATION.** | ) | |
| Plaintiff, | ) | Case No. 04-0124c |
| v. | ) | |
| | ) | Judge Sypolt |
| **UNITED STATES OF AMERICA,** | ) | |
| Defendant. | ) | |

**STATUS REPORT REGARDING "PRE-DISCOVERY CONFERENCE"**

At the "Pre-Discovery Conference" held before Judge Diane Sypolt on April 30, 2004, Judge Sypolt requested that the parties to the "new" spent nuclear fuel ("SNF") cases pending before the Court and participating in the conference file a single document summarizing their positions regarding certain stay and discovery matters, which were addressed more fully in the conference and in notices and responses filed in many of the new SNF cases. Judge Sypolt requested that the document be filed electronically in one of the SNF cases pending before Chief Judge Damich, and in a SNF case pending before Judge Sypolt. Pursuant to that request, undersigned counsel respectfully submit the following report.

As a threshold matter, for various reasons no party has taken the position that so-called "coordinated discovery" should proceed at this time. In particular, no plaintiff now requests discovery regarding matters that were the subject of the prior "coordinated discovery" proceedings in the older SNF cases. The Government has reserved its position that should any such discovery proceed, that discovery should be coordinated.

For these purposes, the positions of the parties to the cases that participated in the conference or who otherwise desire to be included in this report can be summarized and grouped

into several categories. Those categories are described briefly below, and the cases that fall into the respective categories are listed under the corresponding category heading in Exhibit 1 to this motion.

Plaintiffs have elected not to respond in this filing to the substance of the Government's position as stated in Section II of this report. Rather, in cases where the Government has already filed a motion to stay and the plaintiff has responded, the plaintiff's full position is stated in that response, filed electronically in the individual cases. Similarly, where such a stay motion has yet to be filed, the plaintiff's full position will be stated in any response to such a motion. For brevity, the substance of the full responses or anticipated responses by plaintiffs are not repeated here, and the Court is respectfully referred to such filings in individual cases for statements regarding the positions of the parties. The parties wish to emphasize that the ***reasons*** that they have arrived at the indicated positions, and the arguments in favor of such positions, can and frequently do differ. By virtue of this filing, no party should be deemed to acquiesce in the statements or characterizations of positions by other parties, nor should plaintiffs have been deemed in any way to acquiesce in the recitations of the Government's position.

## I. CATEGORIES OF CASES

***A. PLAINTIFFS AND THE GOVERNMENT ARE AGREEABLE TO A DEFINED AND COMPLETE TEMPORARY STAY***. In the cases listed under Category A of the attached Exhibit 1, the plaintiffs and the government are agreeable to a complete stay of all discovery and motions practice for a defined and temporary period of six months, or until the end of 2004, or, alternatively, until March 1, 2005, upon the understanding that a plaintiff could at

any time file a request in an individual case that the stay be lifted, should circumstances so warrant.

**B.** ***PLAINTIFFS OPPOSE A STAY BUT AGREE TO DEFER DAMAGES ISSUES.*** In the cases listed under Category B of the attached Exhibit 1, the plaintiffs are opposed to a stay at this time. Within the next thirty days, plaintiffs intend to file motions seeking orders entering liability rulings against the Government on plaintiffs' claims for partial breach of contract. To the extent the Government intends to contest liability or to file other allegedly dispositive motions concerning plaintiffs' standing or other legal issues, plaintiffs desire to brief and resolve those issues now. Pending resolution of these issues, plaintiffs are not opposed at this time to deferring (1) briefing on the acceptance rate and other damages-related issues, and/or (2) conducting discovery on the acceptance rate and other damages-related issues. Plaintiffs also expect that, to the extent any discovery on the acceptance rate issues is required, that discovery will be extremely limited and would likely consist only of updating information previously obtained.

**C.** ***PLAINTIFFS OBJECT TO A STAY AND BELIEVE THAT THE GOVERNMENT SHOULD RESPOND TO THE COMPLAINTS AND ALSO THAT TARGETED DISCOVERY SHOULD PROCEED.*** In the four cases listed under Category C of the attached Exhibit 1, plaintiffs oppose any stay of these cases. As explained in the four Reports filed on April 23, 2004 for these plaintiffs, these cases are significantly different from the other types of cases filed by owner/operators of nuclear facilities, and would not benefit in any way from a stay. Plaintiffs believe the Government should be required to respond to their

respective complaints and that discovery, targeted to the specific issues generally unique to those plaintiffs, should proceed, as called for by this Court's Rules. Plaintiffs have not yet had access to the 833,000 pages of documents or 66 depositions cited in the Government's Report, but will review these documents and transcripts as authorized to determine if they apply to the plaintiffs' cases and can reduce the need for parallel discovery.

**D. *<u>PLAINTIFFS OBJECT TO A STAY AND BELIEVE THAT THE GOVERNMENT SHOULD HAVE TO ANSWER THE COMPLAINTS AND THAT CERTAIN LIMITED DISCOVERY SHOULD OCCUR.</u>*** In the cases listed under Category D of the attached Exhibit 1, plaintiffs oppose a general stay of the cases.[1] Plaintiffs believe that the Government should be required to answer the complaints in their respective cases. In addition, plaintiffs request that certain limited discovery, including the reciprocal disclosures called for by RCFC Rule 26(a) and plaintiffs' document production,[2] should proceed during the remainder of the year while the *Yankee* and *ComEd* spent fuel cases are being tried. With respect to other discovery, including deposition discovery, assuming the Government will stipulate to plaintiffs' use of previous depositions of Department of Energy ("DOE") and former DOE employees and contractors taken in other SNF cases as if they were taken in these cases, plaintiffs believe that such discovery can be deferred until after January 2005, after the trials in the *Yankee* and *ComEd* cases are completed.

---

1 In *South Carolina Electric & Gas Co. and South Carolina Public Service Commission*, No. 04-0101C, the Court entered an order on April 26, 2004 denying the Government's motion for a stay. The order directs the Government to respond to Plaintiff's complaint by May 28 and directs the parties to file a Joint Preliminary Status Report thereafter.

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037

s/Alex D. Tomaszczuk
Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7940
(703) 770-7901 (fax)

Attorneys for Plaintiffs
*Detroit Edison Company,*
*Entergy Gulf States, Inc.*
*Entergy Nuclear Fitzpatrick, LLC, Entergy Nuclear Indian Point 3, LLC, and Entergy Nuclear Operations, Inc.*
*Entergy Nuclear Generation Company*
*Entergy Nuclear Indian Point 2, LLC*
*Entergy Nuclear Vermont Yankee, LLC, and Entergy Nuclear Operations, Inc.*
*FPL Energy Seabrook, LLC*
*System Fuels, Inc., on its own behalf and as agent for Entergy Arkansas, Inc.*
*System Fuels, Inc., on its own behalf and as agent for Entergy Louisiana, Inc.*
*System Fuels, Inc., on its own behalf and as agent for Systems Entergy Resources, Inc., and South Mississippi Electric Power Association*

s/ Brad Fagg

Brad Fagg
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-5191 Telephone
(202) 739-3001 Facsimile

Attorneys for Plaintiffs
*Arizona Public Service Corporation,*
*Interstate Power and Light Company,*
*Constellation Generation Group, LLC, Calvert Cliffs Nuclear Power Plant, Inc., Nine Mile Point Nuclear Station, LLC,*
*Dominion Resources, Inc., Dominion Nuclear Connecticut, Inc.,*
*Dominion Resources, Inc., Virginia Electric and Power Company,*
*The Cleveland Electric Illuminating Company, Pennsylvania Power Company, The Toledo Edison Company,*
*General Atomics,*
*General Electric Company,*
*PPL Susquehanna, LLC,*
*Carolina Power and Light Company, Florida Power Corporation,*
*Southern California Edison Company, and*
*Wisconsin Public Service Company*

s/ Richard J. Conway

Richard J. Conway
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, D.C. 20037-1526

Attorneys for Plaintiffs
*Delmarva Power and Light Company,*
*Atlantic City Electric Company,*
*Canal Electric Company, and*
*Consolidated Edison Company of New York, Inc.*

s/ Norman M. Hirsch
Norman M. Hirsch
Jenner & Block
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 Telephone
(312) 840-7782 Fascimile

Attorneys for Plaintiffs
*Energy Northwest*
*Exelon Generation Company, LLC*
*AmerGen Energy Company, LLC*
*South Carolina Electric & Gas Company*
*South Carolina Public Service Commission*

s/ M. Stanford Blanton
M. Stanford Blanton
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, AL 35203

Attorneys for Plaintiffs
*Rochester Gas & Electric Company, Niagara Mohawk Power Coorporation, New York State Electric & Gas Corporation, and Central Hudson Gas & Electric Corporation*

s/Michael Henke
Michael J. Henke
Vinson & Elkins LLP
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004

Attorneys for Plaintiffs
*Portland General Electric Company, City of Eugene, Oregon, acting by and through Eugene Water and Electric Board, and PacifiCorp*

**EXHIBIT 1**

**<u>Category A:</u>**

*General Atomics*, 03-2505C, (Wolski, J)

*Arizona Public Service Co.*, 03-2832C, (Hodges, J.)

*Portland General Electric Company, The City of Eugene, Oregon, and Pacificorp*, 04-0009C, (Bruggink, S. J.)

*Carolina Power & Light Co., Florida Power Corp.*, 04-0037C, (Hewitt, J.)

*Interstate Power & Light Co.*, 04-0067C, (Miller, J.)

*Constellation Generation Group, LLC, et al.*, 04-0068C, (Margolis, S. J.)

*Cleveland Elec. Illuminating Co, et al.*, 04-0069C, (Wolski, J.)

*PPL Susquehanna, LLC*, 04-0070C, (Baskir, J.)

*Wisconsin Public Svc. Corp.*, 04-0071C, (Block, J.)

*Dominion Resources, Inc., et al.*, 04-0083C, (Bruggink, S. J.)

*Dominion Resources, Inc., et al.*, 04-0084C, (Bruggink, S. J.)

*Exelon Generation Company, LLC, (Peach Bottom, Limerick)*, 04-0102C, (Hewitt, J.)

*Exelon Generation Company, LLC, (Oyster Creek, TMI, Clinton), et al.*, 04-0104C, (Hewitt, J.)

*General Electric Co. (Vallecitos)*, 04-0108C, (Wolksi, J.)

*Southern California Edison Co.*, 04-0109C, (Baskir, J.)

*Rochester Gas and Electric Corp.*, 04-0118C, (Bush, J.)

*Niagara Mohawk Power Corp. (Nine Mile Point 1)*, 04-0124C, (Sypolt, J.)

*Niagara Mohawk Power Corp., et al., (Nine Mile Point 2)*, 04-0125C, (Allegra, J.)

*BWX Technologies, Inc.*, 04-0096C, (Lettow, J.)

1-WA/2184556.1

**Category B:**

*Detroit Edison Company*, 02-026C, (Williams, J.)

*System Fuels, Inc. – Entergy Louisiana, Inc.*, 03-2621C, (Williams, J.)

*Entergy Nuclear Indian Point 2, LLC*, 03-2622C, (Lettow, J.)

*System Fuels, Inc. – Entergy Arkansas, Inc.*, 03-2623C, (Lettow, J.)

*System Fuels, Inc. – System Energy Resources, Inc. and South Mississippi Electric Power Association*, 03-2624C, (Braden, J.)

*Entergy Gulf States, Inc.*, 03-2625C, (Williams, J.)

*Entergy Nuclear Generation Co.*, 03-2626C, (Lettow, J.)

*Entergy Nuclear Fitzpatrick, LLC, Entergy Nuclear Indian Point 3, LLC and Entergy Nuclear Operations, Inc.*, 03-2627C, (Damich, C. J.)

*Entergy Nuclear Vermont Yankee, LLC & Entergy Nuclear Operations, Inc.*, 03-2663C, (Hodges, J.)

*FPL Energy Seabrook, LLC, et al.*, 04-0088C, (Damich, C. J.)

**Category C:**

*Consolidated Edison Co. of NY, Inc.*, 04-0033C, (Bruggink, S. J.)

*Delmarva Power & Light Co.*, 04-0034C, (Miller, J.)

*Canal Electric Co.*, 04-0035C, (Hodges, J.)

*Atlantic City Electric Co.*, 04-0036C, (Futey, S. J.)

**Category D:**

*Energy Northwest*, 04-0010C, (Damich, C. J.)

*South Carolina Electric & Gas Co., et al.*, 04-0101C, (Lettow, J.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 1, Pgs. 1 - 212



Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:

BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON



A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:

JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:

PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)



A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:

SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:

ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

A P P E A R A N C E S

For the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:

ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983



I N D E X

| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 1 | Organizational charts | 25/25,64,79,311 |
| 2 | Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 | Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 | Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 | Report on Financing | 93/93,102,104 |

(continued)



I N D E X

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 6 | 3/4/93 letter from Alabama Power | 106/106 |
| 7 | 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 | 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 | 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 | 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 | Mission Plan, Volumes I and II | 159/159,162 |
| 12 | U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 | 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 | 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 | 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 | 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 | FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |

(continued)



I N D E X

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 18 | 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 | Remarks before IAEA, 10/12/83 | 230/231 |
| 20 | Letter to Governor Alexander | 275/275,279 |
| 21 | Draft letter to Governor Bryan | 278/278 |
| 22 | 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 | 2/8/83 comments from Duke Power Company | 282/283 |

INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

37

can't recall whether I had unanimity in certain things, but I would say that not everyone felt the same way about every part of the Act.

So I was ultimately responsible for the definition of what was in there.

BY MR. BLANTON:

Q. What did you decide it meant?

A. Pardon?

Q. What did you decide that the Act meant?

MR. BANES: Objection. Vague. Compound.

A. I really don't understand the question. In other words, the Act as written is what we tried to implement. And there were some interpretations, and we interpreted it a given way.

BY MR. BLANTON:

Q. What problem did you determine that the Act was attempting to solve?

A. What problem?

Q. What problem? Or was there a problem that the Act was trying to solve?

A. Yes, the storage of the nuclear waste from the commercial establishment. That's

38

what the whole act was about.

(Deposition Exhibit No. 2 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, I've handed you a document marked Exhibit 2 to your deposition, the first page of which is titled Proceedings of the 1983 Civilian Radioactive Waste Information Management Meeting, December 12 through 15, 1983, Washington, D.C., and then it has February 1984 below that.

And then following that we've included the forward and table of contents but we've not included all the papers listed in the table of contents. But we have included the last two pages titled Program Overview. Do you see that in the document?

A. Yes.

Q. First of all, when we -- In reviewing the cover of the document, there are two dates on it. One is December 12 through 15 of '83, and one is February of 1984. Do you know what those two dates refer to?

A. The February 1984 is the date it was published.

39

Q. And December of '83?

A. The December 12 through 15 of '83 was the time that the meeting took place.

Q. Do you recall this meeting?

A. Yes.

Q. Did you go? Were you there?

A. Yes.

Q. What was the purpose of the meeting?

A. It was basically, as I recall, an information as to what we were doing within DOE and what were some of the issues that we were looking at. And it was basically an overview for those that had interest, including the utilities.

Q. All right, sir. Now, at the time of this meeting, what had happened in the program since the passage of the Act? What progress had you made toward implementing the Act at this point?

A. Okay. The first -- within the first month there were letters that I had the Secretary sign to all the governors as to the process we were about.

We had completed the draft contract as required with the utilities.

40

Then we had resolved those issues and the Federal Register notice that I referred to before.

And the rest of it was just getting a mission plan outlined as to what our goals were and how we intended to get there.

That was the purpose of this meeting, an information meeting.

Q. And for context, the Act was signed by the President in January of '83. Is that right?

A. That's correct.

Q. So you had -- at the time of this meeting, you had been in your job in the Office of Civilian Radioactive Waste Management -- or Nuclear Waste Office or whatever it was -- basically a year?

A. Just about. It was February that I -- that I recall being asked to take the job. I don't have the dates. Close to a year.

Q. Turning to the page of the exhibit that's marked SN069599, it has the title Program Overview, and then under that it has Robert Morgan, Acting Director of Civilian Radioactive Waste Management. Was that you?

A. Yes.
Q. Did you write this paper?
A. I gave the first initial outline, it was filled in, and then I reviewed it.
Q. Who filled it in for you?
A. As I recall, it was Mike Lawrence and other people on the staff.
Q. Did they produce drafts and then bring the draft back to you and you would edit it and give it back to them?
A. I think it was just the one sequence that we used. I'm not sure. But I think I outlined it. We gave it to the people. They sent in the information. I reviewed it and edited it and presented it.
Q. So do I understand correctly that you actually addressed the group verbally and said what's in this paper?
A. That's my recollection.
Q. Who were the attendees at this meeting?
A. I have no idea.
Q. In general. Was it open to the public?
A. Utilities. Utilities, people from



the Hill, staffers. It was an open meeting.
Q. Let me direct your attention, Mr. Morgan, to the seventh paragraph. That paragraph starts, "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do." Do you see that?
A. Yes.
Q. I'm going to give you a chance to read that whole paragraph before I ask you any questions about it.
(Pause.)
A. All right.
Q. The fourth and fifth sentences of that paragraph say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
My question is: With respect to what DOE was required to do in January of 1998, what did you believe at this time was the intent of the Act?
A. We put a mission plan together to where hopefully -- again, this was in the



mission plan. I think it's summarized in the last paragraph of the statement on the next page.
Q. What was the source of your understanding of what the intent of the Act was?
A. I don't recall.
Q. The last two sentences of the -- what did I say that was, the seventh paragraph? -- states that, "The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
Do you see that sentence?
A. Yes.
Q. How did that basic strategy come about?
A. That was my input.
Q. Why did you decide that that was the strategy?
A. That's what I felt was the intent of the Congress. And I think listening to some of the staffers is how I got to that conclusion. But it was my conclusion.
Q. And did the drafts or the outline of the mission plan -- Strike that. Do I



understand you correct that the mission plan, in the state it was when you left, was designed to implement that strategy?
A. That's correct.
Q. So in your view as director of the program, was the mission plan -- Strike that.
Did the mission plan, when you left as director, effectuate the intent of Congress as expressed in the Nuclear Waste Policy Act in your view?
A. I believe so.
Could I add a couple of things to the answer of "I believe so"? There was not uananimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill -- or the House and the Senate.
And I felt that as long as we are getting stoned from both directions that we were about in the right place.
So I don't think that I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, monitored

retrievable storage, because they felt a repository would not be approved by 1998, whereas other people said, "Don't go with the MRS. Put all your effort onto the repository program."

So there was a balancing act that we -- we made compromises as to what was in that mission plan to hit the middle of the road, I guess is the best way to describe it. And I don't think that it really had a full consensus by the House and Senate as to what their intent was.

Do you understand what I'm saying?

Q. Let me ask you a question and I'll see. You can answer my question, and I'll figure that out.

You got conflicting statements from members of Congress --

A. Yes.

Q. -- based on the tactics, for lack of a better word, outlined in the mission plan for meeting the goal.

A. Yes.

Q. Not on the goal.

MR. BANES: Objection. Vague.



A. Well, the goal -- I think that there was -- you know, our goal was to get a repository in by 1998. And there were some members of Congress that said, "Put all the emphasis on an MRS" so that there was a conflict in the goals.

BY MR. BLANTON:

Q. All right, sir. Did the people who said, "Focus on an MRS," was their purpose that you won't be able to get a repository done, so you won't be able to move fuel by '98?

MR. BANES: Objection. Lack of foundation.

A. I cannot -- I cannot, you know, attribute any background or what they felt about it. I just don't know.

BY MR. BLANTON:

Q. As the head of the -- or the acting director of the Civilian Radioactive Waste Management Program, you determined that, as far as your office was concerned, the mission plan at the time you left was the proper way to accomplish the goals?

A. Yes.

(A discussion was had off the



record.)

BY MR. BLANTON:

Q. Back on the record. Mr. Morgan, still looking at Morgan Exhibit 2 and still looking at the seventh paragraph of your Program Overview, the last sentence says, "During the first year of operation" -- the last sentence of the seventh paragraph says, "During the first year of operation of the repository, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."

At this point in time, did you know what that rate was in terms of what quantity of fuel in a year?

MR. BANES: Objection. Calls for a legal conclusion. Go ahead.

A. As I recall, we generally knew the discharge rates from the reactors. There was information available to us. And I recall that there was a company in Atlanta -- and I can't remember the company -- that provided that information. They had it in their database.

BY MR. BLANTON:

Q. Not NAC, is it?



A. Could have been.

Q. So as far as you were concerned, was the rate that was sufficient such that no utility would have to add further storage facilities either on site or at another location, was that rate equivalent to the discharge rate?

A. You notice the next paragraph?

Q. Yes, sir.

A. It says, "So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being . . . ."

Q. Right?

A. So there was a time from '98 to 2001, and in '98 the utilities would be making commitments or possibly commitments for dry storage that would be delivered in the 2000, 2001, but that they wouldn't have to make new commitments for ordering, in that time lag, of commitment to additional storage and then actually having that storage.

So we're talking about hopefully -- In other words, when you start receiving fuel in '98, we're not going to be at full run. There's a start-up lag time. So we felt by the year

2000 or 2001 that we would be meeting the discharge rate.
Q. During your meeting with Congressional staffers when you first received this detail, did the subject of what the rate under the Act should be come up?
MR. BANES: Objection. Irrelevant.
A. I don't recall.
BY MR. BLANTON:
Q. Do you recall what process you went through at DOE internally in arriving at the plan that during the first year of operation we should be -- of the repository in 1998 we should be receiving fuel at a rate so that no utility would have to add any further storage facilities?
Do you recall what the process in DOE was to arrive at that?
A. That was debated and discussed within my staff there. And that was my conclusion.
Q. Okay. Who worked on that issue beside yourself?
A. I would say all the first level



people. I believe in a -- what you would call a collaborative approach to management. I like to have the input discussed before I make a decision.
Q. And by first level people, you are referring to the people who were your direct reports on that organizational chart?
A. Yes, plus Mike Lawrence and McElvey.
Q. Where is Mike Lawrence now? Do you know where he lives?
A. In Richland, Washington.
Q. Does he still work for the Department of Energy as far as you know?
A. No.
Q. Is he retired?
A. No.
Q. Do you know who he worked works for?
A. PNL.
MR. BLANTON: Off the record.
(A discussion was had off the record.)
BY MR. BLANTON:
Q. Do you recall how far in advance of this meeting on December 12 through 15th that DOE arrived -- and really you arrived at this



strategy of picking up fuel at a rate such that utilities would not have to add storage space after 1998?
A. Do I recall?
Q. How far in advance of this December 12 through 15 meeting.
A. I think it was quite some time.
Q. Was it something that evolved over time from the time you got there?
A. Yes.
Q. If I could, let me back up for a second and ask you: Did formal notices go out to various stakeholders about this meeting? Do you recall how it was advertised?
A. There's a certain requirement that I can't recall which says all the stakeholders -- the states, utilities -- had to be involved in a notice. And I believe -- well, I believe that that was accomplished.
Q. All right, sir. It says it was sponsored by the U.S. Department of Energy. Did the Department of Energy fund the meeting?
A. Yes.
Q. Do you recall where it was held? Was it at DOE headquarters, or was it at



someplace else?
A. It was someplace else, as I recall.
Q. Do you know whether you ever discussed the issues that are set out in this Program Overview and specifically the issues discussed in paragraphs seven and eight of the Program Overview?
A. Issues?
Q. Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraph of this Program Overview regarding the intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?
A. Oh, yes.
Q. Did you review this paper with him before you presented it at these proceedings?
A. I had reviewed the initial schedule, a layout of the program, with him in order to get from Point A to 1998.
And in that discussion I do recall saying that this was extremely optimistic, as stated on the next page, that there were many things that were impediments to getting there -- NRC licensing, siting, the siting criteria,

would any of the high-use fuel.
That was -- that was litigated after the final rule by General Electric. And my recollection is that we prevailed and the judge decided in our favor. That was one of the items discussed.
The other item discussed was the rate of acceptance, whether we should have a rate of acceptance or not. And it was decided that we would not put in a rate of acceptance in the contract.
Those are two areas that I recall specifically at this time. I think there were others.
BY MR. BLANTON:
Q. What do you recall about the discussions regarding putting in a rate of acceptance, other than it was -- what the decision was?
A. Well, with the uncertainties and the optimistic schedule that we were looking at, we felt it was inappropriate to commit to a rate at this time in a contract.
Q. Did you view the contract as a mechanism for implementing the intent of



Congress?
A. Absolutely. That was specified in the Act.
Q. Do you recall any other issues, other than the issue on -- that was litigated with GE and the rate of acceptance?
MR. BANES: Objection. Compound.
A. The gross versus net charged to the utility.
BY MR. BLANTON:
Q. Let me ask you another question. We may be able to short-circuit this. Are all the issues that -- do you recall discussing any issues internally in DOE during the contract formation that are not addressed in the notice of rulemaking on the standard contract?
A. No. We only dealt with the comments that we received and resolved. We didn't have any further discussion.
Q. At the time the contract was executed, was your view regarding the intent of Congress in enacting the Nuclear Waste Policy Act the same as it was when you addressed that issue in the Program Overview?
A. One is a contract; the other is a



mission plan. Two different entities. And a mission plan is laying out how to get there.
With the uncertainties that we had facing us in the program, I didn't think it was realistic to include a rate. And there was no objection to that that I know of.
Q. Let me ask the question in a slightly different way. I understand your testimony to be -- and correct me if I'm wrong -- that at the time you gave the Program Overview statement in December of 1983, that it was your view that the intent of Congress in passing the Act was that beginning in 1998 utilities would not have to provide any additional storage facilities on site.
A. No. That wasn't -- The intent was clearly -- you know, they said to accept fuel in 1998. And there was no rate specified.
Q. What was -- so what was the source of your plan to -- as expressed in the Program Overview that beginning in 1998 utilities will not have to provide any additional storage facilities? Why did you say that?
A. Because I thought it made sense. And this is one of the things that was not



defined by Congress in a conference report, which I don't think I could have gotten consensus as to putting a rate in that Congress would agree to.
Q. Was eliminating the need for utilities to add storage facilities on site beginning in 1998 DOE's purpose in drafting the contract the way it drafted it?
A. There was no mention of rate in the contract, no acceptance rate.
And again, I'll say that it was an optimistic schedule presented in the mission plan. And your reference to accepting rate or no new facilities for on-site storage -- again, I'd like to call attention to the fact that in that same testimony I talked about the 2000, 2001, rather than 1998, of matching the discharge so that commitments would be made in '97, '98 for additional storage that would come on line in the 2000 and 2001 period.
Q. I'm still not sure I understand that.
MR. BANES: Objection. Vague.
BY MR. BLANTON:
Q. What's the difference between --

program?
MR. BANES: Objection. Vague.
A. That was basically in my statement of December which said we'd like to catch up with the generating rate in the 2001 period or that time frame.
BY MR. BLANTON:
Q. All right.
A. So that's -- The design of the facility is to accommodate that. It doesn't say when. We would like to have that -- the repository not only take the generating rate but, more than that, to get rid of the backlog. That was the intent of sizing the facility. And that hasn't changed.
Q. Let me get you to take a look at Defendant's Exhibit 4, again, and get you to refer to page 16598.
A. Yes.
Q. If you would just read to yourself the paragraph that says, "Similarly, seven commenters addressed the DOE performance standards . . . ."
(Pause.)
A. Yes.



Q. At the seventh line from the bottom of that paragraph, it says, "The 1998 date is called for in the Act, and we believe it to be a realistic date." Do you see that?
A. Yes.
Q. Was that a true statement at the time that the final contract was issued?
A. That's, again, what I testified in December, that it was an optimistic date but that we believed that we could meet it barring intervention and all the other uncertainties that the Act had.
Q. But at this particular time, DOE believed it was realistic?
A. Optimistically realistic.
Q. I don't see "optimistic" in the sentence. Do you?
MR. BANES: Objection. Argumentative.
A. That's in my statement of December 12.
BY MR. BLANTON:
Q. The next sentence says, "Our performance will be judged by meeting this date." Could you elaborate on that, what that



means?
A. Exactly what it says.
Q. What, in your view, was DOE's performance?
A. Meeting that date.
Q. By doing what?
A. Accepting spent fuel in 1998.
Q. What quantity of spent fuel in 1998 would have satisfied DOE's obligation as stated in that?
MR. BANES: Objection. Calls for a legal conclusion.
A. As I said in the December 12th, that if we accepted one spent fuel element in 1998, we would have met the requirements of the Act as specified, but we did not think that was the intent of the Act.
So the answer to the question, one spent fuel element.
BY MR. BLANTON:
Q. What did you think the intent of the Act was?
MR. BANES: Objection. Irrelevant. Calls for a legal conclusion.
A. I have no idea. That's drawing a



conclusion. I didn't participate in the preparation of that Act.
BY MR. BLANTON:
Q. Well, as the director of the program, was the intent of Congress a factor in what you did?
A. Absolutely.
Q. And what was your working definition of what the intent of Congress was as to the quantity of spent fuel that should be accepted?
MR. BANES: Objection. Calls for a legal conclusion. Irrelevant.
A. Yeah. I can only read intent as to what the words required in the Act, which required the acceptance in 1988 of -- or 1998 of spent fuel.
And as I said on the 12th, to meet that, those words, would be one spent fuel element. That was my comment then. It's the same.
BY MR. BLANTON:
Q. I don't want to argue with you about it, but you said in the next sentence that was not the intent of Congress. And my question is directed to what was your understanding what the

intent of Congress was.

MR. BANES: Objection. Lack of foundation. Irrelevant. Calls for a legal conclusion. Asked and answered.

A. I have no idea, because I could get different answers by talking to different people in Congress. And that was part of my problem.

BY MR. BLANTON:

Q. How is it, then, that your performance would have been judged?

A. By meeting the date of 1998 in accepting a fuel element in 1998.

Q. Not withstanding that that didn't meet the intent of Congress?

A. I don't know if it did or not.

MR. BANES: Objection. Mischaracterizing prior testimony.

A. Excuse me.

BY MR. BLANTON:

Q. Let's stay on this paragraph for a minute, the one I just had you on.

A. We're back on 4?

Q. Yes, sir. Page 16598.

A. Okay.

Q. The previous part of that paragraph



refers to performance standards and the commenters addressing the question of DOE performance standards and remedies with respect to performance. Do you see that?

MR. BANES: Objection. Misleading.

A. Where are we?

BY MR. BLANTON:

Q. The paragraph that says, "Similarly, seven commenters addressed the question of DOE performance standards . . . ."

A. Right.

Q. The last sentence in that paragraph says, "If the intent of the Act was to have intermediate performance standards or dates, they could have been specified in the Act."

What did you mean by "intermediate performance standards"?

A. Intermediate milestones.

Q. Can you give me an example of what something like that would be?

A. When we would break ground, when we would complete performance evaluation of a given site, when we would select a site. Those are interim performance standards or milestones in



my mind.

Q. Is that --

A. Specific items that they wanted us to do by a given date.

Q. I apologize for interrupting you.

Is that what you understood the commenters who addressed the question of DOE performance standards would be talking about?

A. That's my understanding.

Q. Anything else? Any of the performance standards comments relate to anything else?

MR. BANES: Objection. Asked and answered.

A. I have no recollection.

MR. BANES: Is this a good place for a break?

MR. BLANTON: Yeah. That's fine.

(A recess was taken.)

BY MR. BLANTON:

Q. Mr. Morgan, why did your office --

And when I say "your office," can we agree that's either OCRWM or the Nuclear Waste Policy Act Project Office, whichever it was at the time?



A. Yes.

Q. Why did your office adopt a strategy of trying to eliminate or remove spent fuel from reactor sites such that utilities wouldn't have to add any storage facilities after 1998?

MR. BANES: Objection. Vague.

A. We wanted to establish in the mission plan -- and as covered here, the comments by many of the utilities were made regarding the acceptance rate. And we put that in the mission plan but did not include that in the contract.

BY MR. BLANTON:

Q. But my question is: Why was that your goal?

A. That's what the utilities wanted.

Q. Is that what you thought Congress wanted, too?

MR. BANES: Objection. Lacks foundation. Asked and answered.

A. I cannot, you know, be specific as to what the intent of Congress was. What we were doing was complying with the Act.

I don't think there was a consensus in Congress as to the rate of acceptance,

Mission Plan. The underlying premise is that DOE will accept waste in 1998 at a rate sufficient so no additional utility-owned storage capacity is required during the first five years. Therefore, the acceptance rate will be at least equal the utility spent fuel discharge rate." You see that statement?

A. Yes.

Q. And that premise was the premise that PNL was given to make this determination regarding fee adequacy. Is that correct?

A. Yes.

Q. And, in fact, that premise was the DOE's policy at the time. Isn't that correct?

MR. BANES: Objection.

A. It was the mission plan goal, planning document. I don't think it was policy. Okay? There's a difference in my mind between planning and policy.

MR. BANES: He has explained that difference about four times now.

MR. HIRSCH: Did I ask him a question?

MR. BANES: I mean, we are getting dangerously close -- I'm just going to



state for the record my objection, if you don't mind.

MR. HIRSCH: Fine.

MR. BANES: If we are going to go over the same language in different documents, I consider that the same question.

BY MR. HIRSCH:

Q. Do you see -- Why don't you look at page -0238 of this document, Mr. Morgan.

A. Got it.

Q. You see there's a heading there, Repository Deployment Variations?

A. Yes.

Q. Why don't you read those two paragraphs to yourself for a minute.

(Pause.)

A. Yes.

Q. Did you see the statement, "To meet the planed DOE waste acceptance schedule, the MRS must have the same receiving rate as the replaced repository or repositories, i.e., 3,000 MTU maximum receipt rate if the delay is longer than five years, and a total capacity of 3,000 metric tons for each year of delay."

Did you read that statement to



indicate that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year --

A. I think the --

MR. BANES: Objection.

THE REPORTER: I can only take one at a time.

BY MR. HIRSCH:

Q. I have to finish the question, and then Mr. Banes can object, and then you can answer. I apologize, but otherwise she's got three people talking.

A. All right.

Q. Did you understand the statement that I just read from this document to mean that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year by the sixth year after the repository opened and 3,000 tons per year after that?

MR. BANES: Objection. Asked and answered.

You don't have to answer it if you don't want to. You've answered it several times.

MR. HIRSCH: He has not answered



this question.

A. I'll say it again. This is consistent with what we have already discussed relative to the mission plan. So that's correct. It was in the plan. It was in the mission plan. This is definitely consistent with the mission plan.

BY MR. HIRSCH:

Q. So the rate that's described on page -238 is the same rate that was identified in the mission plan. Is that correct?

A. Yes. That's my understanding. We've been through that.

Q. All right. We won't do it anymore.

A. Thank you. I'm sorry.

MR. HIRSCH: Why don't we take a break here.

(The deposition was adjourned at 5:30 p.m. and resumed at 8:00 a.m. on Friday, March 22, 2002. The transcript of proceedings is continued in Volume 2.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------X

NORTHERN STATES POWER :
COMPANY, :
Plaintiff, : No. 98-484C
v. : (Senior Judge Wiese)
UNITED STATES OF AMERICA, :
Defendant. :

--------------------------------X

Washington, D.C.
Wednesday, November 15, 2006

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, N.W., Washington, D.C. at 3:32 p.m., Wednesday, November 15, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
ALEX D. TOMASZCZUK, ESQ.
JAY E. SILBERG, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
1300 N Street, N.W.
Washington, DC 20037
Phone: 202-663-8000

KERRY C. KOEP, ESQ.
Xcel Energy
414 Nicollet Mall
Minneapolis, MN 55401
Phone: 612-215-4583

Page 3

APPEARANCES: (CONT.)

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Phone: 202-307-6288

Page 4

CONTENTS


| WITNESS | PAGE |
|---|---|
| ROBERT L. MORGAN | |
| EXAMINATION BY COUNSEL FOR PLAINTIFF | 6 |


EXHIBITS


| EXHIBIT NO | DESCRIPTION | PAGE |
|---|---|---|
| Morgan 1 | Excerpt from proceedings, December of 1983, Program Overview Question Marked | 16 |
| Morgan 2 | Document dated March 3, 1983, from Northern States Power Company to Mr. Robert Morgan | 64 |
| Morgan 3 | Federal Register notice dated Monday, April 18, 1983 | 79 |
| Morgan 4 | Comments on contract for disposal of spent nuclear fuel and/or high level waste | 99 |
| Morgan 5 | "Comments" cover letter from Mississippi Power and Light Company to Mr. Robert | 101 |


Page 5

EXHIBITS (CONT.)


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Morgan 6 | Document dated March 7, 1983 from Edison Electric Institute to Mr. Robert Morgan, from John Kearney, senior vice president Morgan dated March 4, 1983 | 102 |
| Morgan 7 | Excerpt of a document dated December 20, 1983, draft of the Civilian Radioactive Waste Management program mission plan | 110 |


** Exhibits retained by counsel

Page 18

Q. Do you have an understanding why you were selected to leave your position at Savannah River and to take the acting director position of OCRWM?
A. You'll have to ask him.
Q. You have no knowledge about that?
A. No. I believe that I made an offhand comment in a deposition -- which may or may not be correct --
Q. Well, I'm not sure -- I have re-read that deposition. I'm not sure I read the particulars of that comment.
A. You said because I was a good guy, making a smart-aleck comment.
Q. Did you have any questions for Secretary Hodel at the time he detailed you to the acting director position?
A. I was notified I think on a Thursday that the Secretary wanted to name me as director, acting director. And I responded to, I believe it was Earl Gelde, the special assistant, I'd like time to think about it. And he said that the Secretary intended to announce it on Monday morning at the staff meeting.

Page 19

So I suggested to Earl that if there be several conditions imposed, that I would accept.
Q. What were the conditions?
A. Separate office. That I would not report to Assistant Secretary for Nuclear Energy. That I could name the people who would be on my staff from that office. Also office space. And secretarial services.
Q. Why was it -- I'm sorry. Did you finish your answer?
A. I think that's about what I can recall at the moment.
Q. Why did you request that you not report to the Office of the Assistant Secretary?
A. Because the Act said it would be an independent office, and I wanted to make sure that that was the case.
Q. When you say "the Act," you are referring to the Nuclear Waste Policy Act?
A. Yes.
Q. Had you had occasion prior to being tapped by Secretary Hodel to read the Act?

Page 20

A. No.
Q. After you got the phone call on the Thursday --
A. I was in Washington, D.C. at the time. It was not a phone call.
Q. I see. Okay.
Did you then have occasion to read the Act?
A. Yes, of course.
Q. You were in Washington at the time on other official business?
A. Yes. I was on travel at the time.
Q. All right. At the time you were also living in Savannah River, would I understand that correctly?
A. That's correct. I was living in Aiken, South Carolina.
Q. So you had to go back to Aiken and move yourself up here to take the position?
A. I was on temporary duty, and I kept my home in South Carolina and traveled to accommodate this requirement.

Page 21

Q. Okay. What did you do first when you took the position of acting director of OCRWM?
A. I read the Nuclear Waste Policy Act.
Q. A good first step.
After reading it, what was step number two?
A. I reviewed the staff requirements and selected people that I wanted on my staff. And rejected some people who were currently on that staff.
Q. All right.
A. Then I met with the congressional staff members.
Q. You met with congressional staff members?
A. Yes, sir.
Q. And why did you do that, sir?
A. To try to understand what was behind the Act, because there was no conference report relative to this Act that resolved the differences between the Senate and the House.
Q. And were you able to resolve those differences in the course of your communications with

Page 22

staff members on the Hill?
A. No.
Q. And what was your reaction to that circumstance?
MS. SULLIVAN: Objection. Vague. You can answer. I made an objection. Now you can answer the question. If you understand it.
THE WITNESS: Repeat the question, please.
BY MR. TOMAZCZUK:
Q. Sure.
After not being able to resolve these apparent conflicts between the Senate and the House side, what did you go about -- or what was your reaction to that?
A. My reaction was --
MS. SULLIVAN: Objection. Vague. Objection to the extent it mischaracterizes the witness's prior testimony. You can answer.
THE WITNESS: My reaction was to read the Nuclear Waste Policy Act and to best determine how to proceed based on that understanding.
BY MR. TOMAZCZUK:

Page 23

Q. Did you essentially conclude you had to come up with your own interpretation of the Act, not being able to get it from a conference report or other congressional source?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Go back and ask the question again. I'm sorry.
BY MR. TOMAZCZUK:
Q. Sure. Did you basically conclude that you had to come up with your own interpretation of the Act, having no conference report and having not been able to get guidance from meetings with the Hill?
A. Yes.
Q. All right. What did you conclude, Mr. Morgan, was the purpose of the Act?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
THE WITNESS: The purpose of the Act was to accept spent nuclear fuel in January 1998 from the utilities.
BY MR. TOMAZCZUK:
Q. Were there any other purposes that you

Page 24

derived?
MS. SULLIVAN: Objection, to the extent it calls for a legal conclusion. Vague.
THE WITNESS: The Nuclear Waste Policy Act had several activities that needed to be done, and acceptance of fuel in 1998 was the end product, but there were several intermediate requirements that were required.
BY MR. TOMAZCZUK:
Q. Was one of the purposes of the Act, in your view, the need to avoid utilities having to construct additional at-reactor storage after 1998?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
BY MR. TOMAZCZUK:
Q. You can go ahead unless she instructs you not to answer.
A. Okay. Question again?
Q. Could you read that back?
THE REPORTER: "Question: Was one of the purposes of the Act, in your view, the need to avoid utilities having to construct additional at-reactor

Page 25

storage after 1998?"
THE WITNESS: No.
MS. SULLIVAN: Same objection.
BY MR. TOMAZCZUK:
Q. That was not one of the purposes of the Act, in your view?
MS. SULLIVAN: Same objections.
THE WITNESS: That's correct.
BY MR. TOMAZCZUK:
Q. All right. Let's look at what's been marked as Morgan Deposition Exhibit No. 1.
You are familiar with this document, correct?
A. Yes.
Q. This is a document that you actually prepared; is that right?
A. Yes.
Q. And if I understand your prior testimony, Mr. Morgan, you prepared this in writing and then actually spoke about this document at the conference which was held in or about December of 1983?
A. That's correct.

Page 26

MS. SULLIVAN: Objection. Compound.
THE WITNESS: That's correct.
BY MR. TOMAZCZUK:
Q. All right. And I am going to direct your attention -- take a minute and read it if you'd like.
A. No. I don't need to.
Q. Okay. All right.
I was going to direct your attention to the first page, right-hand column, and the second to the last paragraph, starting with "I would like..."
A. Yes.
Q. All right. In the third sentence of that paragraph, you state, "Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time."
A. That's correct.
Q. All right. And "at that time" meaning January 1, 1998, correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer.
THE WITNESS: Repeat the question.
BY MR. TOMAZCZUK:

Page 27

Q. "At that time" refers to January 1, 1998? The phrase at the very end of the sentence I just read, "at that time," does that refer to the date in the previous sentence, January 1, 1998?
A. Yes.
Q. Thank you. You go on to state, in fact, if we accepted one spent fuel in 1998, we would technically be in accordance with the Act?
A. Yes.
Q. Do you believe that to be true?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
MR. TOMASZCZUK: Let me say for the record, I'm not asking you for legal conclusions. You're not an attorney. I'm asking for your understanding of this language that you wrote in or about 1983.
THE WITNESS: That was a bounding requirement. In other words, you would accept fuel, one element being at one end. And at the other end of that spectrum would be to the following statement, which was to accept it at the rate of discharge.

Page 28

Those were bounding conditions that we were looking at at that point in time.
BY MR. TOMAZCZUK:
Q. What do you mean by bounding conditions?
A. Well, one, what was written in the Act is accept fuel in 1998. So I could accept one or I could accept at the limit of discharge from the utilities. That was the spectrum that we were dealing with.
Q. Okay. And what was your view as to the intent of the Congress in enacting the statute with respect to those boundaries?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. And I have to say, notwithstanding Mr. Tomaszczuk's understanding that he's not asking you to make legal conclusions, you're not a lawyer, I do need to put the objections on the record. I'm making the objections. Then you can answer the question. Thank you.
You can ask the question be read back.
THE WITNESS: For me to say what the intent of Congress is would be inappropriate, because

Page 29

the various views that I was hearing from Congress, some were talking about solely using an MRS for storage of fuel. Others were talking about a repository.
It would be inappropriate for me to try to describe the intent of Congress.
BY MR. TOMAZCZUK:
Q. And you had no understanding about the intent of the Congress in enacting the statute?
MS. SULLIVAN: Objection. To the extent -- withdraw that.
THE WITNESS: I would say that that would be a difficult thing for me to determine. The intent of Congress as a whole, because I was hearing different views from various sides of the House and Senate.
BY MR. TOMAZCZUK:
Q. That's fair. And I'm just trying to understand what you're understanding of the intent was. Are you saying that you could not discern the intent because you were getting conflicting signals?
A. That's correct. I was getting conflicting

Page 30

signals.
Q. All right.
MS. SULLIVAN: Can we go off the record?
MR. TOMASZCZUK: Sure.
MS. SULLIVAN: Just two minutes. I'm sorry.
(Discussion off the record.)
BY MR. TOMASZCZUK:
Q. You were talking about these two boundaries or bounds, one being one spent fuel rod and the other being what I understood to be the discharge rate?
A. Yes.
Q. All right. Did you ever look at taking a rate or accepting fuel at a rate greater than the discharge rate while you were the acting director?
A. Yes.
Q. Okay.
A. That was in the mission plan which you have a copy of.
Q. Okay. Why did you do that, if you had these two bounds?

Page 31

A. To work off the backlog.
MS. SULLIVAN: Mr. Morgan, I would ask, so the court reporter can take the questions, let Mr. Tomaszczuk ask the question, let me -- let me have a chance to object. Then you can provide the answer. I understand you'd like to get this over with. It makes the job easier for the court reporter. Thank you.
BY MR. TOMASZCZUK:
Q. Did you understand at the time that the Department of Energy had an obligation under the Nuclear Waste Policy Act to take all of the utilities' spent nuclear fuel over some period of time?
A. Yes.
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
MS. SULLIVAN: Thank you.
BY MR. TOMASZCZUK:
Q. Going back to Morgan Deposition Exhibit No. 1, continuing on in the paragraph on the

Page 32

right-hand column, just to go back where I was, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
And why did you believe that accepting one spent fuel element would not meet the intent of the Act?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: It said we have to accept fuel January 1998. To meet that requirement would be to accept one fuel element. Common sense says that that is not the intent of Congress.
The utilities wanted an acceptance rate equal to the discharge rate. And going back, that was the bounding conditions that we were looking at.
We were trying to put together a strategy, a plan that would take care of the discharge rate that we could see.
BY MR. TOMASZCZUK:
Q. And why were you attempting to do that?

Page 33

MS. SULLIVAN: Objection. Vague.
THE WITNESS: That was what the interpretation -- our interpretation of the maximum program that we could comply with.
BY MR. TOMASZCZUK:
Q. Reading on in the same paragraph of the same document, Morgan Deposition Exhibit No. 1, the text continues, "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on site."
A. Okay.
Q. And --
MS. SULLIVAN: Let him ask the question.
BY MR. TOMASZCZUK:
Q. You wrote that sentence, correct?
A. Yes.
Q. You were the acting director at the time?
A. That's correct.
Q. This reflects your view at the time; is that fair?
A. That reflects what we were trying to

Page 34

accomplish in the mission plan.
Q. Does it also reflect what you were trying to accomplish as the director of the program?
A. Yes.
Q. And is it your view that that strategy comported with the intent of Congress in enacting the statute?
MS. SULLIVAN: Objection. Legal conclusion.
THE WITNESS: That was basically what the utilities wanted us to achieve. That was, again, the bounding condition, from one to the acceptance rate which would be at the discharge rate.
BY MR. TOMAZCZUK:
Q. I appreciate that. But my question was, this strategy which you've articulated, namely that beginning in 1998, utilities will not have to provide any additional storage facilities on site, does that strategy comport with your understanding of the intent of Congress in enacting the Nuclear Waste Policy Act?
MS. SULLIVAN: Objection. Legal

Page 35

conclusion. Asked and answered.
THE WITNESS: I do not know the intent of Congress. I think I've discussed that earlier. It was impossible for me to determine what the intent of Congress was.
BY MR. TOMAZCZUK:
Q. Do you think the strategy that I've just read that you adopted was inconsistent in any way --
A. No.
Q. -- with Congress' --
MS. SULLIVAN: Mr. Morgan, let Mr. Tomaszczuk finish.
THE WITNESS: Excuse me.
BY MR. TOMAZCZUK:
Q. Was inconsistent in any way with Congress' intent in enacting the Nuclear Waste Policy Act?
MS. SULLIVAN: Legal conclusion.
THE WITNESS: No.
BY MR. TOMAZCZUK:
Q. And in the last sentence of this section of the program overview that you authored, it stated, "During the first year of operation of the

Page 36

repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."
A. That's not entirely correct. If you look at the program plan, the mission plan, you will see that there was an increase of the backlog for the first three or four years. The intent was that they would not have to make further commitments for on site storage in 1998, but they would have already provided contracts for those that they would not have to make any additional long-term commitments in 1998. There is a difference.
Q. So this last sentence that I read from the program overview that you drafted is not quite correct?
A. That's correct. And that's in the mission plan that came out subsequent to this meeting.
Q. Earlier in your testimony, Mr. Morgan, I think you used the term or words to the effect that the maximum program that DOE could comply with, or words to that effect. I understood you to be using

Page 37

that term to describe the upper bounding case?
A. Yes.
Q. Do you mean that from a technical standpoint, that there was a technical limitation as to how much spent fuel DOE could accept?
A. There were many, many uncertainties relative to the accomplishment of this program. It's a new technology. It required NRC licensing of the facility. We did not know the licensing requirements. There were political issues.
There were the consultation issues. There was congressional intervention problems, changing the Nuclear Waste Policy Act.
So that the uncertainties in the program led me to the bottom line that says I cannot make a commitment to the utilities to accept X number of fuel elements at any given point in time. It would be unconscionable for me to do that as a public servant.
Q. What were the consultation issues that you just referred to?
A. Consultation required consultation with

Cooley
GODWARD KRONISH LLP

Gregory A. Smith
(703) 456-8163
gsmith@cooley.com

VIA EMAIL AND U.S. MAIL

May 27, 2008

The Honorable Edward J. Damich
Chief Judge
United States Court of Federal Claims
717 Madison Place, N.W.
Washington, DC 20005

Re: Report of the *Ad Hoc* Committee on Related Cases of U.S. Court of Federal Claim Advisory Council

Dear Chief Judge Damich:

As you are aware, in November 2006 I established an *Ad Hoc* Committee of the Advisory Council to review the October 2006 "Final Report and Recommendations" of the Court's Bar Association, which included recommended changes to Rule 40.2 of the Rules of the U.S. Court of Federal Claims. Thereafter, in March 2007, the Section of Taxation of the American Bar Association submitted a letter to the Court in which it recommended similar changes to Rule 40.2. I asked the *Ad Hoc* Committee to review that recommendation as well.

The first action of the *Ad Hoc* Committee on Related Cases was to prepare a letter to the Court describing the Committee's basic view that changes to the Rule were appropriate and needed to facilitate the handling of related cases. That March 21, 2007 letter reflected the unanimous view of the Committee. The *Ad Hoc* Committee then turned to consideration of the changes to Rule 40.2 that would be recommended to the Advisory Council and the Court. After many meetings, research regarding the handling of related cases by the Multi-District Litigation panel, shared drafts of proposed changes and explanations of the changes, the Committee completed its final report on May 14, 2008. That report included suggested changes to Rule 40.2 that borrowed from the earlier proposals of both the Court's Bar Association and the ABA Section of Taxation, and reflected the unanimous view of the Committee.

The report of the *Ad Hoc* Committee was presented to the Advisory Council at a special meeting on May 21, 2008 where it was discussed at length and unanimously approved by the Advisory Council. Enclosed with this letter is the report of the *Ad Hoc* Committee, with the minor clarifications agreed upon during the Advisory Council's May 21 meeting. The report includes an initial section describing the process followed by the *Ad Hoc* Committee, the specific changes to Rule 40.2 that are being recommended, and a section-by-section commentary on the reasons for the suggested changes. I am transmitting the report to the Court on behalf of the Advisory Council.

Cooley
GODWARD KRONISH LLP

Chief Judge Edward J. Damich
May 27, 2008
Page Two

If the Advisory Council or the *Ad Hoc* Committee can answer any questions the Court might have concerning the report, please let me know.

Sincerely,

Gregory A. Smith

Chair
U.S. Court of Federal Claims Advisory Council

cc: The Honorable Thomas C. Wheeler

Members of the *Ad Hoc* Committee
Jerry Stouck (Chair)
Jeanne Davidson
Brad Fagg
Mel Garbow
David Gustafson
Prof. Greg Sisk

Members of the Advisory Council

ONE FREEDOM SQUARE, RESTON TOWN CENTER, 11951 FREEDOM DRIVE, RESTON, VA 20190-5656 T: (703) 456-8000 F: (703) 456-8100 WWW.COOLEY.COM

# REPORT OF THE AD HOC COMMITTEE ON RELATED CASES OF THE COURT OF FEDERAL CLAIMS ADVISORY COUNCIL

May 21, 2008

## WORK OF THE AD HOC COMMITTEE

The Ad Hoc Committee on Related Cases was convened at the request of the Chief Judge in late 2006. The Committee members are Mel Garbow, Brad Fagg, Jeanne Davidson, Jerry Stouck, David Gustafson, Professor Greg Sisk and Advisory Council Chair Greg Smith *ex officio*. Mr. Garbow served as Chair of the Task Force until recently, when he asked to step down and Mr. Stouck was appointed Chair. In addition, Judge Wheeler recently began to serve as the Court's liaison to the Committee.

From the outset the Committee recognized that the questions of whether and how related cases can be managed in a coordinated way implicates a number of underlying policy concerns that are in some tension with one another. One important concern is the historical independence of individual Judges on the Court, who may understandably be reluctant to yield responsibility for any aspect of a case assigned to them. Cutting the other way is the demonstrable (and avoidable) delay, cost and inefficiencies that arise when cases involving some common issues are not managed in a coordinated way. A third important factor is the right of parties to litigate their own cases in the manner they deem optimal, without undue interference from other cases or from case management procedures imposed by others. As noted, these concerns have conflicting implications, both for the desirability of managing related cases in a coordinated way and for the particular form that such coordinated management may take.

Notwithstanding these disparate concerns, there has been broad consensus among the Committee's members – from both the private and the Government bar – that the Court needs a more effective Rule to govern the management of related cases. Specifically, after initial discussions the Committee unanimously agreed and reported to

the Chief Judge in a letter dated March 21, 2007, that the Court's current Rules 40.1 and 40.2 "have not provided consistently effective tools for dealing with related cases." As also reported in that letter, it was "the Committee's strong view that related cases pose special challenges to the Court that require more effective solutions." The Committee expressed the unanimous view that "the Court would be well-served if it implemented more effective case management procedures on a Court-wide basis."

Subsequently, the Committee's work included careful consideration of the proposed revisions to the Court's related case rules that were made by the Court of Federal Claims Bar Association in October 2006 and by the ABA Section of Taxation in March 2007. In addition, the Committee considered the applicability to related cases of the procedures used in multi-district litigation ("MDL") in the district courts. The Rule that the Committee proposes is similar in format and in many particulars to the Bar Association's proposal, although the proposed Rule also contains different and additional provisions, some of which are significant. The proposed Rule also incorporates elements from the ABA Tax Section proposal, and it explicitly notes the option to use the MDL procedures to manage related cases.

Ultimately, in drafting the proposed Rule set forth below the Committee considered the following issues, which are addressed in the proposed Rule in the manner and to the extent that the Committee unanimously deemed appropriate:

1. Is the distinction drawn in the current rule between directly related cases and indirectly cases useful, and if so, is the proper treatment of directly related cases to assign all of them to the judge in the earliest-filed case as the current rule provides? Or alternatively, should the same rule and procedures apply generally to all related cases?

2. Should a particular group of cases be considered related cases (or indirectly related, if such are to be handled separately from directly related case) subject to *possible* coordinated treatment of some type under the rule?

3. What are the factors to be considered in deciding whether a group of cases are related and subject to possible coordinated treatment of some type?

4. Who or what group or body should make the decision on whether a group of cases should be considered related and subject to possible coordinated treatment? Should that same person or group or body decide what kind of coordinated treatment is warranted, *e.g.*, only coordinated discovery, or formal consolidation or some other type of coordinated treatment?

5. Once a group of cases are considered related and subject to coordinated treatment, what form should the coordinated treatment take? Sub-issues include:

a. Should the rule impose any constraints on the appropriate type of coordinated treatment, or, conversely, is it appropriate to provide open-ended authority to fashion appropriate case management procedures similar to the direction in current Rule 40.2(b)(3) that permits the panel of three Judges to "determine what, if any, action is appropriate."

b. Should the rule limit coordinated treatment to only discovery matters, or only pre-trial activities (the MDL model)?

c. What other constraints, if any, are appropriate?

d. How and to what extent should the parties' preferences on any of the above be (a) solicited, and (b) respected, particularly if they are in agreement?

## THE PROPOSED RULE

### RULE 40.2 RELATED CASES

(a) **Related Cases Panel.** The chief judge shall designate a standing panel of three judges to take such actions as are authorized under this rule. The panel members shall designate one among them to be the presiding officer of the panel. Decisions of the panel shall be determined by majority vote. The members of the panel and the presiding officer shall be identified on the Court's website.

(b) **Filing of Notice.**

(1) At the time the complaint is filed, the plaintiff shall file a Notice of Related Case(s) if the existence of a related case is then known. Where the existence of related cases becomes apparent only after the complaint is filed, Notices of Related Case(s) shall be filed by any party in all related cases and served on all parties who have entered an appearance in the cases.

(2) Two or more cases are deemed related when the cases:

(A) involve the same contract, property, or patent; or

(B) are based on the same or similar claims and present common issues of fact or law, and transfer, consolidation, coordinated discovery or other common or coordinated proceedings would significantly promote the efficient administration of justice.

(3) The notice shall include: (i) the name and docket number of each of the related cases; (ii) the specific action proposed by the filing party, whether involving transfer, consolidation, coordinated discovery, or other common or coordinated proceedings; and (iii) the reasons supporting the proposed action. Counsel shall serve all parties in the related cases.

(c) **Proceedings on Notice.**

(1) Each non-noticing party shall respond to the notice within 14 days. If a responding party requires significant additional information to respond substantively, the response shall so state, all noticing parties shall then provide pertinent information requested by such responding party, disputes over information requests and responses shall be resolved by the presiding judge of the Related Cases Panel, and the responding party shall file a substantive response as soon as possible but not later than 60 days after the notice.

(2) The response shall state that the responding party either agrees or disagrees that the cases are related. Agreement by all parties in the cases in which Notices are filed shall be determinative of the issue of relatedness. If a responding party

disagrees that the cases are related, the response shall state the grounds for the disagreement. If the responding party agrees that the cases are related, the response shall either agree to the specific action proposed by the noticing party, or propose other specific action for the cases of a type contemplated by this Rule or that no such action be taken and state the reasons for the alternative proposal.

(3) Where a Notice of Related Case(s) is filed, the clerk shall refer the notice as well as all responses to the Related Cases Panel. The panel may, in its discretion, order additional briefing, hear oral argument, or conduct other proceedings on the notice. If all parties agree or if the panel determines that any or all of the cases in question are related, the panel may order transfer, consolidation, adoption of a coordinated discovery schedule, or other action not prohibited by these rules for the related cases. Or, the panel may order that the related cases proceed in accordance with the procedures applicable to multi-district litigation in federal district courts. Before ordering any of the preceding actions, the panel shall confer with the judge(s) assigned to the related cases. If the panel determines that one or more of the cases in question are not related, those cases shall proceed before the assigned judges and the panel shall return any unassigned cases to the clerk for random assignment.

(4) Whenever feasible, the Related Cases Panel shall set forth the basis for its action in a written Order, as a guide for other cases deemed similar. After the issuance of the final order or relief in response to the Notice of Related Case(s), the panel's duties under this Rule shall be discharged, and the panel shall have no continuing authority with regard to the related cases.

## SECTION-BY-SECTION COMMENTARY

Section (a)

The Committee believes a panel of three judges provides an appropriate body to address the related case issues covered by the Rule, but saw no reason to limit the panel to senior judges, as the Bar Association's proposal would have. The Committee also believes that the identity of panel members should be made known to the bar and the public.

Section (b)(1)

This provision is identical to the Bar Association's proposal. The Committee has generally adopted the format and thus the procedural aspects of the Bar Association proposal. Although the ABA Tax Section proposal would retain the format and procedural aspects of the current Rule 40.2, the procedural aspects of the two formats do not differ substantially.

Section (b)(2)

The definition of related case includes both directly-related and indirectly- related cases as defined in the current Rule. The Committee believes one rule can appropriately address both types of cases. New section (b)(2)(B) is worded broadly to embrace the cases described in current Rule 40.2 (a)(1)(A), and any set of cases that involve the same or similar claims plus common questions of fact or law.. An important consideration under this subsection in determining whether cases are related is whether common or coordinated proceedings would significantly promote the efficient administration of justice.

Section (b)(3).

This provision is identical to the Bar Association's proposal.

Section (c)

Sections (b)(4) and (b)(5) of the Bar Association proposal have been revised and re-designated as section (c) of the new Rule.

Section (c)(1)

This section recognizes that in some cases, which the Committee expects will be relatively rare, a party receiving a notice of related case may require significant additional information before responding. It therefore provides a means of obtaining such information prior to the filing of a substantive response, which in all events must be file by 60 days after the notice.

Section (c)(2)

This provision includes the substance of subsection (b)(3) of the Bar Association proposal. It also adds the requirements that each responding party state reasons for any disagreement over whether cases are related, and state a position and reasons for it on whether the action proposed by the noticing party for the related cases is appropriate and if not propose an alternative, which may include no coordinated treatment of the related cases.

Section (c)(3)

The first two sentences of this provision are identical to the Bar Association proposal, and the fifth and sixth sentences are substantially identical. The balance of this section (third and fourth sentences) mention a broader range of actions than did that proposal, or the ABA Tax Section proposal, that the Related Cases Panel may order for related cases. For example, MDL procedures are specifically noted. However, this section is not substantively different than either the Bar Association proposal or the ABA Tax Section proposal, both of which would confer broad "catch-all" authority. The Committee believes the Related Cases Panel should have broad authority to tailor common or coordinated actions to particular related cases, and that the positions of the involved parties and the advocacy process will provide sufficient protection against ill-advised actions. The proposed rule (like both the Bar Association proposal and the ABA Tax Section proposal) requires that, before ordering any action for related cases, the Related Cases Panel confer with the judges assigned to the related cases.

Section (c)(4)

The first sentence of this section is new, and reflects the Committee's belief that written explanations of the basis for actions taken by the Related Cases Panel will be of value to the Court and to the bar generally in the cases involved in other cases. The second sentence is identical to one contained in the Bar Association proposal, and reflects the Committee's believe that the Related Cases Panel should have no on-going rule in the related cases.

## Ad Hoc Committee on Related Cases

Jeanne E. Davidson, Esq.
Director
U.S. Department of Justice
Commercial Litigation Branch
Civil Division U.S. Department of Justice
100 L Street, N.W., Room 12044
Washington, D.C. 20530

Brad Fagg, Esq.
Morgan Lewis & Bockius
111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Melvin C. Garbow, Esq.
Arnold & Porter
Thurman Arnold Building
555 Twelfth Street, N.W.
Washington, DC 20004

David Gustafson, Esq.
Tax Division US Department of Justice
P.O. Box 26
Ben Franklin Post office
Washington, DC 20044

Prof. Gregory Sisk
University of St. Thomas School of Law
MSL 400
1000 LaSalle Avenue
Minneapolis, MN 55403

Jerry Stouck, Esq.
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 200037

The Honorable Thomas C. Wheeler
U.S. Court of Federal Claims
717 Madison Place, N.W.
Washington, DC 20005

Gregory A. Smith (*Ex Officiò*)
Cooley Godward Kronish LLP
Reston Town Center
11951 Freedom Drive
Reston, VA 20190

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 21st day of August, 2008, a copy of this **"**DEFENDANT'S MOTION TO COORDINATE DISCOVERY AND DEVELOP A LITIGATION PLAN FOR THE SPENT NUCLEAR FUEL CASES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Marian E. Sullivan